# Exhibit 1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| FAIR ISAAC CORPORATION, | Case No. 1:17-cv-08318 |
|     Plaintiff/Counterclaim Defendant, | |
|     v. | Honorable Sharon Johnson Coleman |
| TRANS UNION LLC, | |
|     Defendant/Counterclaim Plaintiff. | |

## MOVANTS' MOTION TO REASSIGN CASES AS RELATED

Pursuant to Northern District of Illinois Local Rule 40.4, Movants, Plaintiffs in five pending proposed class actions (the "Class Actions") assigned to other judges in this District,[1] respectfully move for entry of an order finding that their cases are related to the above-captioned action and, accordingly, should be reassigned to this calendar because this is the earliest-numbered case.

**WHEREFORE**, Movants respectfully request that the Court enter an Order finding that the Class Actions are related to each other and to this action, and that the Class Actions should be reassigned to this calendar, and providing such other and further relief as the Court deems proper.

Dated:  May 4, 2020

Respectfully submitted,

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

 s/ Joseph P. Guglielmo
Joseph P. Guglielmo (N.D. Ill. No. 2759819)

---

[1]    Movants include Sky Federal Credit Union, First Choice Federal Credit Union, Amalgamated Bank, Alcoa Community Federal Credit Union, and Getten Credit Company.

Peter A. Barile III (N.D. Ill. No. 4364295)
Justin W. Batten
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6444
jgugliemo@scott-scott.com
pbarile@scott-scott.com
jbatten@scott-scott.com

Christopher M. Burke
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508
cburke@scott-scott.com

George A. Zelcs (Ill. Bar No. 3123738)
Randall P. Ewing, Jr. (Ill. Bar No. 6294238)
Ryan Z. Cortazar (Ill. Bar No. 6323766)
**KOREIN TILLERY, LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
Facsimile:  312-641-9751
gzelcs@koreintillery.com
rewing@koreintillery.com
rcortazar@koreintillery.com

Steven M. Berezney (N.D. Ill. Bar No. 56091)
Michael E. Klenov (Ill. Bar No. 6300228)
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: 314-241-4844
Facsimile:  314-241-3525
sberezney@koreintillery.com
mklenov@koreintillery.com

*Counsel for Plaintiff Sky Federal Credit Union*

Steven F. Molo
Lisa W. Bohl
**MOLOLAMKEN LLP**
300 N. LaSalle Street, Suite 5350
Chicago, IL 60654
Telephone: 312-450-6700
Facsimile: 312-450-6701
smolo@mololamken.com
lbohl@mololamken.com

Lauren M. Weinstein
**MOLOLAMKEN LLP**
600 New Hampshire Avenue, N.W., Suite 500
Washington, DC 20037
Telephone: 202-556-2000
Facsimile: 202-556-2001
lweinstein@mololamken.com

Gary F. Lynch
**CARLSON LYNCH LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: 412-322-9243
Facsimile: 412-231-0246
glynch@carlsonlynch.com

Katrina Carroll
**CARLSON LYNCH LLP**
111 W. Wacker Drive, Suite 1240
Chicago, IL 60602
Telephone: 312-750-1265
kcarroll@carlsonlynch.com

***Counsel for Plaintiff First Choice Federal Credit Union***

Jennifer W. Sprengel (Ill. Bar No. 06204446)
**CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP**
150 S. Wacker, Suite 3000
Chicago, IL 60606
Telephone: 312-782-4880
jsprengel@caffertyclobes.com

Barbara J. Hart
Christian Levis
Frank Strangeman
Andrea Farah
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: 914-997-0500
bhart@lowey.com
clevis@lowey.com
fstrangeman@lowey.com
afarah@lowey.com

*Counsel for Plaintiff Amalgamated Bank*

Paul E. Slater
Joseph M. Vanek
Michael G. Dickler
Matthew T. Slater
**SPERLING & SLATER**
55 West Monroe Street, Suite 3200
Chicago, IL 60603
Telephone: 312-641-3200
pes@sperling-law.com
jvanek@sperling-law.com
mdickler@sperling-law.com
mslater@sperling-law.com

Linda P. Nussbaum
Bart D. Cohen
**NUSSBAUM LAW GROUP, P.C.**
1211 Avenue of the Americas, 40th Floor
New York, NY 10036
Telephone: 917-438-9102
lnussbaum@nussbaumpc.com
bcohen@nussbaumpc.com

Michael L. Roberts
Karen Sharp Halbert
**ROBERTS LAW FIRM, P.A.**
20 Rahling Circle
Little Rock, AR 72223
Telephone: 501-821-5575
mikeroberts@robertslawfirm.us
karenhalbert@robertslawfirm.us

*Counsel for Plaintiff Alcoa Community Federal Credit Union*

Daniel C. Hedlund
Michelle J. Looby
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: 612-333-8844
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com

Dennis Stewart
**GUSTAFSON GLUEK PLLC**
600 B Street, 17th Floor
San Diego, CA 92101
Telephone: 619-595-3299
dstewart@gustafsongluek.com

*Counsel for Plaintiff Getten Credit Company*

## <u>CERTIFICATE OF SERVICE</u>

I, Joseph P. Guglielmo, an attorney, hereby certify that the foregoing **MOVANTS'**

**MOTION TO REASSIGN CASES AS RELATED** was electronically filed on May 4, 2020,

and will be served electronically via the Court's ECF Notice system upon the registered parties

of record.

   s/ Joseph P. Guglielmo          
Joseph P. Guglielmo (N.D. Ill. No. 2759819)

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| SKY FEDERAL CREDIT UNION, on Behalf of Itself and All Others Similarly Situated,<br><br>          Plaintiff,<br><br>v.<br><br>FAIR ISAAC CORPORATION,<br><br>          Defendant. | Case No.<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

## TABLE OF CONTENTS

I.  NATURE OF THE ACTION ....................................................................... 1

II. PARTIES ................................................................................................... 4

    A.  Plaintiff .......................................................................................... 4

    B.  Defendant ....................................................................................... 5

III. JURISDICTION, VENUE, AND INTERSTATE COMMERCE ................... 5

IV. ALLEGATIONS OF FACT SUPPORTING THE CLAIM FOR RELIEF ...... 6

    A.  Credit Scores .................................................................................. 6

    B.  The Markets for Credit Scores in the United States ......................... 7

    C.  Fair Isaac Has a Monopoly in the B2B Credit Score Market ........... 10

    D.  Attempts to Compete Have Been Stymied by Fair Isaac's Monopoly in
        the B2B Credit Score Market .......................................................... 11

    E.  Fair Isaac Has Contracted with the Credit Bureaus as Agents and
        Co-Conspirators in Its Scheme to Monopolize ................................ 13

    F.  Fair Isaac's Other Anticompetitive and Exclusionary Conduct ....... 14

        1.  Fair Isaac and the Credit Bureaus Have Entered into Anticompetitive
            Contract Terms that Restrict Their Ability to Compete and Sell
            VantageScore .......................................................................... 15

            a.  The Anticompetitive Agreements Restrict the Credit Bureaus'
                Ability to Develop or Sell Other Credit Scores Compatible
                with B2B Purchasers' Existing Systems ......................... 15

            b.  Fair Isaac and the Credit Bureaus Have Agreed to a Penalty
                Pricing and Bundling Scheme to Foreclose Competition from
                Competitors in the B2B Credit Score Market ............................ 17

            c.  Fair Isaac and the Credit Bureaus Have Agreed to Contract
                Provisions that Allow Fair Isaac to Extract Monopoly Prices ...... 18

        2.  Fair Isaac's Campaign to Create Fear, Uncertainty, and Doubt About
            VantageScore Among B2B Purchasers .................................... 19

            3.  Fair Isaac's Anticompetitive and Exclusionary Conduct Harms
            Competition ........................................................................... 21

V.  CLASS ACTION ALLEGATIONS ............................................................. 22

VI. STATUTES OF LIMITATIONS AND TOLLING ........................................ 25

VII. CLAIMS FOR RELIEF ............................................................................. 25

    CLAIM ONE: MONOPOLIZATION 15 U.S.C. §2 ...................................... 25

    CLAIM TWO: CONSPIRACY TO MONOPOLIZE 15 U.S.C. §2 ................. 27

    CLAIM THREE: UNREASONABLE RESTRAINT OF TRADE 15 U.S.C. §1 ........... 29

    CLAIM FOUR: STATE ANTITRUST LAWS ............................................. 30

    CLAIM FIVE: STATE UNFAIR TRADE PRACTICES LAWS ..................... 32

VIII. PRAYER FOR RELIEF ...................................................................................................... 33

IX. DEMAND FOR JURY TRIAL ............................................................................................. 33

Plaintiff Sky Federal Credit Union, on behalf of itself and all other similarly situated residents of the United States, brings claims under the Sherman Act and state laws against Defendant Fair Isaac Corporation ("Fair Isaac") for redress of the injury and damages resulting from its monopolizing, conspiring to monopolize, and otherwise unreasonably restraining trade from at least as early as January 1, 2006, through the date by which the anticompetitive effects of Defendant's violations of law shall have ceased, but in any case no earlier than the present (the "Class Period"). Based upon personal knowledge, information and belief, proceedings and admissions made in Case No. 1:17-cv-08318 (N.D. Ill.), related ongoing federal government investigations, and investigation of counsel, Plaintiff alleges:

## I.    NATURE OF THE ACTION

1.    "Credit Scores" are three digit numbers that rank or "score" creditworthiness within a range by applying certain algorithms to credit histories. There are two distinct markets for Credit Scores in the United States: (1) the market for the sale of Credit Scores to lenders, financial institutions, and other businesses for risk management decisions (the "B2B Credit Score Market"); and (2) the market for the sale of Credit Scores directly to consumers to monitor their own credit records (the "business-to-consumer" or "B2C Credit Score Market").

2.    This case concerns the B2B Credit Score Market, over which Defendant Fair Isaac has unlawfully maintained a 90% monopoly for many years.

3.    Fair Isaac has abused its monopoly power by engaging in anticompetitive and exclusionary conduct and agreements. Fair Isaac has suppressed competition, stymied innovation, and limited access to credit for millions of Americans – all in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§1 & 2, as well as numerous state antitrust and unfair trade practices laws.

4.      Fair Isaac's FICO Credit Scores ("FICO Scores") have dominated the market for nearly three decades.  Fair Isaac executives have bragged that their FICO Scores are "the 800-pound gorilla" and are "deeply embedded in the system in North America."  Fair Isaac admitted in 2017 that it has "maintained a 90-plus percent market share for at least 13 years."  Fair Isaac advertises that its FICO Scores are used for 90% of all lending decisions in the United States and that Fair Isaac sells four times more FICO Scores per year than McDonald's sells hamburgers worldwide.

5.      TransUnion, Experian, and Equifax are credit reporting agencies that collect, standardize, and distribute information on consumer credit activity (collectively, the "Credit Bureaus").  Credit Bureaus sell lenders, financial institutions, and other businesses credit reports and Credit Scores – including Fair Isaac's FICO Scores – that are used to make decisions about whether and on what terms to evaluate and extend credit.  Credit Bureaus sell those credit reports and Credit Scores to businesses in every state.  For decades, Credit Bureaus have acted as Fair Isaac's agents and co-conspirators to broker sales between businesses and Fair Isaac of the dominant FICO Scores.  Fair Isaac has used these distribution agreements to place anticompetitive restrictions on the three dominant Credit Bureaus' ability to develop or distribute competitive Credit Scores; prohibited Credit Bureaus from individually negotiating royalty prices for access to FICO Scores; charged discriminatory and prohibitively high royalty prices for FICO Scores if a Credit Bureau customer purchases a FICO Score while providing the consumer with a competing score; and increased the royalty prices that must be paid by Credit Bureaus.  Nevertheless, the Credit Bureaus have agreed to, and acquiesced in, these restrictions.

6.      In 2006, VantageScore Solutions, LLC ("VantageScore"), a joint venture of the Credit Bureaus, launched a competitive Credit Score known as VantageScore.  From the outset,

2

VantageScore was competitively priced, highly predictive, and scored millions more Americans than Fair Isaac's FICO products. Today, by making full use of the Credit Bureaus' consumer data, including rental and utility payments, VantageScore is capable of providing Credit Scores for an additional 30 million Americans than FICO can. Were VantageScore widely adopted by businesses, millions more creditworthy Americans would have the opportunity to apply for a home mortgage, car loan, or credit card, and obtain credit at lower cost.

7.      Rather than compete on the merits with VantageScore, Fair Isaac has engaged in a pattern of anticompetitive conduct over the course of more than a decade to discourage the adoption of VantageScore and preserve its own monopoly, with the Credit Bureaus' assistance. Fair Isaac has abused its monopoly power to prevent the Credit Bureaus from successfully marketing and selling a competitive alternative to FICO Scores and has waged a disparaging public relations and advertising campaign to create fear, uncertainty, and doubt about VantageScore's viability and reliability with lenders and consumers.

8.      Through its exclusionary conduct, Fair Isaac has succeeded in preventing the substantial sales growth that VantageScore or a competing credit scoring system would have achieved though competition on the merits. Having suppressed competition, Fair Isaac has been able to significantly increase prices, including most recently in September 2019, for its FICO Scores. But for Fair Isaac's suppression of competition and the resulting contractual agreements not to compete, VantageScore or another competitive credit scoring system would have thrived and won substantial market share through its innovative product and would have reduced the prices paid for B2B Credit Scores by Plaintiff and members of the Class.

9.      Fair Isaac's anticompetitive and exclusionary conduct has harmed businesses that have been deprived of competitive pricing for instruments to allow them to gauge credit risk and

have had their freedom of choice restricted.  Opening the market to competition is essential to competitive pricing and product innovation, including scoring the tens of millions of creditworthy Americans who have been denied access to credit.

10.     In February 2018, TransUnion filed antitrust counterclaims for monopolization and related claims against Fair Isaac in this District.  *See Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318, ECF No. 38 (redacted counterclaims).  In March 2019, The Honorable Sharon Johnson Coleman denied Fair Isaac's motion to dismiss TransUnion's antitrust counterclaims.  *See id*., ECF No. 96.  The matter is ongoing.

11.     On March 15, 2020, Fair Isaac disclosed that it was under investigation by the Antitrust Division of the United States Department of Justice for exclusionary conduct relating to that alleged in the counterclaim upheld by Judge Coleman.[1]

## II.     PARTIES

### A.     Plaintiff

12.     Plaintiff Sky Federal Credit Union is a federally chartered credit union with a principal place of business in Livingston, Montana.

13.     Plaintiff is a financial institution that provides financial services, including deposit accounts, credit and/or debit cards, and lending and other credit-related facilities for consumers.

14.     During the Class Period, Plaintiff directly purchased B2B Credit Scores from Defendant and a Credit Bureau.

15.     Plaintiff was injured in its business or property as a direct, proximate, and material result of Defendant's violations of law.

---

[1]     *See* Press Release, Fair Isaac Corporation, FICO Statement Regarding Antitrust Investigation, https://www.prnewswire.com/news-releases/fico-statement-regarding-antitrust-investigation-301024452.html (Mar. 15, 2020).

16.     Plaintiff is threatened with future injury to its business and property by reason of Defendant's continuing violations of law.

**B.     Defendant**

17.     Defendant Fair Isaac Corporation is a Delaware corporation, with its principal place of business at 181 Metro Drive, Suite 700, San Jose, California 95110.

## III.    JURISDICTION, VENUE, AND INTERSTATE COMMERCE

18.     This action arises under Sections 1 and 2 of the Sherman Antitrust Act of 1890 (as amended), 15 U.S.C. §§1 & 2, and Sections 4 & 16 of the Clayton Antitrust Act of 1914 (as amended), 15 U.S.C. §§15 & 26.

19.     This Court has subject matter jurisdiction under 28 U.S.C. §§1331, 1332(d), and 1337.

20.     The Court has supplemental jurisdiction under 28 U.S.C. §1367 over Plaintiff's state law claims.

21.     Venue is proper in this District under 15 U.S.C. §§15(a) & 22, and 28 U.S.C. §1391(b), (c) and (d), because during the Class Period, Defendant resided, transacted business, was found, or had agents in the United States, including in this District, and a substantial portion of the alleged activity affected interstate trade and commerce, including in this District.

22.     During the Class Period, Defendant's conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States, including in this District.

23.     During the Class Period, Defendant used the instrumentalities of interstate commerce, including interstate wires, wireless spectrum, and the U.S. mail, to effectuate its illegal scheme.

24.     Defendant's conduct also had a substantial effect on the intrastate commerce of at least Arizona; Arkansas; California; Connecticut; District of Columbia; Florida; Hawaii; Illinois; Iowa; Kansas; Maine; Maryland; Massachusetts; Michigan; Minnesota; Mississippi; Missouri; Montana; Nebraska; Nevada; New Mexico; New York; North Carolina; North Dakota; Oregon; Rhode Island; South Carolina; South Dakota; Tennessee; Utah; Vermont; West Virginia; and Wisconsin.

25.     This Court has personal jurisdiction over Defendant because Defendant transacted business, maintained substantial contacts, and is located and/or committed unlawful conduct in this District.  The unlawful scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

26.     Plaintiff purchased at least one FICO Score from Fair Isaac and TransUnion, which is headquartered in this District.

27.     Defendant employs persons who work in its Credit Score business in this District.

28.     Defendant is registered to do business in Illinois with the Illinois Secretary of State.

29.     Defendant selected this District to institute Case No. 1:17-cv-08318, to which this case is filed as related by Plaintiff.

## IV.     ALLEGATIONS OF FACT SUPPORTING THE CLAIM FOR RELIEF

### A.     Credit Scores

30.     Credit Scores are typically three-digit numbers that are designed to assess credit risk.  Higher scores generally indicate that a consumer poses less credit risk.  Credit Scores are produced using credit scoring systems that apply a credit scoring algorithm to a consumer credit report.  Credit Scores are usually accompanied by "reason codes," which inform the lender about the reasons that contributed most significantly to reducing a particular consumer's Credit Score.

31.     Credit Scores are the most widely used indicators of consumers' creditworthiness in the United States.  Lenders, financial institutions, and other businesses rely on Credit Scores to decide whether and on what terms to extend credit to consumers.  Consumers, in contrast, rely on Credit Scores to determine whether they will be able to get a mortgage, credit card, auto loan, or other credit product and the rate they will pay.

32.     The Credit Bureaus collect and supply aggregated consumer credit data in the form of consumer reports.  The Credit Bureaus continuously gather credit and financial data about consumers from creditors, governmental entities, public records, collection agencies, and other third parties.  This information is then compiled into a "credit file."  The Credit Bureaus sell credit reports, which include information gathered from a consumer's credit file, to businesses and consumers.

33.     While Credit Scores are sometimes sold together with credit reports, credit reports are different from Credit Scores and can be sold independently.  A credit report is a statement that has detailed information about a consumer's credit activity and current credit situation.  A consumer's credit report might, for example, include information about that consumer's history of mortgage payments, credit card balances, credit card payments, and credit inquiries.  A Credit Score takes the detailed information in a credit report and turns it into a single three-digit number.

**B.**     **The Markets for Credit Scores in the United States**

34.     There are two distinct markets for Credit Scores in the United States: (1) the B2B Credit Score Market and (2) the B2C Credit Score Market.  B2B and B2C Credit Scores are priced, purchased, and used very differently and serve very different purposes.  The lenders, financial institutions, and other businesses in the B2B Credit Score Market that purchase and use Credit Scores to assess creditworthiness and make decisions about whether and on what terms to extend

credit or otherwise take on risk do not consider credit reports, insurance scores, or any other information about borrowers, to be a substitute for Credit Scores.

35.     Consumers in the B2C Credit Score Market purchase their own Credit Scores to better understand their own creditworthiness and how they likely will be viewed by potential lenders.

36.     The United States is the relevant geographic market in which B2B Credit Scores are provided.  The restraints on competition in the B2B Credit Score Market contained in Fair Isaac's contracts relate to the provision of B2B Credit Scores to businesses throughout the United States.

37.     Purchasers in the B2B Credit Score Market are comprised of lenders, financial institutions, and other businesses that purchase B2B Credit Scores in order to make risk management decisions ("B2B Purchasers").  Lenders, financial institutions, and other businesses that purchase Credit Reports from Defendant and/or the Credit Bureaus generally purchase Credit Scores in order to determine the credit-worthiness and identity of qualified borrowers to whom a preapproved credit offer will be extended ("pre-screening"), make lending decisions ("lending"), or review the risk associated with existing borrowers for purposes such as extending additional credit or changing other account terms ("account management").

38.     Customers in the B2C Credit Score Market, in contrast, purchase Credit Scores in order to manage their credit, protect their identity, or assess their likelihood of obtaining credit. Today, American consumers have signed up for over 160 million credit monitoring or identity protection accounts from businesses such as Capital One, Credit Karma, and LifeLock.  Many of those accounts include access to the consumer's own Credit Score.

39.     The credit risk scoring industry, industry analysts, policy analysts, and investors recognize the B2B Credit Score Market as distinct from the B2C Credit Score Market.  Fair Isaac also regularly acknowledges that the B2B Credit Score Market is distinct from the B2C Credit Score Market.  For example, in its 2019 Form 10-K, Fair Isaac distinguished between its "business-to-business scoring solutions and services" and "business-to-consumer scoring solutions and services including myFICO solutions for consumers."

40.     The B2B Credit Score Market is characterized by significant barriers to entry.  B2B Purchasers encounter significant "switching costs" if they adopt a new Credit Score that has different score-to-risk relationships or that uses different reason codes – regardless of whether it is an updated version of the score they already use or an entirely new brand of Credit Score (unlike consumers in the B2C Credit Score Market).  These switching costs arise because employees have to be trained in the properties and characteristics of a new score; B2B Purchasers must ensure that the new score will be adequately predictive of the creditworthiness of their own customer base; B2B Purchasers often conduct extensive, costly, and time-consuming validation tests to determine whether the new score is cost-effective; and B2B Purchasers may need to invest in updating their internal systems to ensure technical compatibility between those systems and a new score.

41.     Network effects also characterize the B2B Credit Score Market.  For example, in the mortgage and auto loan industries the consistent use of particular Credit Scores with similar score-to-risk relationships and reason codes facilitates the bundling of large groups of mortgage and auto loans from different originators into securities that can be sold to investors.  Because of the consistent use of a single type of Credit Score, marketing materials for these securities can include data on the average and stratified Credit Scores of the borrowers associated with the underlying loans.

### C.    Fair Isaac Has a Monopoly in the B2B Credit Score Market

42.    Fair Isaac has maintained a monopoly over the B2B Credit Score Market in the United States for roughly three decades, largely through the unlawfully achieved dominance of its FICO product line, which includes many different types of FICO Scores.  Introduced in the 1980s, Fair Isaac's "FICO Classic" Credit Scores are the best known and most widely used B2B Credit Scores in the United States.  FICO Classic applies an algorithm to each Credit Bureau's data and generates a score between 300 and 850 that purports to give an indication of the individual's credit risk.  It also generates a set of "reason codes" that explain the reasons the consumer has not been assigned the maximum score.

43.    Fair Isaac advertises its monopoly in the B2B Credit Score Market.  On its website, Fair Isaac advertises: 10 billion FICO Scores are sold each year, which is four times the number of hamburgers that McDonald's sells worldwide each year; 27.4 million FICO Scores are sold every day, which is over twice the number of cups of coffee Starbucks sells worldwide in a day; and 90% of all lending decisions in the United States rely on FICO Scores.

44.    Similarly, in its 2019 Form 10-K, Fair Isaac described its "FICO Scores" as "the standard measure in the U.S. of consumer credit risk" and reported that "FICO Scores are used . . . by nearly all of the major banks, credit card organizations, mortgage lenders, and auto loan originators."

45.    Fair Isaac representatives have described Fair Isaac's FICO score as "***the 800-pound gorilla***" in the market for B2B Credit Scores and bragged about Fair Isaac's 90% market share.  For example, in November 2017, at the JPMorgan Ultimate Services Investor Conference, Fair Isaac's CFO and Executive Vice President, Michael Pung, stated that Fair Isaac's FICO Scores are:

- ***The "most widely used credit scoring system here in the U.S.";***

- *Used by "[v]irtually every major lender in the U.S."; and that*

- *Fair Isaac has "maintained a 90-plus percent market share for at least . . . 13 years."*

46.     Fair Isaac representatives have also recognized that FICO Scores have benefited from the network effects created by the widespread use of FICO Scores in many industries.  For example, in November 2011, then-CEO of Fair Isaac, Mark Greene, explained that the "network effect" of "FICO Scores . . . being sort of the standard language" and "*having everybody . . . standardize on a FICO Score, that's magic*."

47.     Fair Isaac's monopoly in the B2B Credit Score Market for Credit Scores has given it the power to control prices.  Indeed, Fair Isaac's CEO, Will Lansing, has noted that in the B2B Credit Score Market Fair Isaac has "*quite a bit of discretion in whether we want our margins to be higher or lower or where they are*."

**D.     Attempts to Compete Have Been Stymied by Fair Isaac's Monopoly in the B2B Credit Score Market**

48.     In March 2006, VantageScore introduced the VantageScore Credit Score and credit scoring system.  VantageScore is a competitor to FICO Scores in the B2B Credit Score Market.

49.     From the time it was first released in 2006, VantageScore scored millions more consumers than the FICO scoring systems.  Whereas Fair Isaac's FICO scoring systems would not generate a score if a consumer had not used credit in more than six months or if a credit account was fewer than six months old, VantageScore calculated scores for consumers that had not used credit for up to two years.  It also reached more consumers by using utility and telecommunications payment histories when reported to the Credit Bureaus.

50.     Today, VantageScore scores 30 million more Americans than traditional FICO scoring systems.  Fair Isaac's outdated FICO Classic credit scoring systems – which are still used

by many lenders – exclude many creditworthy Americans that VantageScore can reliably score. About one-quarter of American adults – some 65 million people – do not have a traditional FICO score. VantageScore is capable of reducing the number of adults without a Credit Score by almost half. Ten million of those newly scored individuals are "prime" borrowers that should be attractive to traditional lenders.

51.     Without a Credit Score, it is difficult or impossible to apply for or successfully obtain a mortgage, car loan, or reasonable interest rates on personal lines of credit. Not having a Credit Score can also have drastic effects outside of the credit market. For example, Credit Scores are increasingly used by landlords to screen potential tenants.

52.     Those excluded by Fair Isaac's traditional FICO scoring systems – who face an increased risk of being denied access to credit in the form of credit cards, auto and home loans, and apartment housing – include disproportionate numbers of low-income and minority consumers.

53.     Indeed, one advocacy group focused on making it possible for people with limited incomes, especially people of color, to achieve financial security has observed: "Black and Hispanic individuals are . . . significantly more likely than white individuals to be credit invisible" – meaning that they have "no established credit history," are "unscored," and "lack[] sufficient or recent enough credit history to be given a [FICO] Credit Score." VantageScore calculates a score for 9.5 million Hispanic and Black consumers who do not have a FICO score, including 2.7 million minority consumers who should be considered "prime" borrowers.

54.     Despite the potential advantages of using VantageScore, Fair Isaac continues to maintain its monopoly in the B2B Credit Score Market. In February 2013, at a Morgan Stanley Conference, Fair Isaac's CEO, Will Lansing, explained that despite the existence of VantageScore,

"there [is] not that much competition around our [B2B] scores business" because "*FICO scores are very much part of the fabric of the banking industry*" and "*really deeply imbedded*."

**E.  Fair Isaac Has Contracted with the Credit Bureaus as Agents and Co-Conspirators in Its Scheme to Monopolize**

55.  With its dominant position in the B2B Credit Score Market, Fair Isaac uses the Credit Bureaus to perpetuate and extend its monopoly.  Fair Isaac's relationship with B2B Purchasers is often dependent on B2B Purchasers' relationships with the Credit Bureaus.  To facilitate the sale of its FICO Scores to B2B Purchasers, Fair Isaac enlists the assistance of the Credit Bureaus.

56.  When a B2B Purchaser requires a Credit Score, it purchases the report from the Credit Bureau, and the Credit Score jointly from the Credit Bureau and Fair Isaac.  Although the payment may at times occur in a single transaction, the practical reality, as expressly set forth in contracts governing the sale of Credit Scores to B2B Purchasers, is that both the Credit Bureau and Fair Isaac act as the provider of the FICO Score.

57.  B2B Purchasers' contracts for FICO Scores are often known as Credit Scoring Services Agreements ("CSSAs").  CSSAs provide for both the method of payment and fee model for the delivery of Credit Score services.

58.  For example, the CSSA between Plaintiff, its Credit Bureau, and Fair Isaac makes clear in the "Method of Payment" section that "Experian/Fair, Isaac will deliver to Subscriber invoices" for its Credit Scores and that "Subscriber will pay Experian/Fair, Isaac the amounts indicated on such invoices."  It also specifies that in "consideration of Experian/Fair, Isaac's performance of the Experian/Fair, Isaac Model, Subscriber will pay Experian/Fair, Isaac fees."

59.  In Plaintiff's and Class Members' procurement of FICO Scores, the Credit Bureaus act as co-conspirators and agents of Fair Isaac.  Indeed, Plaintiff's CSSA states that "the

13

Experian/Fair, Isaac Model results from the joint efforts of Experian Information Solutions, Inc. and Fair, Isaac and Company, Incorporated"; and authorizes the Credit Bureau to execute the contract "on behalf of itself and Fair, Isaac and Company, Incorporated." (Fair Isaac was formerly known as Fair, Isaac and Company.)

### F. Fair Isaac's Other Anticompetitive and Exclusionary Conduct

60. Fair Isaac has used its monopoly power to coordinate a multi-faceted campaign to eliminate competition from VantageScore. Fair Isaac has been explicit that this is its goal. In April 2015, Will Lansing informed investors on a quarterly earnings conference call that Fair Isaac's strategic goal was to ensure that "the entire industry adopts FICO scores instead of [other] scores." To achieve this goal, Fair Isaac has enlisted its competitors (the Credit Bureaus, which jointly own and control VantageScore) to agree to anticompetitive contracts that: prevent them from developing or selling alternative Credit Scores that could be seamlessly integrated into many lenders' systems or used interchangeably with FICO Scores; prevent them from competing with each other to negotiate prices from FICO; and create a pricing scheme effectively foreclosing B2B Purchasers from choosing to use FICO Scores in their lending decisions at the same time as providing customers with a competing Credit Score, including VantageScore. At the same time, Fair Isaac has waged a media campaign against VantageScore and made false and misleading statements in order to sow fear, uncertainty, and doubt about VantageScore's reliability. By its anticompetitive and exclusionary conduct, Fair Isaac has injured competition in the B2B Credit Score Market, increased prices for Plaintiff and the Class, and limited access to credit for millions of Americans.

1. **Fair Isaac and the Credit Bureaus Have Entered into Anticompetitive Contract Terms that Restrict Their Ability to Compete and Sell VantageScore**

61. In January 2015, Fair Isaac and TransUnion entered into a contract, the Analytic and Data License Agreement. With TransUnion's prior contracts with Fair Isaac set to expire on December 31, 2014, Fair Isaac demanded that the parties enter into a new contract rather than renew their existing contracts. Fair Isaac represented to TransUnion that Experian and Equifax had already agreed to materially similar new contracts with Fair Isaac. If TransUnion did not agree to the terms demanded by Fair Isaac, it would lose substantial business from customers that depend on FICO Scores. On information and belief, TransUnion, Equifax, and Experian all agreed to Fair Isaac's plan to exclude competitors and maintain its monopoly.

a. **The Anticompetitive Agreements Restrict the Credit Bureaus' Ability to Develop or Sell Other Credit Scores Compatible with B2B Purchasers' Existing Systems**

62. Fair Isaac has imposed a similar or identical "No Equivalent Products" clause on each of the Credit Bureaus. By imposing a "No Equivalent Products" term, Fair Isaac has sought to block the Credit Bureaus from offering alternative Credit Score products, such as VantageScore, that would allow B2B Purchasers to easily switch from FICO Scores to VantageScore without incurring the cost of redesigning their lending programs and systems, or to use VantageScore alongside or interchangeably with FICO Scores. The Credit Bureaus have agreed to and acquiesced in these anticompetitive agreements, terms, and resulting anticompetitive effects.

63. The "No Equivalent Products" clause provides that a Credit Bureau may not internally develop a credit scoring system that is aligned to the odds-to-score relationship of any Fair Isaac Analytic or that uses more than a limited number of reason codes that "match" reason codes used by any Fair Isaac Analytic. It also prohibits a Credit Bureau from distributing any competing analytic (*i.e.*, credit scoring system) that is aligned with FICO Scores or uses too many

of the same reason codes, and the clause expressly names Vantage Score Solutions LLC as a developer of such a scoring system that may not be distributed if VantageScore were to offer an "Equivalent Product."

64.     For example, if a competing Credit Score product used a 700 score to indicate a less-than-five-percent risk of credit delinquency, and if a 700 FICO score also indicated the same risk of delinquency, then the "No Equivalent Products" clause prevents a Credit Bureau from distributing the competing product.  Similarly, if a competing Credit Score product used reason codes that match 20% or more of the reason codes used by FICO scoring systems, the "No Equivalent Products" clause prohibits a Credit Bureau from distributing the product.

65.     The "No Equivalent Products" clause effectively prevents a Credit Bureau from developing (contrary to the original goal of VantageScore and the easy ability to do so) or selling an alternative to FICO's Credit Scores that would (i) be compatible with many B2B Purchasers' systems, models, and processes; and (ii) allow B2B Purchasers to have a legitimate choice between using FICO Scores and an alternative score.  Many B2B Purchasers have spent substantial effort and resources to develop systems, models, and processes that are designed for FICO Scores.  B2B Purchasers' systems, models, and processes are tailored to FICO's odds-to-score relationship (*i.e.*, each given score has a given ratio of non-defaulting consumers to defaulting consumers), and reason codes (the particular reasons cited for increased risk of default).  For example, a bank's software might be designed to accept one or more FICO Scores and reason codes, combine this information with data it collects internally, and automatically produce a lending decision.

66.     The "No Equivalent Products" clause protects and sustains Fair Isaac's monopoly. The odds-to-score relationship is an arbitrary mapping between risk and score and does not reflect protectable intellectual property.   Similarly, the reason codes that may not be used by an

"Equivalent Product" were not invented by Fair Isaac but reflect well-established industry best practices for lending.

> **b. Fair Isaac and the Credit Bureaus Have Agreed to a Penalty Pricing and Bundling Scheme to Foreclose Competition from Competitors in the B2B Credit Score Market**

67. Fair Isaac's contracts with each Credit Bureau include a similar or identical "Dynamic Royalty Schedule" clause and a similar or identical "Pre-Qualification" royalty category. Through the "Pre-Qualification" royalty category, Fair Isaac has effectively foreclosed lenders from the ability to purchase and use a FICO score in their lending decision while providing a consumer with a competing Credit Score, which drives lenders to buy exclusively Fair Isaac's FICO Scores and not to purchase competing Credit Scores. As a consequence of Fair Isaac's imposition of the "Pre-Qualification" royalty category, TransUnion has lost sales of VantageScore to major banks to provide to consumers.

68. In 2015, Fair Isaac unilaterally imposed, and the Credit Bureaus have complied with, a new "Pre-Qualification" royalty category, which Fair Isaac defines to "mean an End User's qualification of a potential consumer customer for an End User's own internal lending offering." This royalty category distinguishes between: (1) lenders that use FICO Scores for "Pre-Qualification" without providing any Credit Score or credit data to consumers; and (2) lenders that use FICO Scores for "Pre-Qualification" while also providing Credit Scores or credit data to consumers "in connection" with the "Pre-Qualification." Certain banks and lenders offer consumers opportunities to apply to qualify for credit opportunities (*e.g.*, a credit card or loan) and, at the same time, receive their personal Credit Score. The offer of a free Credit Score to a consumer can entice consumers to apply for credit opportunities.

69. The royalty price associated with a FICO score used for "Pre-Qualification" depends on whether other Credit Scores or credit data are provided to consumers. If a lender

purchases a FICO score for use in "Pre-Qualification" and does not provide any Credit Score or credit data to the consumer "in connection" with the "Pre-Qualification," there is one per-score royalty rate. If the lender purchases a FICO score for use in "Pre-Qualification" and provides any other Credit Score (such as a VantageScore) to the consumer "in connection" with the "Pre-Qualification," there is a different per-score royalty rate that is higher – a penalty rate.

70.     The penalty rate can be avoided in one of two ways, both of which involve purchasing exclusively FICO Scores. First, the B2B Purchaser could purchase a FICO score for use in "Pre-Qualification" and provide no Credit Score or credit data to the consumer. Second, the B2B Purchaser could purchase a bundled FICO product from Fair Isaac. Fair Isaac offers bundled products to lenders that combine the use of scores by lenders with the provision of scores to consumers.

71.     There is no legitimate business justification for the penalty rate agreed upon by Fair Isaac and the Credit Bureaus when the lender also purchases any other Credit Score to disclose to consumers. The transparent purpose of the "Pre-Qualification" royalty category is to drive all B2B Purchasers engaging in "Pre-Qualification" to purchase exclusively FICO Scores and make it cost-prohibitive for B2B Purchasers engaging in "Pre-Qualification" to purchase a competing Credit Score for disclosure to consumers. This scheme has been effective, and few, if any, B2B Purchasers have opted to pay the penalty rate.

> **c.     Fair Isaac and the Credit Bureaus Have Agreed to Contract Provisions that Allow Fair Isaac to Extract Monopoly Prices**

72.     Fair Isaac's "Level Playing Field," requires that the prices that are made available to one Credit Bureau be made available to the other Credit Bureaus. Taken together, the "Dynamic Royalty Schedule" and the "Level Playing Field" clauses enable Fair Isaac to unilaterally increase the royalty prices it charges for FICO Scores. Fair Isaac's contracts with TransUnion, Equifax,

and Experian include similar or identical "Level Playing Field" and "Dynamic Royalty Schedule" provisions.

73. Fair Isaac has used the "Level Playing Field" and "Dynamic Royalty Schedule" provisions in its contracts with the Credit Bureaus to extract monopoly prices from B2B Purchasers. These provisions disincentivize a Credit Bureau from negotiating for a lower price because it knows that even if it succeeds, it will not as a result gain a competitive advantage over the other Credit Bureaus.

### 2. Fair Isaac's Campaign to Create Fear, Uncertainty, and Doubt About VantageScore Among B2B Purchasers

74. Despite having successfully induced the Credit Bureaus to agree with Fair Isaac and with each other to impose restrictions on VantageScore's ability to compete with FICO, Fair Isaac has gone even further and waged an aggressive public relations and advertising campaign to spread false statements, convey false impressions, and mislead B2B Purchasers about the qualities and characteristics of FICO Scores and VantageScore. In advertisements, letters, and blog posts, Fair Isaac has disparaged VantageScore by calling it a "Fako" score, falsely claimed that VantageScore is an unreliable measure of creditworthiness, and misrepresented the information considered by VantageScore's credit scoring system.

75. On December 12, 2017, Fair Isaac took out a full-page advertisement in *The Wall Street Journal* addressed to "Lenders, Policymakers and Consumer Advocates" that disparaged VantageScore without identifying it by name. The advertisement contrasted Fair Isaac, which "is not owned by the credit bureaus" and whose FICO Scores have been used "by lenders and securitization investors for decades," with an alternative Credit Score, which is "owned by the credit bureaus," is less reliable than FICO Scores in evaluating credit risk, and fails to use "sound practices" or "science-based credit evaluation." To anyone familiar with the market for Credit

Scores, the advertisement unambiguously conveys the false message that VantageScore is "[w]eakening scoring standards, [and] harm[ing] consumers, and the lending system," particularly in the B2B Credit Score Market.

76.     The *Wall Street Journal* advertisement directed readers to "Learn more at FICO.com/independent," a Fair Isaac-owned website that connects visitors to articles and blog posts that disparage VantageScore by name. One such blog post asserts: "Despite claims by VantageScore, weakening the minimum scoring criteria will not empower millions of low-risk mortgage credit seekers."

77.     Moreover, the implication that FICO Classic scoring systems provide Credit Scores for as many consumers as VantageScore is false and misleading. VantageScore provides Credit Scores for millions of American consumers that are not scored by FICO Classic scoring systems.

78.     Fair Isaac's website includes numerous posts disparaging VantageScore and making false or misleading statements about VantageScore's features. For example, one blog post claims that "[r]esearch results consistently showed that scoring models relying solely on sparse or old credit data were weak and did a poor job forecasting future performance." This statement is false and misleading because it conveys the message that VantageScore's scoring model is "weak" and does a "poor job forecasting future performance" because it considers a consumer's full credit history even if the consumer has not used a traditional credit line in the last six months. In fact, studies have shown that VantageScore is strongly predictive.

79.     Another blog post claims that whereas "FICO Score 9 differentiates medical from non-medical collections," "VantageScore does not." This statement conveys the false message that VantageScore does not differentiate medical from non-medical collections. In fact, VantageScore 3.0 was the first credit scoring system to address medical debt. VantageScore 4.0,

the most recent version of VantageScore, distinguishes medical collection accounts from non-medical collection accounts and penalizes medical collections less than non-medical ones.

80. Fair Isaac's campaign against VantageScore is not new. In 2006, just months after the launch of VantageScore, Fair Isaac filed a meritless lawsuit against the Credit Bureaus and VantageScore in the United States District Court for the District of Minnesota. *See Fair Isaac Corporation v. Equifax Inc.*, No. 06-cv-04112 (D. Minn.). This was the monopolist's first attempt to kill the nascent competitor. Fair Isaac's numerous claims included a claim that the development of VantageScore violated the antitrust laws and a claim that the development of VantageScore constituted trademark infringement. In its prayer for relief, Fair Isaac sought nothing less than the end of VantageScore: it requested that the "Defendants be ordered to dissolve VantageScore."

81. All of Fair Isaac's claims failed; in fact, the jury concluded that Fair Isaac was the wrongdoer. In support of its trademark infringement claim, Fair Isaac had alleged that VantageScore's use of a scoring range of 501-990 constituted trademark infringement because it was similar to FICO's scoring range of 300-850. The Credit Bureaus and VantageScore counterclaimed for fraud on the United States Patent and Trademark Office ("PTO"), alleging that Fair Isaac had misrepresented to the PTO that only FICO used the 300-850 score range. The jury concluded that Fair Isaac had committed fraud on the PTO by making false statements as part of its application to register the score range of 300-850 as a trademark.

82. The public statements described in the foregoing paragraphs were transmitted to and seen by a substantial number of businesses and consumers nationwide.

### 3. Fair Isaac's Anticompetitive and Exclusionary Conduct Harms Competition

83. Fair Isaac's campaign of exclusionary conduct to maintain and expand its monopoly has harmed and continues to harm participants in the B2B Credit Score Market. Fair

Isaac's unlawful conduct, including that which has been taken in concert with the Credit Bureaus, has foreclosed competition in the B2B Credit Score Market by foreclosing opportunities for the Credit Bureaus to sell VantageScore or any other competitive products. The anticompetitive and exclusionary conduct has allowed Fair Isaac to maintain its monopoly and charge monopoly prices for B2B Credit Scores to B2B Purchasers during the Class Period.

84. Fair Isaac's conduct, in concert with the Credit Bureaus, including by the contracts entered into by the Credit Bureaus, has reduced choice for B2B Purchasers. The anticompetitive terms agreed to between Fair Isaac and the Credit Bureaus have frustrated the ability of B2B Purchasers to purchase VantageScore or any other competitive Credit Score that could be seamlessly integrated into lenders' existing processes and systems. Fair Isaac's media and advertising campaign against VantageScore has been successful in sowing fear, uncertainty, and doubt about VantageScore in the marketplace.

85. Media sources, financial blogs, and consumers have absorbed Fair Isaac's message that VantageScore is a "***Fako***" ***score*** merely because it is not a FICO score. For example, thebalance.com – a website devoted to personal finance issues – posted in February 2017, and continues to display as of the date of this filing: "If you purchased your Credit Score anywhere but MyFICO.com, then it's a Fako score."[2]

## V.   CLASS ACTION ALLEGATIONS

86. Plaintiff brings this action on behalf of itself, and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of:

> **All B2B Purchasers residing in the United States that directly purchased a FICO Score from Fair Isaac and/or a Credit Bureau during the Class Period.**

---

[2]   Latoya Irby, *FICO & FAKO Credit Scores*, THE BALANCE, https://www.thebalance.com/fico-and-fako-credit-scores-960497 (last visited Apr. 2, 2020).

87.     Excluded from the Class are: Defendant, its officers, directors, management, employees, subsidiaries, and affiliates.  Also expressly excluded are any natural persons that purchased their own Credit Score solely via myFico.com, the Credit Bureaus, or other entities for their personal use.

88.     Also excluded is the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household or the spouse of such a person.

89.     Members of the Class are so numerous and geographically dispersed that joinder is impracticable.  Further, members of the Class are readily identifiable from information and records in the possession of Defendant.

90.     Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and members of the Class were damaged by the same wrongful conduct of Defendant.

91.     Plaintiff will fairly and adequately protect and represent the interests of members of the Class.  The interests of Plaintiff are coincident with, and not antagonistic to, those of members of the Class.

92.     Plaintiff is represented by counsel with experience in the prosecution and leadership of class action antitrust and other complex litigation, including class actions in the financial services industry.

93.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, thereby making damages with respect to members of the Class as a whole appropriate.  Questions of law and fact common to members of the Class include, but are not limited to:

> a.   whether Defendant monopolized, conspired to monopolize, or unreasonably restrained trade in violation of federal law;

23

    b.  whether Defendant monopolized, conspired to monopolize, or unreasonably restrained trade in violation of certain state antitrust laws;

    c.  whether Defendant engaged in unfair or deceptive trade practices in violation of certain state laws;

    d.  the duration of the alleged unlawful conduct;

    e.  injury suffered by Plaintiff and members of the Class;

    f.  damages suffered by Plaintiff and members of the Class; and

    g.  whether Defendant has acted or refused to act on grounds generally applicable to members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Class as a whole.

94.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

95.    The benefit of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

96.    Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

97.    Plaintiff has defined members of the Class based on currently available information and hereby reserves the right to amend the definition of members of the Class, including, without limitation, the Class Period.

## VI.    STATUTES OF LIMITATIONS AND TOLLING

98.    By its very nature, the unlawful activity in which Defendant engaged was self-concealing from Plaintiff and the Class.    As a result of Defendant's affirmative acts, misrepresentations, and nondisclosures as alleged herein, any applicable statutes of limitation on claims asserted by Plaintiff and members of the Class have been and are tolled, and Defendant is equitably estopped from raising statutes of limitations as a defense.

99.    Any applicable statutes of limitations were tolled at least until February 12, 2018, the date that TransUnion filed its Counterclaim against Defendant.

100.    The federal government's initiation of its antitrust investigation of Defendant's unlawful conduct also operates to toll any federal statute of limitations under 15 U.S.C. §16.

## VII.    CLAIMS FOR RELIEF

### CLAIM ONE:
### MONOPOLIZATION
### 15 U.S.C. §2

101.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

102.    The relevant product market is the market for the sale of B2B Credit Scores.

103.    The relevant geographic market for the sale of B2B Credit Scores is the United States.

104.    The B2B Credit Score Market is the relevant market.

105.    Fair Isaac has had and continues to have at least 90% market share in the B2B Credit Score Market.

106.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

107.    Fair Isaac has had and continues to have the power to control prices or exclude competition in the B2B Credit Score Market.

108.    Through unlawful, interconnected, and mutually reinforcing anticompetitive and exclusionary acts and agreements, Fair Isaac has substantially foreclosed competition in the market for B2B Credit Scores in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. §2.

109.    Fair Isaac has demonstrated its ability to control prices and exclude competition by raising prices without a corresponding increase in demand and to supracompetitive levels.

110.    Fair Isaac's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

111.    Fair Isaac's monopolization has injured and will continue to injure competition in this market.

112.    Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

113.    The anticompetitive conduct raised the prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

114.    Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's violation of Section 2 of the Sherman Act within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15.

115.    Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendant's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26.

**CLAIM TWO:**
**CONSPIRACY TO MONOPOLIZE**
**15 U.S.C. §2**

116.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

117.    The relevant product market is the market for the sale of B2B Credit Scores.

118.    The relevant geographic market for the sale of B2B Credit Scores is the United States.

119.    The B2B Credit Score Market is the relevant market.

120.    Fair Isaac has had and continues to have at least 90% market share in the B2B Credit Score Market.

121.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

122.    Fair Isaac has had and continues to have the power to control prices or exclude competition in the B2B Credit Score Market.

123.    Through unlawful, interconnected, and mutually reinforcing anticompetitive and exclusionary acts and agreements, Fair Isaac has substantially foreclosed competition in the market for B2B Credit Score Market in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. §2.

124.    Fair Isaac has demonstrated its ability to control prices and exclude competition by raising prices without a corresponding increase in demand, and to supracompetitive levels.

125.    Fair Isaac entered into a combination or conspiracy with the Credit Bureaus to maintain its monopoly power in the B2B Credit Score Market.  Fair Isaac created and maintained this conspiracy through a series of agreements with each of the Credit Bureaus.   In these

agreements, the Credit Bureaus and Fair Isaac agreed that the Credit Bureaus would not offer or sell VantageScore or any other competing Credit Score to Plaintiff and members of the Class. Fair Isaac and the Credit Bureaus further agreed that the Credit Bureaus would act as Fair Isaac's agent in the sale of FICO Scores to Plaintiff and members of the Class.

126. These agreements foreclosed competition in a substantial portion of the B2B Credit Score Market and unlawfully maintained Fair Isaac's monopoly, resulting in Fair Isaac extracting supracompetitive prices for FICO Scores from Plaintiff and members of the Class.

127. Fair Isaac's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

128. Fair Isaac's monopolization conspiracy has injured and will continue to injure competition in this market.

129. Fair Isaac has acted with the specific intent of monopolizing the market for B2B Credit Scores in the United States.

130. Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

131. The conspiracy raised the prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

132. Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's violation of Section 2 of the Sherman Act within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15.

133. Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendant's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26.

## CLAIM THREE:
## UNREASONABLE RESTRAINT OF TRADE
## 15 U.S.C. §1

134.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

135.    The relevant product market is the market for the sale of B2B Credit Scores.

136.    The relevant geographic market for the sale of B2B Credit Scores is the United States.

137.    The B2B Credit Score Market is the relevant market.

138.    Fair Isaac and the Credit Bureaus have had and continue to collectively have at least 90% market share in the B2B Credit Score Market.

139.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

140.    Fair Isaac has had and continues to have the power to control prices or exclude competition in the B2B Credit Score Market.

141.    Fair Isaac entered into agreements with TransUnion, Experian, and Equifax that contained anticompetitive terms whereby each Credit Bureau agreed not to offer or sell VantageScore as a competing product to Plaintiff and members of the Class.

142.    The agreements between Fair Isaac and the Credit Bureaus had substantial anticompetitive effects.  The agreements excluded VantageScore, a significant competitor, from a substantial portion of competition in the B2B Credit Score Market.

143.    The agreements raised the price for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

144.    Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

29

145. Plaintiff and members of the Class continue to suffer damage, and will continue to do so, if Fair Isaac does not cease its anticompetitive conduct.

146. Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's violation of Section 1 of the Sherman Act, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15.

147. Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendant's continuing violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26.

## CLAIM FOUR:
## STATE ANTITRUST LAWS

148. Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

149. By reason of the foregoing, Defendant has violated, and Plaintiff and members of the Class are entitled to relief under, the antitrust laws of the States of Arizona, California, Connecticut, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin, as well as the District of Columbia, as follows:

    i. Arizona Revised Statutes §44-1401, *et seq*.;

    ii. California Cartwright Act, California Business & Professions Code §16700, *et seq*.

    iii. Connecticut Antitrust Act, Conn. Gen. Stat. 35-24, *et seq*.;

    iv. District of Columbia Code §28-4501, *et seq*.;

    v. Hawaii Revised Statutes §480-2, *et seq*.;

30

vi.  Illinois Antitrust Act, Illinois Complied Statutes §740, Ill. Comp. Stat. 1011, *et seq.*;

vii.  Iowa Competition Law, Iowa Code §553.1, *et seq.*;

viii.  Kansas Statutes Annotated §50-101, *et seq.*;

ix.  Maine Revised Statutes Annotated, tit. 10, §1101, *et seq.*;

x.  Maryland Code Annotated, Commercial Law, §11-204, *et seq.*;

xi.  Michigan Compiled Laws §445.771, *et seq.*;

xii.  Minnesota Antitrust Law of 1971, Minnesota Statutes §325D.49, *et seq.*;

xiii.  Mississippi Code Annotated §75-21-1, *et seq.*;

xiv.  Nebraska Revised Statutes §59-801, *et seq.*;

xv.  Nevada Revised Statutes Annotated §598A.010, *et seq.*;

xvi.  New Mexico Statutes Annotated §57-1-1, *et seq.*;

xvii.  New York Donnelly Act, New York General Business Law §340, *et seq.*;

xviii.  North Carolina General Statutes §75-1, *et seq.*;

xix.  North Dakota Century Code §51-08.1-01, *et seq.*;

xx.  Oregon Revised Statutes §646.705, *et seq.*;

xxi.  Rhode Island General Laws §6-36-4, *et seq.*;

xxii.  South Dakota Codified Laws §37-1-3.1, *et seq.*;

xxiii.  Tennessee Code Annotated §47-25-101, *et seq.*;

xxiv.  Utah Code Annotated §76-10-3104, *et seq.*;

xxv.  Vermont Statutes Annotated, tit. 9, §2451, *et seq.*;

xxvi.  West Virginia Code §47-18-1, *et seq.*; and

xxvii.  Wisconsin Statutes §133.01, *et seq.*

## CLAIM FIVE:
## STATE UNFAIR TRADE PRACTICES LAWS

150.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

151.    By reason of the foregoing, Defendant has violated, and Plaintiff and members of the Class are entitled to relief under, the Unfair Trade Practices and Consumer Protection Laws of the States of Arkansas, California, Connecticut, Florida, Massachusetts, Missouri, Montana, New Mexico, New York, North Carolina, Rhode Island, South Carolina, and Vermont, as well as the District of Columbia, as follows:

  i.    Arkansas Code Annotated, §4-88-101, *et seq*.;

  ii.   California Business and Professions Code §17200, *et seq*.;

  iii.  Connecticut Unfair Trade Practices Act, Conn Gen. Stat. §42-110a, *et seq*.;

  iv.   District of Columbia Code §28-3901, *et seq*.;

  v.    Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201, *et seq*.;

  vi.   Massachusetts Consumer Protection Act, Mass. Gen. L. Ch. 93A, *et seq*.;

  vii.  Missouri Merchandising Practices Act, Mo. Rev. Stat. §407.010, *et seq*.;

  viii. Montana Code, §30-14-103, *et seq*., and §30-14-201, *et seq*.;

  ix.   New Mexico Statutes Annotated §57-12-1, *et seq*.;

  x.    New York General Business Law §349, *et seq*.;

  xi.   North Carolina General Statutes §75-1.1, *et seq*.;

  xii.  Rhode Island General Laws §6-13.1-1, *et seq*.;

  xiii. South Carolina Code Annotated §39-5-10, *et seq*.; and

  xiv.  Vermont Statutes Annotated, tit. 9, §2451, *et seq*.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and members of the Class, respectfully prays that This Honorable Court:

A.      Order that this action may be maintained as a class action pursuant to Rules 23(a) & (b) of the Federal Rules of Civil Procedure, that it be named a Class Representative, that the undersigned be named Lead Class Counsel, and that reasonable notice of this action, as provided by Rule 23(c)(2), be given to members of the Class;

B.      Adjudge that Defendant violated the federal antitrust laws as set forth above;

C.      Adjudge that Defendant violated the state antitrust and unfair trade practices laws as set forth above;

D.      Award Plaintiff and members of the Class actual, treble, and exemplary damages;

E.      Award Plaintiff and members of the Class attorneys' fees and costs of suit, including costs of consulting and testifying experts;

F.      Award Plaintiff and members of the Class pre- and post-judgment interest;

G.      Enjoin Defendant from its violations of law; and

H.      Grant such other, further and different relief, including structural relief, as may be just and proper.

## IX.     DEMAND FOR JURY TRIAL

Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a Trial by Jury as to all issues so triable.

Dated:  April 2, 2020

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

 s/ Joseph P. Guglielmo
Joseph P. Guglielmo (N.D. Ill. No. 2759819)
Peter A. Barile III (N.D. Ill. No. 4364295)

Justin W. Batten (*pro hac vice* forthcoming)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334
jgugliemo@scott-scott.com
pbarile@scott-scott.com
jbatten@scott-scott.com

Christopher M. Burke (*pro hac vice* forthcoming)
**SCOTT+SCOTT  ATTORNEYS  AT  LAW  LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone:  619-233-4565
Facsimile:  619-233-0508
cburke@scott-scott.com

George A. Zelcs (Ill. Bar No. 3123738)
Randall P. Ewing, Jr. (Ill. Bar No. 6294238)
Ryan Z. Cortazar (Ill. Bar No. 6323766)
**KOREIN TILLERY, LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
Facsimile:  312-641-9751
gzelcs@koreintillery.com
rewing@koreintillery.com
rcortazar@koreintillery.com

Steven M. Berezney (N.D. Ill. Bar No. 56091)
Michael E. Klenov (Ill. Bar No. 6300228)
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: 314-241-4844
Facsimile:  314-241-3525
sberezney@koreintillery.com
mklenov@koreintillery.com

*Counsel for Plaintiff Sky Federal Credit Union*

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| FIRST CHOICE FEDERAL CREDIT UNION, on Behalf of Itself and All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| FAIR ISAAC CORPORATION, | |
| Defendant. | |

**TABLE OF CONTENTS**

I. NATURE OF THE ACTION ................................................................. 1

II. PARTIES .......................................................................................... 4

    A. Plaintiff ................................................................................ 4

    B. Defendant ............................................................................ 5

III. JURISDICTION, VENUE, AND INTERSTATE COMMERCE ................... 5

IV. ALLEGATIONS OF FACT SUPPORTING THE CLAIM FOR RELIEF ....... 6

    A. Credit Scores ........................................................................ 6

    B. The Markets for Credit Scores in the United States .............. 7

    C. Fair Isaac Has a Monopoly in the B2B Credit Score Market ................ 9

    D. Attempts To Compete Have Been Stymied by Fair Isaac's Monopoly in the B2B Credit Score Market ............................................. 11

    E. Fair Isaac Has Contracted with the Credit Bureaus as Agents and Co-Conspirators in Its Scheme To Monopolize ...................... 13

    F. Fair Isaac's Other Anticompetitive and Exclusionary Conduct ................ 14

        1. Fair Isaac and the Credit Bureaus Have Entered into Anticompetitive Contract Terms that Restrict Their Ability To Compete and Sell VantageScore ............................................................. 15

            a. The Anticompetitive Agreements Restrict the Credit Bureaus' Ability To Develop or Sell Other Credit Scores Compatible with B2B Purchasers' Existing Systems ....................... 15

            b. Fair Isaac and the Credit Bureaus Have Agreed to a Penalty Pricing and Bundling Scheme To Foreclose Competition from Competitors in the B2B Credit Score Market ...................... 17

            c. Fair Isaac and the Credit Bureaus Have Agreed to Contract Provisions that Allow Fair Isaac To Extract Monopoly Prices ..... 19

        2. Fair Isaac's Campaign To Create Fear, Uncertainty, and Doubt About VantageScore Among B2B Purchasers ................... 19

        3. Fair Isaac's Anticompetitive and Exclusionary Conduct Harms Competition .......................................................................... 22

V. CLASS ACTION ALLEGATIONS ....................................................... 23

VI. STATUTES OF LIMITATIONS AND TOLLING ..................................... 25

VII. CLAIMS FOR RELIEF ..................................................................... 25

    CLAIM ONE: MONOPOLIZATION 15 U.S.C. § 2 ............................. 25

    CLAIM TWO: CONSPIRACY TO MONOPOLIZE 15 U.S.C. § 2 ............ 27

    CLAIM THREE: UNREASONABLE RESTRAINT OF TRADE 15 U.S.C. § 1 .......... 29

VIII. PRAYER FOR RELIEF ..................................................................... 30

IX. DEMAND FOR JURY TRIAL ............................................................ 31

Plaintiff First Choice Federal Credit Union, on behalf of itself and all other similarly situated residents of the United States, brings claims under the Sherman Act against Defendant Fair Isaac Corporation ("Fair Isaac") for redress of the injury and damages resulting from its monopolizing, conspiring to monopolize, and otherwise unreasonably restraining trade from at least as early as January 1, 2006, through the date by which the anticompetitive effects of Defendant's violations of law shall have ceased, but in any case no earlier than the present (the "Class Period"). Based upon personal knowledge, information and belief, proceedings and admissions made in Case No. 1:17-cv-08318 (N.D. Ill.), related ongoing federal government investigations, and investigation of counsel, Plaintiff alleges:

## I.    NATURE OF THE ACTION

1.    "Credit Scores" are three digit numbers that rank or "score" creditworthiness within a range by applying certain algorithms to credit histories. There are two distinct markets for Credit Scores in the United States: (1) the market for the sale of Credit Scores to lenders, financial institutions, and other businesses for risk management decisions (the "B2B Credit Score Market"); and (2) the market for the sale of Credit Scores directly to consumers to monitor their own credit records (the "business-to-consumer" or "B2C Credit Score Market").

2.    This case concerns the B2B Credit Score Market, over which Defendant Fair Isaac has unlawfully maintained a 90% monopoly for many years.

3.    Fair Isaac has abused its monopoly power by engaging in anticompetitive and exclusionary conduct and agreements. Fair Isaac has suppressed competition, stymied innovation, and limited access to credit for millions of Americans – all in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

4.      Fair Isaac's FICO Credit Scores ("FICO Scores") have dominated the market for nearly three decades.  Fair Isaac executives have bragged that their FICO Scores are "the 800-pound gorilla" and are "deeply embedded in the system in North America."  Fair Isaac admitted in 2017 that it has "maintained a 90-plus percent market share for at least 13 years."  Fair Isaac advertises that its FICO Scores are used for 90% of all lending decisions in the United States and that Fair Isaac sells four times more FICO Scores per year than McDonald's sells hamburgers worldwide.

5.      TransUnion, Experian, and Equifax are credit reporting agencies that collect, standardize, and distribute information on consumer credit activity (collectively, the "Credit Bureaus").  Credit Bureaus sell lenders, financial institutions, and other businesses credit reports and Credit Scores – including Fair Isaac's FICO Scores – that are used to make decisions about whether and on what terms to evaluate and extend credit.  Credit Bureaus sell those credit reports and Credit Scores to businesses in every state.  For decades, Credit Bureaus have acted as Fair Isaac's agents and co-conspirators to broker sales between businesses and Fair Isaac of the dominant FICO Scores.  Fair Isaac has used these distribution agreements to place anticompetitive restrictions on the three dominant Credit Bureaus' ability to develop or distribute competitive Credit Scores; prohibited Credit Bureaus from individually negotiating royalty prices for access to FICO Scores; charged discriminatory and prohibitively high royalty prices for FICO Scores if a Credit Bureau customer purchases a FICO Score while providing the consumer with a competing score; and increased the royalty prices that must be paid by Credit Bureaus.  Nevertheless, the Credit Bureaus have agreed to, and acquiesced in, these restrictions.

6.      In 2006, VantageScore Solutions, LLC ("VantageScore"), a joint venture of the Credit Bureaus, launched a competitive Credit Score known as VantageScore.  From the outset,

VantageScore was competitively priced, highly predictive, and scored millions more Americans than Fair Isaac's FICO products. Today, by making full use of the Credit Bureaus' consumer data, including rental and utility payments, VantageScore is capable of providing Credit Scores for an additional 30 million Americans who do not have a FICO Score. Were VantageScore widely adopted by businesses, millions more creditworthy Americans would have the opportunity to apply for a home mortgage, car loan, or credit card, and obtain credit at lower costs.

7.     Rather than compete on the merits with VantageScore, Fair Isaac has engaged in a pattern of anticompetitive conduct over the course of more than a decade to discourage the adoption of VantageScore and preserve its own monopoly, with the Credit Bureaus' assistance. Fair Isaac has abused its monopoly power to prevent the Credit Bureaus from successfully marketing and selling a competitive alternative to FICO Scores and has waged a disparaging public relations and advertising campaign to create fear, uncertainty, and doubt about VantageScore's viability and reliability with lenders and consumers.

8.     Through its exclusionary conduct, Fair Isaac has succeeded in preventing the substantial sales growth that VantageScore or a competing credit scoring system would have achieved though competition on the merits. Having suppressed competition, Fair Isaac has been able to significantly increase prices, including most recently in September 2019, for its FICO Scores. But for Fair Isaac's suppression of competition and the resulting contractual agreements not to compete, VantageScore or another competitive credit scoring system would have thrived and won substantial market share through its innovative product and would have reduced the prices paid for B2B Credit Scores by Plaintiff and members of the Class.

9.     Fair Isaac's anticompetitive and exclusionary conduct has harmed businesses that have been deprived of competitive pricing for instruments that allow them to gauge credit risk and have had their freedom of choice restricted.  Opening the market to competition is essential to competitive pricing and product innovation, including scoring the tens of millions of creditworthy Americans who have been denied access to credit.

10.     In February 2018, TransUnion filed antitrust counterclaims for monopolization and related claims against Fair Isaac in this District.  *See Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318, ECF No. 38 (redacted counterclaims).  In March 2019, The Honorable Judge Sharon Johnson Coleman denied Fair Isaac's motion to dismiss TransUnion's antitrust counterclaims.  *See id.*, ECF No. 96.  The matter is ongoing.

11.     On March 15, 2020, Fair Isaac disclosed that it was under investigation by the Antitrust Division of the United States Department of Justice for exclusionary conduct relating to the allegations in the counterclaims upheld by Judge Coleman.[1]

## II.     PARTIES

### A.     Plaintiff

12.     Plaintiff First Choice Federal Credit Union is a federally chartered credit union with a principal place of business in New Castle, Pennsylvania.

13.     Plaintiff is a financial institution that provides financial services, including deposit accounts, credit and/or debit cards, and lending and other credit-related facilities for consumers.

---

[1] *See* Fair Isaac Corporation, *Press Release: FICO Statement Regarding Antitrust Investigation*, PR Newswire (Mar. 15, 2020), https://www.prnewswire.com/news-releases/fico-statement-regarding-antitrust-investigation-301024452.html.

14.     During the Class Period, Plaintiff directly purchased B2B Credit Scores from Defendant and a Credit Bureau.

15.     Plaintiff was injured in its business or property as a direct, proximate, and material result of Defendant's violations of law.

16.     Plaintiff is threatened with future injury to its business and property by reason of Defendant's continuing violations of law.

**B.     Defendant**

17.     Defendant Fair Isaac Corporation is a Delaware corporation, with its principal place of business at 181 Metro Drive, Suite 700, San Jose, California 95110.

## III.     JURISDICTION, VENUE, AND INTERSTATE COMMERCE

18.     This action arises under Sections 1 and 2 of the Sherman Antitrust Act of 1890 (as amended), 15 U.S.C. §§ 1, 2, and Sections 4 and 16 of the Clayton Antitrust Act of 1914 (as amended), 15 U.S.C. §§ 15, 26.

19.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), and 1337.

20.     Venue is proper in this District under 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b), (c) and (d), because during the Class Period, Defendant resided, transacted business, was found, or had agents in the United States, including in this District, and a substantial portion of the alleged activity affected interstate trade and commerce, including in this District.

21.     During the Class Period, Defendant's conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States, including in this District.

22.     During the Class Period, Defendant used the instrumentalities of interstate commerce, including interstate wires, wireless spectrum, and the U.S. mail, to effectuate its illegal scheme.

23.     This Court has personal jurisdiction over Defendant because Defendant transacted business, maintained substantial contacts, and is located and/or committed unlawful conduct in this District. The unlawful scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

24.     Plaintiff purchased at least one FICO Score from Fair Isaac and TransUnion, which is headquartered in this District.

25.     Defendant employs persons who work in its Credit Score business in this District.

26.     Defendant is registered to do business in Illinois with the Illinois Secretary of State.

27.     Defendant selected this District to institute Case No. 1:17-cv-08318, to which this case is filed as related by Plaintiff.

## IV.     ALLEGATIONS OF FACT SUPPORTING THE CLAIM FOR RELIEF

### A.     Credit Scores

28.     Credit Scores are typically three-digit numbers that are designed to assess credit risk. Higher scores generally indicate that a consumer poses less credit risk. Credit Scores are produced using credit scoring systems that apply a credit scoring algorithm to a consumer credit report. Credit Scores are usually accompanied by "reason codes," which inform the lender about the reasons that contributed most significantly to reducing a particular consumer's Credit Score.

29.     Credit Scores are the most widely used indicators of consumers' creditworthiness in the United States. Lenders, financial institutions, and other businesses rely on Credit Scores to decide whether and on what terms to extend credit to consumers. Consumers, in contrast, rely on

Credit Scores to determine whether they will be able to get a mortgage, credit card, auto loan, or other credit product and the rate they will pay.

30.     The Credit Bureaus collect and supply aggregated consumer credit data in the form of consumer reports.  The Credit Bureaus continuously gather credit and financial data about consumers from creditors, governmental entities, public records, collection agencies, and other third parties.  This information is then compiled into a "credit file."  The Credit Bureaus sell credit reports, which include information gathered from a consumer's credit file, to businesses and consumers.

31.     While Credit Scores are sometimes sold together with credit reports, credit reports are different from Credit Scores and can be sold independently.  A credit report is a statement that has detailed information about a consumer's credit activity and current credit situation.  A consumer's credit report might, for example, include information about that consumer's history of mortgage payments, credit card balances, credit card payments, and credit inquiries.  A Credit Score takes the detailed information in a credit report and turns it into a single three-digit number.

**B.      The Markets for Credit Scores in the United States**

32.     There are two distinct markets for Credit Scores in the United States: (1) the B2B Credit Score Market; and (2) the B2C Credit Score Market.  B2B and B2C Credit Scores are priced, purchased, and used very differently and serve very different purposes.  The lenders, financial institutions, and other businesses in the B2B Credit Score Market that purchase and use Credit Scores to assess creditworthiness and make decisions about whether and on what terms to extend credit or otherwise take on risk do not consider credit reports, insurance scores, or any other information about borrowers, to be a substitute for Credit Scores.

7

33.     Consumers in the B2C Credit Score Market purchase their own Credit Scores to better understand their own creditworthiness and how they likely will be viewed by potential lenders.

34.     The United States is the relevant geographic market in which B2B Credit Scores are provided.  The restraints on competition in the B2B Credit Score Market contained in Fair Isaac's contracts relate to the provision of B2B Credit Scores to businesses throughout the United States.

35.     Purchasers in the B2B Credit Score Market are comprised of lenders, financial institutions, and other businesses that purchase B2B Credit Scores in order to make risk management decisions ("B2B Purchasers").  Lenders, financial institutions, and other businesses that purchase Credit Reports from Defendant and/or the Credit Bureaus generally purchase Credit Scores in order to determine the creditworthiness and identity of qualified borrowers to whom a preapproved credit offer will be extended ("pre-screening"), make lending decisions ("lending"), or review the risk associated with existing borrowers for purposes such as extending additional credit or changing other account terms ("account management").

36.     Customers in the B2C Credit Score Market, in contrast, purchase Credit Scores in order to manage their credit, protect their identity, or assess their likelihood of obtaining credit. Today, American consumers have signed up for over 160 million credit monitoring or identity protection accounts from businesses such as Capital One, Credit Karma, and LifeLock.  Many of those accounts include access to the consumer's own Credit Score.

37.     The credit risk scoring industry, industry analysts, policy analysts, and investors recognize the B2B Credit Score Market as distinct from the B2C Credit Score Market.  Fair Isaac also regularly acknowledges that the B2B Credit Score Market is distinct from the B2C Credit

Score Market. For example, in its 2019 Form 10-K, Fair Isaac distinguished between its "business-to-business scoring solutions and services" and "business-to-consumer scoring solutions and services including myFICO® solutions for consumers."

38. The B2B Credit Score Market is characterized by significant barriers to entry. B2B Purchasers encounter significant "switching costs" if they adopt a new Credit Score that has different score-to-risk relationships or that uses different reason codes – regardless of whether it is an updated version of the score they already use or an entirely new brand of Credit Score (unlike consumers in the B2C Credit Score Market). These switching costs arise because employees have to be trained in the properties and characteristics of a new score; B2B Purchasers must ensure that the new score will be adequately predictive of the creditworthiness of their own customer base; B2B Purchasers often conduct extensive, costly, and time-consuming validation tests to determine whether the new score is cost-effective; and B2B Purchasers may need to invest in updating their internal systems to ensure technical compatibility between those systems and a new score.

39. Network effects also characterize the B2B Credit Score Market. For example, in the mortgage and auto loan industries, the consistent use of particular Credit Scores with similar score-to-risk relationships and reason codes facilitates the bundling of large groups of mortgage and auto loans from different originators into securities that can be sold to investors. Because of the consistent use of a single type of Credit Score, marketing materials for these securities can include data on the average and stratified Credit Scores of the borrowers associated with the underlying loans.

**C.     Fair Isaac Has a Monopoly in the B2B Credit Score Market**

40. Fair Isaac has maintained a monopoly over the B2B Credit Score Market in the United States for roughly three decades, largely through the unlawfully achieved dominance of

its FICO product line, which includes many different types of FICO Scores. Introduced in the 1980s, Fair Isaac's "FICO Classic" Credit Scores are the best known and most widely used B2B Credit Scores in the United States. FICO Classic applies an algorithm to each Credit Bureau's data and generates a score between 300 and 850 that purports to give an indication of the individual's credit risk. It also generates a set of "reason codes" that explain the reasons the consumer has not been assigned the maximum score.

41.     Fair Isaac advertises its monopoly in the B2B Credit Score Market. On its website, Fair Isaac advertises: 10 billion FICO Scores are sold each year, which is four times the number of hamburgers that McDonald's sells worldwide each year; 27.4 million FICO Scores are sold every day, which is over twice the number of cups of coffee Starbucks sells worldwide in a day; and 90% of all lending decisions in the United States rely on FICO Scores.

42.     Similarly, in its 2019 Form 10-K, Fair Isaac described its "FICO Scores" as "the standard measure in the U.S. of consumer credit risk" and reported that "FICO Scores are used . . . by nearly all of the major banks, credit card organizations, mortgage lenders and auto loan originators."

43.     Fair Isaac representatives have described Fair Isaac's FICO Score as "***the 800-pound gorilla***" in the market for B2B Credit Scores and bragged about Fair Isaac's 90% market share. For example, in November 2017, at the JPMorgan Ultimate Services Investor Conference, Fair Isaac's CFO and Executive Vice President, Michael Pung, stated that Fair Isaac's FICO Scores are:

- ***The "most widely used credit scoring system here in the U.S.";***

- ***Used by "[v]irtually every major lender in the U.S."; and***

- ***Fair Isaac has "maintained a 90-plus percent market share for at least . . . 13 years."***

44.     Fair Isaac representatives have also recognized that FICO Scores have benefited from the network effects created by the widespread use of FICO Scores in many industries.  For example, in November 2011, then-CEO of Fair Isaac, Mark Greene, explained that the "network effect" of "FICO Scores . . . being sort of the standard language" and "**having everybody . . . standardize on a FICO Score, that's magic**."

45.     Fair Isaac's monopoly in the B2B Credit Score Market for Credit Scores has given it the power to control prices.  Indeed, Fair Isaac's CEO, Will Lansing, has noted that in the B2B Credit Score Market Fair Isaac has "**quite a bit of discretion in whether we want our margins to be higher or lower or where they are**."

**D.     Attempts To Compete Have Been Stymied by Fair Isaac's Monopoly in the B2B Credit Score Market**

46.     In March 2006, VantageScore introduced the VantageScore Credit Score and credit scoring system.  VantageScore is a competitor to FICO Scores in the B2B Credit Score Market.

47.     From the time it was first released in 2006, VantageScore scored millions more consumers than the FICO scoring systems.  Whereas Fair Isaac's FICO scoring systems would not generate a score if a consumer had not used credit in more than six months or if a credit account was fewer than six months old, VantageScore calculated scores for consumers that had not used credit for up to two years.  It also reached more consumers by using utility and telecommunications payment histories when reported to the Credit Bureaus.

48.     Today, VantageScore scores 30 million more Americans than traditional FICO scoring systems.  Fair Isaac's outdated FICO Classic credit scoring systems – which are still used by many lenders – exclude many creditworthy Americans that VantageScore can reliably score. About one-quarter of American adults – some 65 million people – do not have a traditional FICO

Score. VantageScore is capable of reducing the number of adults without a Credit Score by almost half. Ten million of those newly scored individuals are "prime" borrowers that should be attractive to traditional lenders.

49. Without a Credit Score, it is difficult or impossible to apply for or successfully obtain a mortgage, car loan, or reasonable interest rates on personal lines of credit. Not having a Credit Score can also have drastic effects outside of the credit market. For example, Credit Scores are increasingly used by landlords to screen potential tenants.

50. Those excluded by Fair Isaac's traditional FICO scoring systems – who face an increased risk of being denied access to credit in the form of credit cards, auto and home loans, and apartment housing – include disproportionate numbers of low-income and minority consumers.

51. Indeed, one advocacy group focused on making it possible for people with limited incomes, especially people of color, to achieve financial security has observed: "Black and Hispanic individuals are . . . significantly more likely than white individuals to be credit invisible" – meaning that they have "no established credit history," are "unscored," and "lack[] sufficient or recent enough credit history to be given a [FICO] credit score." VantageScore calculates a score for 9.5 million Hispanic and Black consumers who do not have a FICO Score, including 2.7 million minority consumers who should be considered "prime" borrowers.

52. Despite the potential advantages of using VantageScore, Fair Isaac continues to maintain its monopoly in the B2B Credit Score Market. In February 2013, at a Morgan Stanley Conference, Fair Isaac's CEO, Will Lansing, explained that despite the existence of VantageScore, "there [is] not that much competition around our [B2B] scores business" because

"*FICO scores are very much part of the fabric of the banking industry*" *and are* "*really deeply imbedded*."

**E.      Fair Isaac Has Contracted with the Credit Bureaus as Agents and Co-Conspirators in Its Scheme To Monopolize**

53.      With its dominant position in the B2B Credit Score Market, Fair Isaac uses the Credit Bureaus to perpetuate and extend its monopoly.  Fair Isaac's relationship with B2B Purchasers is often dependent on B2B Purchasers' relationships with the Credit Bureaus.  To facilitate the sale of its FICO Scores to B2B Purchasers, Fair Isaac enlists the assistance of the Credit Bureaus.

54.      When a B2B Purchaser requires a Credit Score, it purchases the report from the Credit Bureau and the Credit Score jointly from the Credit Bureau and Fair Isaac.  Although the payment may at times occur in a single transaction, the practical reality, as expressly set forth in contracts governing the sale of Credit Scores to B2B Purchasers, is that both the Credit Bureau and Fair Isaac act as the provider of the FICO Score.

55.      B2B Purchasers' contracts for FICO Scores are often known as Credit Scoring Services Agreements ("CSSAs").  CSSAs provide for both the method of payment and fee model for the delivery of Credit Score services.

56.      For example, the CSSA between Plaintiff, its Credit Bureau TransUnion, and Fair Isaac makes clear that "the Fair Isaac Scores are the property of Fair Isaac and are proprietary to Fair Isaac" and that Fair Isaac grants to Plaintiff a "limited license to use, internally, the Fair Isaac Scores solely for the particular purpose . . . for which the Fair Isaac Scores were obtained." The CSSA further provides that TransUnion "is fully authorized to sign this Agreement, including Exhibit A, on behalf of Fair Isaac and such signature on behalf of Fair Isaac constitutes Fair Isaac's agreement to the terms and conditions of this Agreement."  Exhibit A to the CSSA

then sets forth the various Fair Isaac Scores which may be purchased by Plaintiff and specifically permits the fees for such Fair Isaac Scores to "be included in a separate pricing schedule between TransUnion and Client."

57.    In Plaintiff's and Class members' procurement of FICO Scores, the Credit Bureaus act as co-conspirators and agents of Fair Isaac. Indeed, Plaintiff's CSSA provides that "TransUnion [will] deliver Fair Isaac Scores" to Plaintiff and that TransUnion is executing the Agreement "for itself and Fair Isaac Corporation."

**F.    Fair Isaac's Other Anticompetitive and Exclusionary Conduct**

58.    Fair Isaac has used its monopoly power to coordinate a multi-faceted campaign to eliminate competition from VantageScore. Fair Isaac has been explicit that this is its goal. In April 2015, Will Lansing informed investors on a quarterly earnings conference call that Fair Isaac's strategic goal was to ensure that "the entire industry adopts FICO scores instead of [other] scores." To achieve this goal, Fair Isaac has enlisted its competitors (the Credit Bureaus, which jointly own and control VantageScore) to agree to anticompetitive contracts that: prevent them from developing or selling alternative Credit Scores that could be seamlessly integrated into many lenders' systems or used interchangeably with FICO Scores; prevent them from competing with each other to negotiate prices from FICO; and create a pricing scheme that effectively forecloses B2B Purchasers from choosing to use FICO Scores in their lending decisions while simultaneously providing customers with a competing Credit Score, including VantageScore. At the same time, Fair Isaac has waged a media campaign against VantageScore and has made false and misleading statements in order to sow fear, uncertainty, and doubt about VantageScore's reliability. By its anticompetitive and exclusionary conduct, Fair Isaac has injured competition in the B2B Credit Score Market, increased prices for Plaintiff and the Class, and limited access to credit for millions of Americans.

1.      **Fair Isaac and the Credit Bureaus Have Entered into Anticompetitive Contract Terms that Restrict Their Ability To Compete and Sell VantageScore**

59.      In January 2015, Fair Isaac and TransUnion entered into a contract, the Analytic and Data License Agreement.  With TransUnion's prior contracts with Fair Isaac set to expire on December 31, 2014, Fair Isaac demanded that the parties enter into a new contract rather than renew their existing contracts.  Fair Isaac represented to TransUnion that Experian and Equifax had already agreed to materially similar new contracts with Fair Isaac.  If TransUnion did not agree to the terms demanded by Fair Isaac, it would lose substantial business from customers that depend on FICO Scores.  On information and belief, TransUnion, Equifax, and Experian all agreed to Fair Isaac's plan to exclude competitors and maintain its monopoly.

a.      **The Anticompetitive Agreements Restrict the Credit Bureaus' Ability To Develop or Sell Other Credit Scores Compatible with B2B Purchasers' Existing Systems**

60.      Fair Isaac has imposed a similar or identical "No Equivalent Products" clause on each of the Credit Bureaus.  By imposing a "No Equivalent Products" term, Fair Isaac has sought to block the Credit Bureaus from offering alternative Credit Score products, such as VantageScore, that would allow B2B Purchasers to easily switch from FICO Scores to VantageScore without incurring the cost of redesigning their lending programs and systems, or to use VantageScore alongside or interchangeably with FICO Scores.  The Credit Bureaus have agreed to and acquiesced in these anticompetitive agreements, terms, and resulting anticompetitive effects.

61.      The "No Equivalent Products" clause provides that a Credit Bureau may not internally develop a credit scoring system that is aligned to the odds-to-score relationship of any Fair Isaac Analytic or that uses more than a limited number of reason codes that "match" reason codes used by any Fair Isaac Analytic.  It also prohibits a Credit Bureau from distributing any

competing analytic (*i.e.*, credit scoring system) that is aligned with FICO Scores or uses too many of the same reason codes. The clause expressly names Vantage Score Solutions LLC as a developer of such a scoring system that may not be distributed if VantageScore were to offer an "Equivalent Product."

62. For example, if a competing Credit Score product used a 700 score to indicate a less-than-five-percent risk of credit delinquency, and if a 700 FICO Score also indicated the same risk of delinquency, then the "No Equivalent Products" clause prevents a Credit Bureau from distributing the competing product. Similarly, if a competing Credit Score product used reason codes that match 20% or more of the reason codes used by FICO scoring systems, the "No Equivalent Products" clause prohibits a Credit Bureau from distributing the product.

63. The "No Equivalent Products" clause effectively prevents a Credit Bureau from developing (contrary to the original goal of VantageScore and the easy ability to do so) or selling an alternative to FICO's Credit Scores that would (1) be compatible with many B2B Purchasers' systems, models, and processes; and (2) allow B2B Purchasers to have a legitimate choice between using FICO Scores and an alternative score. Many B2B Purchasers have spent substantial effort and resources to develop systems, models, and processes that are designed for FICO Scores. B2B Purchasers' systems, models, and processes are tailored to FICO's odds-to-score relationship (*i.e.*, each given score has a given ratio of non-defaulting consumers to defaulting consumers), and reason codes (the particular reasons cited for increased risk of default). For example, a bank's software might be designed to accept one or more FICO Scores and reason codes, combine this information with data it collects internally, and automatically produce a lending decision.

64.     The "No Equivalent Products" clause protects and sustains Fair Isaac's monopoly. The odds-to-score relationship is an arbitrary mapping between risk and score and does not reflect protectable intellectual property.  Similarly, the reason codes that may not be used by an "Equivalent Product" were not invented by Fair Isaac but reflect well-established industry best practices for lending.

        **b.**      **Fair Isaac and the Credit Bureaus Have Agreed to a Penalty Pricing and Bundling Scheme To Foreclose Competition from Competitors in the B2B Credit Score Market**

65.     Fair Isaac's contracts with each Credit Bureau include a similar or identical "Dynamic Royalty Schedule" clause and a similar or identical "Pre-Qualification" royalty category.  Through the "Pre-Qualification" royalty category, Fair Isaac has effectively foreclosed lenders from the ability to purchase and use a FICO Score in their lending decision while providing a consumer with a competing Credit Score, which drives lenders to buy exclusively Fair Isaac's FICO Scores and not to purchase competing Credit Scores.  As a consequence of Fair Isaac's imposition of the "Pre-Qualification" royalty category, TransUnion has lost sales of VantageScore to major banks to provide to consumers.

66.     In 2015, Fair Isaac unilaterally imposed, and the Credit Bureaus have complied with, a new "Pre-Qualification" royalty category, which Fair Isaac defines to "mean an End User's qualification of a potential consumer customer for an End User's own internal lending offering." This royalty category distinguishes between: (1) lenders that use FICO Scores for "Pre-Qualification" without providing any Credit Score or credit data to consumers; and (2) lenders that use FICO Scores for "Pre-Qualification" while also providing Credit Scores or credit data to consumers "in connection" with the "Pre-Qualification."  Certain banks and lenders offer consumers opportunities to apply to qualify for credit opportunities (*e.g.*, a credit card or loan)

and, at the same time, receive their personal Credit Score.  The offer of a free Credit Score to a consumer can entice consumers to apply for credit opportunities.

67.     The royalty price associated with a FICO Score used for "Pre-Qualification" depends on whether other Credit Scores or credit data are provided to consumers.  If a lender purchases a FICO Score for use in "Pre-Qualification" and does not provide any Credit Score or credit data to the consumer "in connection" with the "Pre-Qualification," there is one per-score royalty rate.  If the lender purchases a FICO Score for use in "Pre-Qualification" and provides any other Credit Score (such as a VantageScore) to the consumer "in connection" with the "Pre-Qualification," there is a different per-score royalty rate that is higher – a penalty rate.

68.     The penalty rate can be avoided in one of two ways, both of which involve purchasing exclusively FICO Scores.  First, the B2B Purchaser could purchase a FICO Score for use in "Pre-Qualification" and provide no Credit Score or credit data to the consumer.  Second, the B2B Purchaser could purchase a bundled FICO product from Fair Isaac.  Fair Isaac offers bundled products to lenders that combine the use of scores by lenders with the provision of scores to consumers.

69.     There is no legitimate business justification for the penalty rate agreed upon by Fair Isaac and the Credit Bureaus when the lender also purchases any other Credit Score to disclose to consumers.  The transparent purpose of the "Pre-Qualification" royalty category is to drive all B2B Purchasers engaging in "Pre-Qualification" to purchase exclusively FICO Scores and make it cost-prohibitive for B2B Purchasers engaging in "Pre-Qualification" to purchase a competing Credit Score for disclosure to consumers.  This scheme has been effective, and few, if any, B2B Purchasers have opted to pay the penalty rate.

18

        **c.**      **Fair Isaac and the Credit Bureaus Have Agreed to Contract Provisions that Allow Fair Isaac To Extract Monopoly Prices**

70.    Fair Isaac's "Level Playing Field" provision requires that the prices that are made available to one Credit Bureau be made available to the other Credit Bureaus. Taken together, the "Dynamic Royalty Schedule" and the "Level Playing Field" clauses enable Fair Isaac to unilaterally increase the royalty prices it charges for FICO Scores. Fair Isaac's contracts with TransUnion, Equifax, and Experian include similar or identical "Level Playing Field" and "Dynamic Royalty Schedule" provisions.

71.    Fair Isaac has used the "Level Playing Field" and "Dynamic Royalty Schedule" provisions in its contracts with the Credit Bureaus to extract monopoly prices from B2B Purchasers. These provisions disincentivize a Credit Bureau from negotiating for a lower price because it knows that even if it succeeds, it will not as a result gain a competitive advantage over the other Credit Bureaus.

        **2.**      **Fair Isaac's Campaign To Create Fear, Uncertainty, and Doubt About VantageScore Among B2B Purchasers**

72.    Despite having successfully induced the Credit Bureaus to agree with Fair Isaac and with each other to impose restrictions on VantageScore's ability to compete with FICO, Fair Isaac has gone even further and waged an aggressive public relations and advertising campaign to spread false statements, convey false impressions, and mislead B2B Purchasers about the qualities and characteristics of FICO Scores and VantageScore. In advertisements, letters, and blog posts, Fair Isaac has disparaged VantageScore by calling it a "Fako" score, falsely claimed that VantageScore is an unreliable measure of creditworthiness, and misrepresented the information considered by VantageScore's credit scoring system.

73.    On December 12, 2017, Fair Isaac took out a full-page advertisement in *The Wall Street Journal* addressed to "Lenders, Policymakers and Consumer Advocates" that disparaged

VantageScore without identifying it by name. The advertisement contrasted Fair Isaac, which "is not owned by the credit bureaus" and whose FICO Scores have been used "by lenders and securitization investors for decades," with an alternative Credit Score, which is "owned by the credit bureaus," is less reliable than FICO Scores in evaluating credit risk, and fails to use "sound practices" or "science-based credit evaluation." To anyone familiar with the market for Credit Scores, the advertisement unambiguously conveys the false message that VantageScore is "[w]eakening scoring standards, [and] harm[ing] consumers, and the lending system," particularly in the B2B Credit Score Market.

74. The *Wall Street Journal* advertisement directed readers to "Learn more at FICO.com/independent," a Fair Isaac-owned website that connects visitors to articles and blog posts that disparage VantageScore by name. One such blog post asserts: "Despite claims by VantageScore, weakening the minimum scoring criteria will not empower millions of low-risk mortgage credit seekers."

75. Moreover, the implication that FICO Classic scoring systems provide Credit Scores for as many consumers as VantageScore is false and misleading. VantageScore provides Credit Scores for millions of American consumers that are not scored by FICO Classic scoring systems.

76. Fair Isaac's website includes numerous posts disparaging VantageScore and making false or misleading statements about VantageScore's features. For example, one blog post claims that "[r]esearch results consistently showed that scoring models relying solely on sparse or old credit data were weak and did a poor job forecasting future performance." This statement is false and misleading because it conveys the message that VantageScore's scoring model is "weak" and does a "poor job forecasting future performance" because it considers a

consumer's full credit history even if the consumer has not used a traditional credit line in the last six months. In fact, studies have shown that VantageScore is strongly predictive.

77.     Another blog post claims that whereas "FICO Score 9 differentiates medical from non-medical collections," "VantageScore does not." This statement conveys the false message that VantageScore does not differentiate medical from non-medical collections. In fact, VantageScore 3.0 was the first credit scoring system to address medical debt. VantageScore 4.0, the most recent version of VantageScore, distinguishes medical collection accounts from non-medical collection accounts and penalizes medical collections less than non-medical ones.

78.     Fair Isaac's campaign against VantageScore is not new. In 2006, just months after the launch of VantageScore, Fair Isaac filed a meritless lawsuit against the Credit Bureaus and VantageScore in the United States District Court for the District of Minnesota. *See Fair Isaac Corporation v. Equifax Inc.*, No. 06-cv-04112 (D. Minn.). This was the monopolist's first attempt to kill the nascent competitor. Fair Isaac's numerous claims included a claim that the development of VantageScore violated the antitrust laws and a claim that the development of VantageScore constituted trademark infringement. In its prayer for relief, Fair Isaac sought nothing less than the end of VantageScore: It requested that the "Defendants be ordered to dissolve VantageScore."

79.     All of Fair Isaac's claims failed; in fact, the jury concluded that Fair Isaac was the wrongdoer. In support of its trademark infringement claim, Fair Isaac had alleged that VantageScore's use of a scoring range of 501-990 constituted trademark infringement because it was similar to FICO's scoring range of 300-850. The Credit Bureaus and VantageScore counterclaimed for fraud on the United States Patent and Trademark Office ("PTO"), alleging that Fair Isaac had misrepresented to the PTO that only FICO used the 300-850 score range. The

jury concluded that Fair Isaac had committed fraud on the PTO by making false statements as part of its application to register the score range of 300-850 as a trademark.

80.     The public statements described in the foregoing paragraphs were transmitted to and seen by a substantial number of businesses and consumers nationwide.

### 3.     Fair Isaac's Anticompetitive and Exclusionary Conduct Harms Competition

81.     Fair Isaac's campaign of exclusionary conduct to maintain and expand its monopoly has harmed and continues to harm participants in the B2B Credit Score Market.  Fair Isaac's unlawful conduct, including that which has been taken in concert with the Credit Bureaus, has foreclosed competition in the B2B Credit Score Market by foreclosing opportunities for the Credit Bureaus to sell VantageScore or any other competitive products.  The anticompetitive and exclusionary conduct has allowed Fair Isaac to maintain its monopoly and charge monopoly prices for B2B Credit Scores to B2B Purchasers during the Class Period.

82.     Fair Isaac's conduct, in concert with the Credit Bureaus, including by the contracts entered into by the Credit Bureaus, has reduced choice for B2B Purchasers.  The anticompetitive terms agreed to between Fair Isaac and the Credit Bureaus have frustrated the ability of B2B Purchasers to purchase VantageScore or any other competitive Credit Score that could be seamlessly integrated into lenders' existing processes and systems.  Fair Isaac's media and advertising campaign against VantageScore has been successful in sowing fear, uncertainty, and doubt about VantageScore in the marketplace.

83.     Media sources, financial blogs, and consumers have absorbed Fair Isaac's message that VantageScore is a "***Fako***" score merely because it is not a FICO Score.  For example, thebalance.com – a website devoted to personal finance issues – posted in February

2017, and continues to display as of the date of this filing: "If you purchased your Credit Score anywhere but MyFICO.com, then it's a Fako score."[2]

## V.    CLASS ACTION ALLEGATIONS

84.    Plaintiff brings this action on behalf of itself, and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of:

**All B2B Purchasers residing in the United States that directly purchased a FICO Score from Fair Isaac and/or a Credit Bureau during the Class Period.**

85.    Excluded from the Class are: Defendant, its officers, directors, management, employees, subsidiaries, and affiliates.  Also expressly excluded are any natural persons that purchased their own Credit Score solely via myFico.com, the Credit Bureaus, or other entities for their personal use.

86.    Also excluded is the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household or the spouse of such a person.

87.    Members of the Class are so numerous and geographically dispersed that joinder is impracticable.  Further, members of the Class are readily identifiable from information and records in the possession of Defendant.

88.    Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and members of the Class were damaged by the same wrongful conduct of Defendant.

89.    Plaintiff will fairly and adequately protect and represent the interests of members of the Class.  The interests of Plaintiff are coincident with, and not antagonistic to, those of the members of the Class.

---

[2]    Latoya Irby, *FICO & FAKO Credit Scores*, The Balance (Aug. 18, 2018), https://www.thebalance.com/ fico-and-fako-credit-scores-960497 (last visited Apr. 23, 2020).

90.     Plaintiff is represented by counsel with experience in the prosecution and leadership of class action antitrust and other complex litigation, including class actions in the financial services industry.

91.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, thereby making damages with respect to members of the Class as a whole appropriate.  Questions of law and fact common to members of the Class include, but are not limited to:

   a.   whether Defendant monopolized, conspired to monopolize, or unreasonably restrained trade in violation of federal law;

   b.   the duration of the alleged unlawful conduct;

   c.   injury suffered by Plaintiff and members of the Class;

   d.   damages suffered by Plaintiff and members of the Class; and

   e.   whether Defendant has acted or refused to act on grounds generally applicable to members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Class as a whole.

92.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

93.     The benefit of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

94.     Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

95.     Plaintiff has defined members of the Class based on currently available information and hereby reserves the right to amend the definition of members of the Class, including, without limitation, the Class Period.

## VI.     STATUTES OF LIMITATIONS AND TOLLING

96.     By its very nature, the unlawful activity in which Defendant engaged was self-concealing from Plaintiff and the Class.  As a result of Defendant's affirmative acts, misrepresentations, and nondisclosures as alleged herein, any applicable statutes of limitation on claims asserted by Plaintiff and members of the Class have been and are tolled, and Defendant is equitably estopped from raising statutes of limitations as a defense.

97.     Any applicable statutes of limitations were tolled at least until February 12, 2018, the date that TransUnion filed its Counterclaim against Defendant.

98.     The federal government's initiation of its antitrust investigation of Defendant's unlawful conduct also operates to toll any federal statute of limitations under 15 U.S.C. § 16.

## VII.    CLAIMS FOR RELIEF

### CLAIM ONE:
### MONOPOLIZATION
### 15 U.S.C. § 2

99.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

100.    The relevant product market is the market for the sale of B2B Credit Scores.

101.    The relevant geographic market for the sale of B2B Credit Scores is the United States.

102.    The B2B Credit Score Market is the relevant market.

103.    Fair Isaac has had and continues to have at least 90% market share in the B2B Credit Score Market.

104.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

105.    Fair Isaac has had and continues to have the power to control prices or exclude competition in the B2B Credit Score Market.

106.    Through unlawful, interconnected, and mutually reinforcing anticompetitive and exclusionary acts and agreements, Fair Isaac has substantially foreclosed competition in the market for B2B Credit Scores in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

107.    Fair Isaac has demonstrated its ability to control prices and exclude competition by raising prices without a corresponding increase in demand and to supracompetitive levels.

108.    Fair Isaac's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

109.    Fair Isaac's monopolization has injured and will continue to injure competition in this market.

110.    Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

111.    The anticompetitive conduct raised the prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

112.    Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's violation of Section 2 of the Sherman Act within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

113.    Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendant's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

### CLAIM TWO:
### CONSPIRACY TO MONOPOLIZE
### 15 U.S.C. § 2

114.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

115.    The relevant product market is the market for the sale of B2B Credit Scores.

116.    The relevant geographic market for the sale of B2B Credit Scores is the United States.

117.    The B2B Credit Score Market is the relevant market.

118.    Fair Isaac has had and continues to have at least 90% market share in the B2B Credit Score Market.

119.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

120.    Fair Isaac has had and continues to have the power to control prices or exclude competition in the B2B Credit Score Market.

121.    Through unlawful, interconnected, and mutually reinforcing anticompetitive and exclusionary acts and agreements, Fair Isaac has substantially foreclosed competition in the

market for B2B Credit Score Market in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

122.     Fair Isaac has demonstrated its ability to control prices and exclude competition by raising prices without a corresponding increase in demand, and to supracompetitive levels.

123.     Fair Isaac entered into a combination or conspiracy with the Credit Bureaus to maintain its monopoly power in the B2B Credit Score Market.  Fair Isaac created and maintained this conspiracy through a series of agreements with each of the Credit Bureaus.   In these agreements, the Credit Bureaus and Fair Isaac agreed that the Credit Bureaus would not offer or sell VantageScore or any other competing Credit Score to Plaintiff and members of the Class. Fair Isaac and the Credit Bureaus further agreed that the Credit Bureaus would act as Fair Isaac's agent in the sale of FICO Scores to Plaintiff and members of the Class.

124.     These agreements foreclosed competition in a substantial portion of the B2B Credit Score Market and unlawfully maintained Fair Isaac's monopoly, resulting in Fair Isaac extracting supracompetitive prices for FICO Scores from Plaintiff and members of the Class.

125.     Fair Isaac's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

126.     Fair Isaac's monopolization conspiracy has injured and will continue to injure competition in this market.

127.     Fair Isaac has acted with the specific intent of monopolizing the market for B2B Credit Scores in the United States.

128.     Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

129.    The conspiracy raised the prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

130.    Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's violation of Section 2 of the Sherman Act within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

131.    Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendant's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

## CLAIM THREE:
## UNREASONABLE RESTRAINT OF TRADE
## 15 U.S.C. § 1

132.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

133.    The relevant product market is the market for the sale of B2B Credit Scores.

134.    The relevant geographic market for the sale of B2B Credit Scores is the United States.

135.    The B2B Credit Score Market is the relevant market.

136.    Fair Isaac and the Credit Bureaus have had and continue to collectively have at least 90% market share in the B2B Credit Score Market.

137.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

138.    Fair Isaac has had and continues to have the power to control prices or exclude competition in the B2B Credit Score Market.

139.     Fair Isaac entered into agreements with TransUnion, Experian, and Equifax that contained anticompetitive terms whereby each Credit Bureau agreed not to offer or sell VantageScore as a competing product to Plaintiff and members of the Class.

140.     The agreements between Fair Isaac and the Credit Bureaus had substantial anticompetitive effects.  The agreements excluded VantageScore, a significant competitor, from a substantial portion of competition in the B2B Credit Score Market.

141.     The agreements raised the price for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

142.     Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

143.     Plaintiff and members of the Class continue to suffer damage, and will continue to do so, if Fair Isaac does not cease its anticompetitive conduct.

144.     Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's violation of Section 1 of the Sherman Act, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

145.     Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendant's continuing violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and members of the Class, respectfully prays that This Honorable Court:

A.     Order that this action may be maintained as a class action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, that it be named a Class Representative, that the

undersigned be named Lead Class Counsel, and that reasonable notice of this action, as provided by Rule 23(c)(2), be given to members of the Class;

B.    Adjudge that Defendant violated the federal antitrust laws as set forth above;

C.    Award Plaintiff and members of the Class actual, treble, and exemplary damages;

D.    Award Plaintiff and members of the Class attorneys' fees and costs of suit, including costs of consulting and testifying experts;

E.    Award Plaintiff and members of the Class pre- and post-judgment interest;

F.    Enjoin Defendant from its violations of law; and

G.    Grant such other, further and different relief, including structural relief, as may be just and proper.

## IX.    DEMAND FOR JURY TRIAL

Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury as to all issues so triable.

Dated:  April 23, 2020                          Respectfully submitted,

**CARLSON LYNCH LLP**                           **MOLOLAMKEN LLP**

Gary F. Lynch                                   /s/ Steven F. Molo
1133 Penn Avenue, 5th Floor                     Steven F. Molo
Pittsburgh, PA  15222                           Lisa W. Bohl
Telephone: 412-322-9243                         300 N. LaSalle Street, Suite 5350
Facsimile:  412-231-0246                        Chicago, IL  60654
glynch@carlsonlynch.com                         Telephone: 312-450-6700
                                                Facsimile:  312-450-6701
Katrina Carroll                                 smolo@mololamken.com
111 W. Wacker Drive, Suite 1240                 lbohl@mololamken.com
Chicago, IL  60602
Telephone: 312-750-1265                         Lauren M. Weinstein
kcarroll@carlsonlynch.com                       (*pro hac vice* forthcoming)
                                                600 New Hampshire Avenue, N.W., Suite 500
                                                Washington, D.C.  20037
                                                Telephone: 202-556-2000
                                                Facsimile:  202-556-2001
                                                lweinstein@mololamken.com

*Counsel for Plaintiff First Choice Federal Credit Union*

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| AMALGAMATED BANK, on behalf of itself and all others similarly situated, | |
| Plaintiff, | Docket No. |
| - against - | |
| FAIR ISAAC CORPORATION, | **CLASS ACTION COMPLAINT** |
| Defendant. | **JURY TRIAL DEMANDED** |

Plaintiff Amalgamated Bank ("Plaintiff"), on behalf of itself and all other similarly situated residents of the United States, complains upon knowledge as to itself and its acts and upon information and belief as to all other matters, against Defendant Fair Isaac Corporation ("Defendant" or "Fair Isaac") for violations of the Sherman Act and state laws from at least January 1, 2006 through the date on which the anticompetitive effects of Defendant's unlawful conduct ceased, but no sooner than the present (the "Class Period"). Based upon personal knowledge, information and belief, investigation by counsel, proceedings and admissions made in *Fair Isaac Corp. v. Trans Union LLC,* 17-cv-08318 (N.D. Ill.), and related ongoing federal government investigations, Plaintiff alleges:

## INTRODUCTION

1.     "Credit Scores" rank or "score" creditworthiness within a range by applying certain algorithms to credit histories. This process results in a three digit Credit Score. Two distinct markets exist for Credit Scores in the United States: (1) the market for the sale of Credit Scores to lenders, financial institutions, and businesses in making risk management decisions (the "B2B Credit Score Market"); and (2) the direct market for the sale of consumers' own Credit Scores to enable monitoring of their own credit records (the "business-to-consumer" or "B2C Credit Score Market").

2.     This action relates to the B2B Credit Score Market, which Fair Isaac has unlawfully monopolized for years due to its dominant position with a 90% market share.

3.     Fair Isaac has leveraged its dominant market position by engaging in anticompetitive and exclusionary conduct including suppressing competition, obstructing innovation, and limiting access to credit for millions of Americans.  Fair Isaac's conduct is in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§1 and 2, in addition to state antitrust and unfair trade practices laws.

4.     Fair Isaac's FICO Credit Scores ("FICO Scores") have had a dominant market position for over two decades.  Fair Isaac executives, including public affairs manager Craig Watts

1

("Watts"), have bragged that their FICO Scores are "the 800- pound gorilla"[1] and experts have opined that Fair Isaac's FICO Scores are "deeply embedded in the U.S. financial system[.]"[2] In 2017, Fair Isaac admitted that it has maintained a market share of 90% or more for at least 13 years. Fair Isaac advertises that "90% of top lenders use FICO® Scores when making lending decisions."[3]

5.      Equifax, Experian, and TransUnion (collectively, the "Credit Bureaus") are credit reporting agencies that collect, standardize, and distribute information concerning consumer credit activity. Credit Bureaus sell credit reports and Credit Scores, including Fair Isaac's FICO Scores, to lenders, financial institutions, and other businesses. These businesses use the credit reports and Credit Scores to make decisions about whether to extend credit and on what terms. Credit Bureaus sell credit reports and Credit Scores to businesses in every state in the United States. Credit Bureaus have long acted as Fair Isaac's agents and co-conspirators to broker sales of FICO scores between businesses and Fair Isaac. Fair Isaac has used distribution agreements with the Credit Bureaus to: (1) place restrictions on the Credit Bureaus' ability to develop or distribute their own competitive Credit Scores; (2) prohibit Credit Bureaus from individually negotiating royalty prices for FICO Score access; (3) charge discriminatory royalty prices for FICO Scores when a Credit Bureau customer purchases a FICO Score while providing the consumer with a competing score; and (4) increase the royalty prices paid by Credit Bureaus. Despite these restrictions, the Credit Bureaus have agreed to and complied with Fair Isaac's agreement conditions.

---

[1] Dana Dratch, *What Does 'Good' Credit Really Mean?,* BANKRATE, (published Oct. 30, 3008, updated Aug. 5, 2010), https://www.cnbc.com/id/27458815.

[2] Nina Zdinjak, *Here is What Newbrook Capital Advisors Thinks of Fair Isaac Corporation (FICO),* INSIDER MONKEY, (Apr. 15, 2019), https://finance.yahoo.com/news/newbrook-capital-advisors-thinks-fair-162450887.html.

[3] https://www.myfico.com/credit-education/fico-scores-bridge.

6.     In 2006, the Credit Bureaus jointly formed VantageScore Solutions, LLC ("VantageScore"), and launched VantageScore, an alternative competitive Credit Score. Since its creation, VantageScore was extremely accurate and was competitively priced, making it more attractive than Fair Isaac's FICO products to large numbers of Americans. Now, through its full utilization of consumer data from the Credit Bureaus, including rental and utility payments, VantageScore can provide Credit Scores for 30 million more Americans than Fair Isaac's FICO can. If businesses utilized VantageScore, because of its additional features, millions of additional creditworthy Americans would be able to obtain credit at more favorable rates and at a lower cost.

7.     Seeing the threat from VantageScore to its dominant market position, Fair Isaac has acted to discourage widespread adoption of VantageScore. To effectuate this, Fair Isaac has abused its monopoly power to prevent the Credit Bureaus from successfully launching a competitive alternative to FICO Scores and has utilized a public relations and advertising campaign to disparage VantageScore and create doubt about VantageScore's accuracy with lenders and consumers alike.

8.     Fair  Isaac has succeeded in preventing the growth of VantageScore or any other potential competing credit scoring system through its exclusionary conduct. By continually suppressing competition, Fair Isaac has been able to increase prices for its FICO Scores, doing so most recently in September 2019. Due to Fair Isaac's suppression of competition, and its insistence that non-compete clauses be included in contractual agreements, VantageScore, or any another credit scoring system, was unable to thrive and gain market share despite creation of an innovative and arguably, superior product. The existence of VantageScore and similar competitive scoring systems would have yielded lower prices paid for B2B Credit Scores by Plaintiff and Class members.

9.     Through its anticompetitive and exclusionary conduct, Fair Isaac has harmed businesses by depriving them of competitive pricing and freedom of choice for Credit Score instruments that would allow them to evaluate credit risk. Eliminating Fair Isaac's stranglehold on the

market by opening the market to competition is essential to ensure competitive prices, product innovation, freedom of choice, and widespread access to credit for all creditworthy Americans.

10.     On February 12, 2018, TransUnion filed antitrust counterclaims for monopolization and related claims against Fair Isaac in this District. *See Fair Isaac Corp. v. Trans Union LLC*, 1:17-cv-08318, ECF No. 38 (redacted counterclaims). On March 27, 2019, Judge Sharon Johnson Coleman denied Fair Isaac's motion to dismiss TransUnion's antitrust counterclaims. *See id.*, ECF No. 96. The matter is ongoing.

11.     On March 15, 2020, Fair Isaac disclosed that it was notified two days earlier that it was being investigated by the United States Department of Justice Antitrust Division for exclusionary conduct relating to the same conduct alleged in the counterclaims upheld by Judge Coleman.[4]

## PARTIES

### A.     Plaintiff

12.     Plaintiff Amalgamated Bank is a New York state chartered commercial bank and trust company with a principal place of business at 275 Seventh Avenue, New York, New York 10011.

13.     Plaintiff is the largest union-owned bank in the United States. Workers United and affiliated organizations are the largest shareholders. Plaintiff provides financial services, including personal banking services for consumers, and services for businesses, non-profit organizations, and institutional investing services.

14.     During the Class Period, Plaintiff directly purchased B2B Credit Scores from Defendant and from members of the Credit Bureaus.

---

[4] *See* Press Release, Fair Isaac Corporation, FICO Statement Regarding Antitrust Investigation, (Mar. 15, 2020), https://www.prnewswire.com/news-releases/fico-statement-regarding-antitrust-investigation-301024452.html.

15.     Plaintiff suffered injury in its business or property as a direct, proximate, and material result of Defendant's violations of law.

16.     Plaintiff is at continual risk of additional injury to its business and property by reason of Defendant's continuing violations of law.

**B.      Defendant**

17.     Defendant Fair Isaac Corporation is a Delaware corporation, with a principal place of business at 181 Metro Drive, Suite 700, San Jose, California 95110.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action pursuant to Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§1 and 2, and Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§15 and 26.

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331, 1332(d), and 1337.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

21.     Venue is proper in this District pursuant to 15 U.S.C. §§15(a) and 22, and 28 U.S.C. §1391(b), (c) and (d). During the Class Period, Defendant resided, transacted business, was found, or had agents in the United States, including in this District, and a substantial portion of the affected interstate trade and commerce described in this Complaint was carried out in this District.

22.     During the Class Period, Defendant's conduct was within the flow of, was intended to, and did have a substantial effect on the interstate commerce of the United States, including in this District.

23.     During the Class Period, Defendant used the instrumentalities of interstate commerce, including interstate wires, United States Postal Service mail, and wireless spectrum to effectuate its illegal scheme.

24.     Defendant's conduct also had a substantial effect on the intrastate commerce of at least the following states: Arizona; Arkansas; California; Connecticut; Florida; Hawaii; Illinois; Iowa; Kansas; Maine; Maryland; Massachusetts; Michigan; Minnesota; Mississippi; Missouri; Montana; Nebraska; Nevada; New Mexico; New York; North Carolina; North Dakota; Oregon; Rhode Island; South Carolina; South Dakota; Tennessee; Utah; Vermont; West Virginia; and Wisconsin; as well as the District of Columbia.

25.     This Court has personal jurisdiction over Defendant because Defendant utilized this District to transact business, maintain substantial contacts, and commit unlawful conduct. Defendant's unlawful scheme was directed at, and had the intended effect of, causing injury to persons residing in, otherwise located in, or doing business in this District.

26.     Plaintiff purchased at least one FICO Score from Experian, which employs Credit Score business personnel in this District.

27.     Defendant employs Credit Score business personnel in this District.

28.     Defendant is registered to do business in Illinois with the Illinois Secretary of State.

29.     Defendant selected this District to initiate litigation against Trans Union LLC, Case No. 1:17-cv-08318, to which this case is filed as related by Plaintiff.

## SUBSTANTIVE ALLEGATIONS

## I.     Background

### A.     Credit Scores

30.     Credit Scores are three-digit numbers that are meant to assess credit risk. Consumers with higher Credit Scores generally pose less credit risk than those with lower Credit Scores. Credit

Scores are created through the use of a credit scoring algorithm to provide a consumer credit report. Credit Scores are usually paired with "reason codes," which detail information about what caused reductions to a particular consumer's Credit Score.

31.    In the United States, Credit Scores are the most widely used indicators of consumers' creditworthiness. Financial institutions, lenders, and other businesses use Credit Scores in making consumer credit decisions. Consumers rely on Credit Scores to determine their ability to procure a mortgage, auto loan, or credit card, in addition to the rate that they will pay.

32.    The Credit Bureaus collect and supply aggregated consumer credit data in consumer reports. The Credit Bureaus collect credit and financial data about consumers from creditors, collection agencies, governmental entities, public records, and other third parties. The Credit Bureaus then compile this information to create a credit file.  The Credit Bureaus sell credit reports,  which include  consumer credit file information,  to  businesses  and consumers.

33.    Although Credit Scores are sometimes bundled and sold together with credit reports, they are two different products and credit reports can be sold independently of Credit Scores. Credit reports have detailed information about the credit activity and current credit situation of consumers. A credit report could include information about a consumer's mortgage payment history, credit card balances and payments, and credit inquiries. A Credit Score is based on the information provided in a credit report, which ultimately yields a single three-digit number assessment.

### B.    The B2B and B2C Credit Score Markets in the United States

34.    In the United States, there are two markets for Credit Scores, the B2B Credit Score Market, and the B2C Credit Score Market. B2B Credit Scores and B2C Credit Scores serve different purposes and are priced and purchased differently.

35.    Financial institutions, lenders, and other businesses in the B2B Credit Score Market use Credit Scores to assess consumer creditworthiness and make lending decisions. These institutions,

lenders, and businesses do not consider credit reports or other borrower information to be a substitute for Credit Scores.

36. In contrast, in the B2C Credit Score Market, consumers purchase their own Credit Scores to gauge their own creditworthiness and determine how they will be categorized by potential lenders and creditors.

37. The United States is the relevant geographic market in which B2B Credit Scores are provided because the restraints on competition contained in Fair Isaac's contracts relate to the provision of B2B Credit Scores to businesses across the United States.

38. B2B Credit Score Market p u r c h a s e r s include financial institutions, lenders, and other businesses that purchase B2B Credit Scores to make risk management decisions ("B2B Purchasers"). Financial institutions, lenders, and other businesses that purchase Credit reports from Defendant and/or the Credit Bureaus generally do so to: (1) determine the identity and credit-worthiness of qualified borrowers to whom a preapproved offer of credit offer will be extended; (2) make lending decisions, and (3) evaluate the risk for existing borrowers, including for purposes such as o f f e r i n g t o extend additional credit or making changes to other account terms.

39. In contrast, customers in the B2C Credit Score Market purchase Credit Scores to assess their likelihood of obtaining credit, otherwise manage their credit, or protect their identity. Presently, millions of American consumers have signed up for credit monitoring or identity protection services. Many of those credit monitoring accounts provide consumers with their Credit Score.

40. The credit risk scoring industry, including industry and policy analysts, and investors distinguish the B2B Credit Score Market and the B2C Credit Score Market as two distinct markets. Fair Isaac also views the B2B Credit Score Market as distinct from the B2C Credit Score Market. In its 2019 Form 10-K, Fair Isaac described different components of its Scores reportable segment

including its "business-to-business scoring solutions and services" and the "myFICO® solutions for consumers."

41.     The B2B Credit Score Market has high barriers to entry.  B2B Purchasers  face significant "switching costs" if they adopt a new Credit Score that has different score-to-risk relationships or that uses different reason codes, regardless of whether it is an updated version of the score they already use or an entirely new brand of Credit Score. This is not the case for B2C Credit Score Market consumers.  Switching costs for B2B Purchasers arise because: (1) employees require training in the properties and elements of a new score; (2) B2B Purchasers must verify that the new score will adequately predict the creditworthiness of their existing customers; (3) B2B Purchasers often conduct extensive and costly validation tests to determine whether the new score is cost-effective; and (4) B2B Purchasers often need to update their internal systems to ensure technical compatibility between their systems and a new score.

42.     The B2B Credit Score Market is also characterized by network effects. In certain industries, such as the industries for mortgages and auto loans, the use of Credit Scores with similar score-to-risk relationships and reason codes allows the bundling of mortgage and auto loans from different originators into securities that can be sold to investors. Consistent use of a single type of Credit Score allows the marketing materials for these securities to include data about the average Credit Scores of the borrowers associated with the underlying loans.

### C.     Fair Isaac Has Maintained Monopoly Power in the B2B Credit Score Market for Decades

43.     Fair Isaac has maintained its monopoly over the B2B Credit Score Market in the United States for nearly three decades, largely through the anticompetitive dominant nature of its FICO product line, which includes several different types of FICO Scores.  Introduced over thirty years ago, Fair Isaac's "FICO Classic" Credit Scores are the most widely known and used B2B Credit Scores in the United States. FICO Classic applies an algorithm to each Credit Bureau's data

and generates a score between 300 and 850 that purportedly provides an indication of the individual's credit risk level. FICO Classic also generates "reason codes" that explain why the consumer has not been assigned the maximum score of 850.

44.     Fair Isaac does not attempt to hide its B2B Credit Score Market monopoly power. Instead, it advertises its monopoly power, stating that 90% of all lending decisions in the United States utilize FICO Scores, even boasting on its website that 100 billion FICO Scores have been sold.  Fair Isaac also brags that its sales are four times the number of McDonald's worldwide yearly sales of hamburgers, and its daily FICO Scores sales are more than double Starbucks' worldwide daily coffee sales.[5]

45.     Similarly, in its 2019 Form 10-K, Fair Isaac described its "FICO Scores" as "the standard measure in the U.S. of consumer credit risk" and reported that "FICO Scores are used in the majority of U.S. credit decisions, by nearly all of the major banks, credit card organizations, mortgage lenders, and auto loan originators."

46.     Representatives for Fair Isaac, including Watts, have labeled Fair Isaac's FICO score as "the 800- pound gorilla" in the market for B2B Credit Scores,[6] and as previously noted, bragged about Fair Isaac's dominant 90% market share. For example, in November 2017, Fair Isaac's CFO and Executive Vice President, Michael Pung, stated that Fair Isaac's FICO Scores are used by nearly every major lender and are the most widely used credit scoring system in the United States.

47.     Fair Isaac representatives have also recognized their benefit from the widespread use of FICO Scores throughout many different industries. On November 3, 2011,

---

[5] *FICO Knows A Lot About You But What Do You Know About FICO?*, ADVISORBOX, http://advisorbox.com/fico-knows-lot-know-fico/ (citing http://www.fico.com/en/about-us#at_glance).

[6] Dana Dratch, *What Does 'Good' Credit Really Mean?,* BANKRATE, (published Oct. 30, 2008, updated Aug. 5, 2010), https://www.cnbc.com/id/27458815.

at Fair Isaac's Analyst/Investor Day, Fair Isaac's then-CEO, Mark Greene, explained that the network effect of FICO Scores being the industry standard and "having everybody . . . standardize on a FICO Score, that's magic."[7]

48.     Fair Isaac's monopoly power in the B2B Credit Score Market for Credit Scores has provided it with the power to control prices. Fair Isaac's CEO, Will Lansing ("Lansing"), has stated that in the B2B Credit Score Market, Fair Isaac has the ability to decide where it wants its margins to be.

## II.     Fair Isaac's Monopoly in the B2B Credit Score Market Has Eliminated the Chances of any Potential Competitors

49.     Nearly 15 years ago, VantageScore introduced the VantageScore Credit Score and credit scoring system. VantageScore is a competitor to FICO Scores in the B2B Credit Score Market.

50.     From the time it was first released in March 2006, VantageScore has been able to score millions more consumers than the FICO scoring systems. VantageScore had more dynamic capabilities because it calculated scores for consumers that had not used credit for up to two years. It also had far-reaching access to many more consumers by using utility and telecommunications payment histories reported to the Credit Bureaus. In contrast, Fair Isaac's FICO scoring systems would not generate a score if a consumer did not use credit in over six months or if a credit account was opened less than six months ago.

51.     Due to its expansive reach, VantageScore now issues Credit Scores for 30 million more Americans than traditional FICO scoring systems. Fair Isaac's FICO Classic credit scoring systems, which are still used by many lenders, exclude large numbers of creditworthy Americans that can be reliably scored by VantageScore. Roughly 25 percent of American adults, or about 65 million people,

---

[7] Fair Isaac Corp. – Analyst/Investor Day Transcript, (Nov. 3, 2011), https://seekingalpha.com/article/307417-fair-isaac-corp-analyst-investor-day.

do not have a traditional FICO score. Through widespread usage of VantageScore, the number of adults without a Credit Score would be cut nearly in half. Remarkably, approximately ten million of those newly scored individuals would be classified as "prime" borrowers that would be extremely attractive to financial institutions and lenders.

52.     For any consumers without a Credit Score, it is difficult if not impossible to successfully obtain a mortgage, car loan, or reasonable interest rates for personal lines of credit. The implications of not having a Credit Score can even affect a consumer's ability to rent an apartment, as Credit Scores are increasingly used by landlords in their tenant screening process.

53.     Low-income and minority consumers make up a disproportionate percentage of the individuals excluded by Fair Isaac's traditional FICO scoring systems. The lack of access for these affected individuals results in a greater likelihood of their being denied access to credit cards, auto and home loans, and apartment housing.

54.     The Consumer Financial Protection Bureau ("CFPB") published a report which stated that Black and Hispanic consumers are considerably more likely to be credit invisible or have unscored credit records than White consumers. About 15 percent of Black and Hispanic consumers are credit invisibles compared to just nine percent of White consumers. An additional 13 percent of Black consumers and 12 percent of Hispanic consumers have records that cannot be scored under the widely-used model, compared to just seven percent of White consumers. CFPB analysis suggests that these differences across racial and ethnic groups materialize early in the adult lives of these consumers and persist thereafter.[8]   However, through usage of VantageScore, a score could be calculated for

---

[8] *CFPB Report Finds 26 Million Consumers Are Credit Invisible*, CFPB, (May 5, 2015), https://www.consumerfinance.gov/about-us/newsroom/cfpb-report-finds-26-million-consumers-are-credit-invisible/.

roughly 9.5 million Hispanic and Black consumers who do not currently have a FICO score, with over 2.5 million of these minority consumers qualifying for "prime" borrowing status.

55.     Despite the tremendous benefits that using VantageScore would provide to millions of consumers, Fair Isaac continues to maintain its monopoly position in the B2B Credit Score Market. On February 27, 2013, at a Morgan Stanley Technology, Media & Telecom  Conference, Lansing explained that despite the presence of VantageScore in the market, "there's not that much competition around our [B2B] scores business" because "[t]he FICO scores are very much part of the fabric of the banking industry."[9]

## III.    Fair Isaac Has Contracted with the Credit Bureaus as Agents and Co-Conspirators to Monopolize the B2B Credit Score Market

56.     Despite the Credit Bureaus' attempts to compete in the B2B Credit Score Market, due to its dominant market position, Fair Isaac is able to employ the Credit Bureaus in its scheme to extend the shelf life of its monopoly. Fair Isaac depends on the Credit Bureaus to help foster its relationship with B2B Purchasers. Fair Isaac enlists the Credit Bureaus for assistance with the sale of its FICO Scores to these B2B Purchasers.

57.     For B2B Purchasers that require a Credit Score, they purchase the report from the Credit Bureau, and the Credit Score jointly from the Credit Bureau and Fair Isaac. At times, payment may at times occur in a single transaction, but practically speaking, as expressly stated in B2B Purchasers' contract terms, both the Credit Bureau and Fair Isaac serve as the provider of the FICO Score.

---

[9] Morgan Stanley Technology, Media & Telecom Conference Transcript, (Feb. 27, 2013), https://seekingalpha.com/article/1231981-fair-isaacs-ceo-presents-at-morgan-stanley-technology-media-and-telecom-conference-transcript.

58. B2B Purchasers' FICO Scores contracts are often referred to as Credit Scoring Services Agreements ("CSSAs"). CSSAs provide for both the payment method and fee model for the delivery of Credit Score services.

59. In Plaintiff's and Class Members' obtaining of FICO Scores, the Credit Bureaus serve as co-conspirators and agents of Fair Isaac. Pursuant to common terms of CSSAs, the Credit Bureaus often deliver subscriber invoices for Credit Scores that dictate payment should be made to Fair Isaac.

## IV.    Fair Isaac's Additional Anticompetitive and Exclusionary Conduct

60. Fair Isaac utilized its monopoly power to coordinate a campaign to eliminate competition from VantageScore and has explicitly stated that this is its end goal. On April 23, 2015, Lansing informed investors on a quarterly earnings conference call that Fair Isaac's strategic goal was to ensure that "the entire industry adopts FICO scores instead of [other] scores."[10] Remarkably, thanks to its dominant position in the B2B Credit Score Market, Fair Isaac has enlisted its competitors, the Credit Bureaus, which jointly own and control VantageScore, to sign anticompetitive contracts that: (1) prevent them from developing or selling alternative Credit Scores that could be seamlessly integrated into lenders' systems, or at a minimum, could be used interchangeably with FICO Scores; (2) prevent them from competing with each other to negotiate better prices from FICO; and (3) create a pricing scheme effectively eliminating the possibility that B2B Purchasers choose to use FICO Scores in their lending decisions at the same time as providing customers with a competing Credit Score, such as VantageScore. Concurrently, Fair Isaac has smeared VantageScore in the media and has made false and misleading statements to establish doubt about VantageScore's accuracy and reliability. Through such anticompetitive and exclusionary conduct, Fair Isaac has injured and essentially

---

[10] Fair Isaac's (FICO) CEO Will Lansing on Q2 2015 Results – Earnings Call Transcript, (Apr. 23, 2015), https://seekingalpha.com/article/3097846-fair-isaacs-fico-ceo-will-lansing-on-q2-2015-results-earnings-call-transcript.

eliminated competition in the B2B Credit Score Market, drastically increased prices for Plaintiff and the Class, and severely limited access to credit for millions of Americans.

**A.     Fair Isaac and the Credit Bureaus Have Executed Contracts with Anticompetitive Terms that Restrict the Credit Bureaus' Ability to Compete and Sell VantageScore**

61.     In January 2015, Fair Isaac and TransUnion entered into a contract, the Analytic and Data License Agreement. Fair Isaac utilized the December 31, 2014 contract expiration date to demand that the parties enter into a new contract rather than simply renew their existing contracts. Fair Isaac represented to TransUnion that the other Credit Bureaus, Experian and Equifax, already agreed to new contracts with Fair Isaac that were materially similar. If TransUnion did not agree to Fair Isaac's desired terms, it would lose substantial business from customers that depend on FICO Scores. On information and belief, the Credit Bureaus all agreed to Fair Isaac's terms and its plan to exclude competitors and maintain its monopoly.

**1.     Through the Anticompetitive Agreements Fair Issac Restricted the Credit Bureaus' Ability to Develop or Sell Other Credit Scores Compatible with B2B Purchasers' Existing Systems**

62.     Fair Isaac has imposed similar or identical "No Equivalent Products" clauses on each of the Credit Bureaus. By imposing the "No Equivalent Products" terms, Fair Isaac has sought to eliminate the Credit Bureaus' ability to offer alternative Credit Score products, such as VantageScore, that would allow B2B Purchasers to easily switch from FICO Scores to VantageScore without incurring increases in costs to redesign their lending programs and systems, or to use VantageScore in addition to or interchangeably with FICO Scores. The Credit Bureaus have agreed to Fair Isaac's demands in these anticompetitive agreements, terms, and the resulting anticompetitive effects.

63.     The "No Equivalent Products" clauses provide that the Credit Bureaus may not internally develop a credit scoring system that is aligned to the odds-to-score relationship of any Fair Isaac Analytic or that uses more than a limited number of reason codes that "match" reason codes

used by any Fair Isaac Analytic. These clauses also prohibit the Credit Bureaus from distributing any competing analytic, such as a credit scoring system, that is aligned with FICO Scores or uses too many of the same reason codes. These clauses expressly name Vantage Score Solutions LLC as a developer of such a scoring system that may not be distributed in the event that VantageScore ever offered an "Equivalent Product."

64. For example, if a competing Credit Score product used a 750 score to designate a less-than-one-percent risk of credit delinquency, and if a 750 FICO score also designated the same risk of delinquency, then the "No Equivalent Products" clause prevents the Credit Bureaus from distributing the competing product. Similarly, if a competing Credit Score product used reason codes that match 20% or more of the reason codes used by FICO scoring systems, the "No Equivalent Products" clause prohibits the Credit Bureaus from distributing the product.

65. Ultimately, the "No Equivalent Products" clauses prevent the Credit Bureaus from developing or selling an alternative to FICO's Credit Scores that would be compatible with many B2B Purchasers' systems, models, and processes, and would allow B2B Purchasers to have a real choice between using FICO Scores and some alternative score. Many B2B Purchasers have expended substantial efforts and resources to develop systems, models, and processes that are designed for FICO Scores compatibility. B2B Purchasers' systems, models, and processes are tailored to FICO's odds-to-score relationship, providing a given ratio of non-defaulting consumers to defaulting consumers for each given score, and reason codes indicating the particular reasons listed for increased risk of default. An example of this tailoring is bank software designed to accept one or more FICO Scores and reason codes, that combines this information with internally collected data, and automatically produces a lending decision.

66. The "No Equivalent Products" clauses in contracts with the Credit Bureaus allow Fair Isaac to maintain its monopoly. The odds-to-score relationship is simply an arbitrary mapping

16

between credit risk and score and does not constitute protectable intellectual property. Similarly, the reason codes that may not be used by any "Equivalent Product" were not invented by Fair Isaac but are instead based on well-established industry best practices for lending.

2.   **Fair Isaac's Anticompetitive Agreements Restrict the Credit Bureaus' Ability to Develop or Sell Other Credit Scores Compatible with B2B Purchasers' Existing Systems**

67.   Fair Isaac's contracts with each Credit Bureau include a similar or identical "Dynamic Royalty Schedule" clause and a similar or identical "Pre-Qualification" royalty category. Through use of the "Pre-Qualification" royalty category, Fair Isaac has effectively eliminated lenders' ability to purchase and utilize a FICO score in their lending decision while also providing a consumer with a competing Credit Score. This causes lenders to buy Fair Isaac's FICO Scores exclusively rather than consider and potentially purchase competing Credit Scores, such as VantageScore. Due to Fair Isaac's unilateral inclusion of the "Pre-Qualification" royalty category, TransUnion has lost massive amounts of sales of VantageScore to major banks so they can provide the scores to consumers.

68.   In the 2015 agreements, Fair Isaac demanded, and the Credit Bureaus have complied with, a new "Pre-Qualification" royalty category, which Fair Isaac describes as an End User's qualification of a potential consumer customer for that End User's own internal lending offering. The "Pre-Qualification" royalty category distinguishes between: (1) lenders that use FICO Scores for "Pre-Qualification" without providing any Credit Score or credit data to consumers; and (2) lenders that use FICO Scores for "Pre-Qualification" in addition to providing Credit Scores or credit data to consumers related to the "Pre-Qualification." Certain banks and lenders offer consumers opportunities to apply to qualify for credit opportunities (*e.g.*, a credit card or loan) and, simultaneously, receive their personal Credit Score. In many instances, this offer of a free Credit Score can entice consumers to apply for credit opportunities.

17

69.     The royalty price associated with a FICO score used for "Pre-Qualification" depends on whether other Credit Scores or credit data are provided to consumers. If a lender purchases a FICO score for use in "Pre-Qualification" and does not provide any Credit Score or credit data to the consumer "in connection" with the "Pre-Qualification," there is one per-score royalty rate. If the lender purchases a FICO score for use in "Pre-Qualification" and provides any other Credit Score to the consumer "in connection" with the "Pre- Qualification," a higher penalty per-score royalty rate is imposed.

70.     The penalty rate can be avoided through exclusive purchase of FICO Scores. In one example, the B2B Purchaser could purchase a FICO score for use in "Pre-Qualification" and provide no Credit Score or credit data to the consumer. In the alternative, the B2B Purchaser could purchase a bundled FICO product from Fair Isaac. Fair Isaac offers bundled products to lenders that combine the use of Credit Scores by lenders with the provision of Credit Scores to consumers.

71.     No legitimate business justification exists for the penalty rate agreed upon by Fair Isaac and the Credit Bureaus when the lender also purchases any other Credit Score to disclose to consumers. The only reason for the "Pre-Qualification" royalty category is to drive all B2B Purchasers engaging in "Pre-Qualification" to purchase FICO Scores exclusively and make it cost-prohibitive for B2B Purchasers engaging in "Pre-Qualification" to purchase a competing Credit Score to disclose to consumers. Fair Isaac's scheme has been hugely successful, with very few B2B Purchasers opting to pay the penalty rate.

### 3.     Fair Isaac Has Extracted Monopoly Prices from B2B Purchasers Facilitated by its Anticompetitive Contracts with the Credit Bureaus

72.     In its Agreements, Fair Isaac requires a "Level Playing Field," in which the prices that are made available to one Credit Bureau are made available to all of the Credit Bureaus. Combined with the "Dynamic Royalty Schedule" clause, the "Level Playing Field" clause enables Fair Isaac to unilaterally increase the royalty prices it charges for FICO Scores. Fair Isaac's contracts with each of

18

the Credit Bureaus include similar or identical "Dynamic Royalty Schedule" and "Level Playing Field" provisions.

73.     B2B Purchasers have paid monopoly prices due to Fair Isaac's implementation of the "Dynamic Royalty Schedule" and "Level Playing Field" provisions in its contracts with the Credit Bureaus. These provisions disincentivize the Credit Bureaus from negotiating for a lower price because each one knows that even the negotiation is successful, no competitive advantage over the other Credit Bureaus will be gained.

**B.     Fair Isaac Disparaged VantageScore in an Aggressive Public Relations Campaign to Create Doubt About VantageScore's Viability Among B2B Purchasers**

74.     Unsatisfied with its successful implementation of anticompetitive restrictions that eliminated VantageScore's ability to compete with FICO, Fair Isaac went even further and waged an aggressive public relations campaign to spread false statements and mislead B2B Purchasers about the qualities and characteristics of FICO Scores and VantageScore. Fair Isaac has disparaged VantageScore by calling it a "Fako" score, falsely claimed that VantageScore is an unreliable measure of creditworthiness, and misrepresented VantageScore's credit scoring system and its overall process.

75.     On December 12, 2017, Fair Isaac placed a full-page advertisement in *The Wall Street Journal* addressed to "Lenders, Policymakers and Consumer Advocates" that criticized VantageScore, despite not identifying it by name.  The advertisement presented Fair Isaac as independent from the Credit Bureaus and stated that Fair Isaac's FICO Scores have been used by lenders and securitization investors for decades.  In contrast, the advertisement described an alternative Credit Score, owned by the Credit Bureaus as less reliable than FICO Scores in evaluating credit risk.  The advertisement unambiguously conveyed the false message that VantageScore weakened scoring standards, and harmed both consumers and the market, particularly the B2B Credit Score Market.

76.     Fair Isaac's advertisement in the *Wall Street Journal* also directed readers to view a Fair Isaac-owned website that connects visitors to articles and blog posts that further disparage VantageScore directly by name. A November 15, 2016 blog post asserts: "Despite claims by VantageScore, weakening the minimum scoring criteria will not empower millions of low-risk mortgage credit seekers."[11]

77.     Fair Issac's implication that FICO Classic scoring systems provide Credit Scores for as many consumers as VantageScore is erroneous and misleading to the B2B Credit Score Market and consumers. As described *supra*, VantageScore provides Credit Scores for millions of American consumers that are not scored by FICO Classic scoring systems.

78.     Fair Isaac's website includes numerous posts that disparage VantageScore and make false or misleading statements about VantageScore's features. A November 16, 2015 blog post claims that "[r]esearch results consistently showed that scoring models relying solely on sparse or old credit data were weak and did a poor job forecasting future performance."[12] This statement is false and misleading because it attempts to present VantageScore's scoring model as "weak" and as doing a "poor job forecasting future performance" because it considers a consumer's full credit history even if the consumer has not used a traditional credit line in the last six months. Despite Fair Isaac's claims, studies have shown that VantageScore is strongly predictive.

79.     Fair Isaac's blog post from February 6, 2017 asserts that whereas "FICO Score 9 differentiates medical from non-medical collections," "VantageScore does not."[13] Fair Isaac's

---

[11] Joanne Gaskin, *Truth Squad: Will Looser Scoring Standards Help Millions More Americans Get Mortgages?*, FICO BLOG, (Nov. 15, 2016), https://www.fico.com/blogs/truth-squad-will-looser-scoring-standards-help-millions-more-americans-get-mortgages.

[12] Ethan Dornhelm, *Why Bureau Data Alone Can't Score More Consumers*, (Nov. 16, 2015), FICO BLOG, https://www.fico.com/blogs/why-bureau-data-alone-can-t-score-more-consumers.

[13] Joanne Gaskin, *Truth Squad: Is FICO Score 700 the Same as VantageScore 700?*, (Feb. 6, 2017), FICO BLOG, https://www.fico.com/blogs/truth-squad-fico-score-700-same-vantagescore-700.

statement conveys the false message that VantageScore does not differentiate medical from non-medical collections. Despite this assertion, the opposite is true. Notably, VantageScore 3.0 was the first credit scoring system to address medical debt. VantageScore 4.0, the most recent version of VantageScore, distinguishes medical collection accounts from non- medical collection accounts and attributes lower penalizes to medical collections than non-medical ones.

80.     Fair Isaac's campaign against VantageScore has been ongoing for nearly fifteen years. In 2006, just months after VantageScore's launch, Fair Isaac filed a frivolous lawsuit against the Credit Bureaus and VantageScore in the United States District Court for the District of Minnesota. *See Fair Isaac Corp. v. Equifax Inc.*, No. 06-cv-04112 (D. Minn.). This was the Fair Isaac's initial attempt to eliminate its competitive threat.

81.     Fair Isaac's lawsuit included claims that the development of VantageScore violated the antitrust laws and that the development of VantageScore constituted trademark infringement. In its prayer for relief, Fair Isaac sought dissolution of VantageScore. Not only did all of Fair Isaac's claims fail, the jury justly determined that Fair Isaac was the wrongdoer. In support of its trademark infringement claim, Fair Isaac had alleged that VantageScore's 501-990 scoring range constituted trademark infringement because it was similar to FICO's scoring range of 300-850. The Credit Bureaus and VantageScore issued counterclaims for fraud on the United States Patent and Trademark Office ("PTO"), alleging that Fair Isaac misrepresented to the PTO that only FICO used the 300-850 score range. The jury concluded that Fair Isaac committed fraud on the PTO by making false statements in its application to register the score range of 300-850 as a trademark.

82.     The public statements described in the foregoing paragraphs were transmitted to and seen by a substantial number of businesses and consumers nationwide.

**C.      Fair Isaac Eliminates Competition Through its Extensive Anticompetitive and Exclusionary Conduct**

83.     Fair Isaac's exclusionary conduct s e e k i n g to maintain and expand its monopoly power has harmed for years and continues to harm participants in the B2B Credit Score Market. Fair Isaac's unlawful conduct, including that which has been taken in concert with the Credit Bureaus, has eliminated competition in the B2B Credit Score Market by foreclosing opportunities for the Credit Bureaus to sell VantageScore or any other similar competitive products. Fair Isaac's anticompetitive and exclusionary conduct has allowed it to maintain its monopoly and charge monopoly prices for B2B Credit Scores to B2B Purchasers throughout the Class Period.

84.     Fair Isaac's conduct, in concert with the Credit Bureaus, including by the contracts entered into by the Credit Bureaus, has drastically reduced choice for B2B Purchasers. The anticompetitive terms agreed to between Fair Isaac and the Credit Bureaus have frustrated the ability of B2B Purchasers to purchase VantageScore or any other competitive Credit Score that could be seamlessly integrated into lenders' existing processes and systems. Fair Isaac's media and advertising campaign against VantageScore has successfully instilled uncertainty, and doubt about VantageScore among B2B Purchasers in the marketplace.

85.     Through blog posts and the media, Fair Isaac has spread its message to consumers that VantageScore is a "Fako" score solely because it is not a FICO score. In a post on thebalance.com that was originally posted in February 2017, and that Fair Isaac continues to display today: "If you purchased your Credit Score anywhere but MyFICO.com, then it's a FAKO score."[14]

---

[14] Latoya Irby, *FICO & FAKO Credit Scores*, THE BALANCE, (updated Aug. 18, 2020), https://www.thebalance.com/fico-and-fako-credit-scores-960497.

## CLASS ACTION ALLEGATIONS

86.     Plaintiff brings this action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil

Procedure, on its own behalf and as representative of the following Class:[15]

> All B2B Purchasers residing in the United States that directly purchased a
> FICO Score from Fair Isaac and/or a Credit Bureau during the Class Period.
>
> Excluded from the Class are: Defendant, its directors, officers, management,
> employees, subsidiaries, and affiliates. Also expressly excluded from the Class
> are any natural persons that purchased their own Credit Score for personal use
> solely via myFico.com, the Credit Bureaus, or other entities.

87.     The Class is so numerous and geographically dispersed that joinder of all members is

impracticable.  While the exact number of Class members is unknown to Plaintiff at this time,

members of the Class are readily identifiable from information and records in the possession of

Defendant.

88.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff

and members of the Class sustained damages from the same wrongful conduct of Defendant. The

injuries and damages of each member of the Class were directly caused by Defendant's wrongful

conduct in violation of the laws described herein.

89.     Plaintiff will fairly and adequately protect and represent the interests of members of

the Class. Plaintiff is an adequate representative of the Class and has no interest which is adverse to

the interests of absent Class members.  Plaintiff has retained counsel competent and experienced in

class action antitrust litigation, including class actions in the financial services industry.

---

[15] Plaintiff has defined the Class based on currently available information and herby reserves the right
to amend the definition of the Class, including, without limitation, membership criteria and the Class
Period.

90.     Common questions of law and fact exist as to all members of the Class, which predominate over questions affecting solely individual members of the Class. These common questions of law include, without limitation:

1.      whether Defendant monopolized, conspired to monopolize, or unreasonably restrained trade in violation of federal law;

2.      whether Defendant monopolized, conspired to monopolize, or unreasonably restrained trade in violation of certain state antitrust laws;

3.      whether Defendant engaged in unfair or deceptive trade practices in violation of certain state laws;

4.      the duration of the alleged unlawful conduct;

5.      injury suffered by Plaintiff and members of the Class;

6.      the appropriate measure of damages suffered by Plaintiff and Class members; and

7.      whether Defendant acted or refused to act on grounds generally applicable to Class members, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to Class members as a whole.

91.     A class action is superior to other methods for the fair and efficient adjudication of the controversy because joinder of all Class members is impracticable. Treatment as a class will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.

92.     Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for the Defendants.

93. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## STATUTES OF LIMITATIONS AND TOLLING

94. The applicable statutes of limitations relating to the claims for relief alleged herein were tolled because of fraudulent concealment involving both active acts of concealment by Defendant and inherently self-concealing conduct. Due to Defendant's affirmative acts, misrepresentations, and nondisclosures as alleged herein, any applicable statutes of limitation on claims asserted by Plaintiff and members of the Class have been and are tolled, and Defendant is equitably estopped from raising statutes of limitations as a defense.

95. Any applicable statutes of limitations were tolled until at least February 12, 2018, the date that TransUnion filed its Counterclaim against Defendant.

96. The federal government's antitrust investigation of Defendant's unlawful conduct also operates to toll any federal statute of limitations under 15 U.S.C. § 16.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
### (Monopolization)
### (15 U.S.C. § 2)

97. Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

98. The relevant product market is the market for the sale of B2B Credit Scores.

99. The relevant geographic market for the sale of B2B Credit Scores is the United States.

100. The B2B Credit Score Market is the relevant market.

101. Fair Isaac has had and maintains at least 90% market share in the B2B Credit Score Market.

102.     Fair Isaac has had and maintains monopoly power in the B2B Credit Score Market.

103.     Fair Isaac has had and maintains the power to control prices or exclude competition in the B2B Credit Score Market.

104.     Fair Isaac, through unlawful, anticompetitive and exclusionary acts and agreements, has substantially eliminated any competition in the market for B2B Credit Scores in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

105.     Fair Isaac has demonstrated its monopoly position through its ability to control prices and exclude competition by raising prices to supracompetitive levels despite no corresponding increase in demand.

106.     Fair Isaac's monopoly power is not due to its growth or development or because of a superior product, business acumen, or historic accident.

107.     Fair Isaac's monopoly of the market has injured and will continue to injure competition.

108.     Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

109.     Fair Isaac's monopolistic conduct raised the prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

110.     Plaintiff and Class members have been injured in their business or property by Defendant's violation of Section 2 of the Sherman Act within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

111.     Plaintiff and Class members are threatened with future injury to their business and property by Defendant's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

## SECOND CLAIM FOR RELIEF
### (Conspiracy to Monopolize)
### (15 U.S.C. § 2)

112.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

113.     The relevant product market is the market for the sale of B2B Credit Scores.

114.     The relevant geographic market for the sale of B2B Credit Scores is the United States.

115.     The B2B Credit Score Market is the relevant market.

116.     Fair Isaac has had and maintains at least 90% market share in the B2B Credit Score Market.

117.     Fair Isaac has had and maintains monopoly power in the B2B Credit Score Market.

118.     Fair Isaac has had and maintains the power to control prices or exclude competition in the B2B Credit Score Market.

119.     Fair Isaac, through unlawful anticompetitive and exclusionary acts and agreements, has substantially foreclosed competition in the market for B2B Credit Score Market in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

120.     Fair Isaac has demonstrated its monopoly position through its ability to control prices and exclude competition by raising prices to supracompetitive levels despite no corresponding increase in demand.

121.     Fair Isaac entered into a combination or conspiracy with the Credit Bureaus to maintain its monopoly power in the B2B Credit Score Market. Fair Isaac created and maintained this conspiracy through a series of agreements with each of the Credit Bureaus. In these agreements, the parties agreed that the Credit Bureaus would not offer or sell VantageScore or any other competing Credit Score to Plaintiff and Class members. Fair Isaac and the Credit Bureaus further agreed that the

Credit Bureaus would act as Fair Isaac's agent in the sale of FICO Scores to Plaintiff and Class members.

122.     These agreements eliminated competition in a substantial portion of the B2B Credit Score Market and unlawfully allowed Fair Isaac to maintain its monopoly, resulting in Fair Isaac receiving supracompetitive prices for FICO Scores from Plaintiff and Class members.

123.     Fair Isaac's monopoly power is not due to its growth or development or because of a superior product, business acumen, or historic accident.

124.     Fair Isaac's monopoly of the market has injured and will continue to injure competition.

125.     Fair Isaac has acted with the specific intent of monopolizing the market for B2B Credit Scores in the United States.

126.     Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

127.     Fair Isaac's conspiracy to monopolize raised the prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

128.     Plaintiff and Class members have been injured in their business or property by Defendant's violation of Section 2 of the Sherman Act within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

129.     Plaintiff and Class members are threatened with future injury to their business and property by Defendant's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

### THIRD CLAIM FOR RELIEF
**(Unreasonable Restraint of Trade)**
**(15 U.S.C. §1)**

130.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

131.    The relevant product market is the market for the sale of B2B Credit Scores.

132.    The relevant geographic market for the sale of B2B Credit Scores is the United States.

133.    The B2B Credit Score Market is the relevant market.

134.    Fair Isaac and the Credit Bureaus have had and collectively maintain at least 90% market share in the B2B Credit Score Market.

135.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

136.    Fair Isaac has had and continues to have the ability to control prices and exclude competition in the B2B Credit Score Market.

137.    Fair Isaac entered into separate agreements with TransUnion, Equifax, and Experian that contained anticompetitive terms whereby each Credit Bureau agreed not to offer or sell VantageScore or other competing products to Plaintiff and members of the Class.

138.    Fair Isaac's agreements with the Credit Bureaus had substantial anticompetitive effects. The agreements excluded VantageScore, a significant competitor, from a substantial portion of competition in the B2B Credit Score Market.

139.    Fair Isaac's agreements with the Credit Bureaus raised the price for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

140.    Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

141.    Plaintiff and Class members continue to suffer damage, and will continue to do so, if Fair Isaac's anticompetitive conduct does not cease.

142.    Plaintiff and Class members have been injured in their business or property by Defendant's violation of Section 1 of the Sherman Act, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

143.    Plaintiff and Class members are threatened with future injury to their business and property by Defendant's continuing violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

## FOURTH CLAIM FOR RELIEF
### (State Antitrust Laws)

144.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

145.    By reason of the foregoing alleged herein, Defendant has violated, and Plaintiff and members of the Class are entitled to relief pursuant to the antitrust laws of the States of Arizona, California, Connecticut, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin, as well as the District of Columbia, as follows:

   i.     Arizona Revised Statutes § 44-1401, *et seq.*;

   ii.    California Cartwright Act, California Business & Professions Code § 16700, *et seq.*;

   iii.   Connecticut Antitrust Act, Conn. Gen. Stat. § 35-24, *et seq.*;

   iv.    District of Columbia Code § 28-4501, *et seq.*;

   v.     Hawaii Revised Statutes § 480-2, *et seq.*;

   vi.    Illinois Antitrust Act, Illinois Complied Statutes § 740, Ill. Comp. Stat. 1011, *et seq.*;

vii.      Iowa Competition Law, Iowa Code § 553.1, *et seq.*;

viii.     Kansas Statutes Annotated § 50-101, *et seq.*;

ix.      Maine Revised Statutes Annotated, tit. 10, § 1101, *et seq.*;

x.      Maryland Code Annotated, Commercial Law, § 11-204, *et seq.*;

xi.      Michigan Compiled Laws § 445.771, *et seq.*;

xii.     Minnesota Antitrust Law of 1971, Minnesota Statutes § 325D.49, *et seq.*;

xiii.     Mississippi Code Annotated § 75-21-1, *et seq.*;

xiv.     Nebraska Revised Statutes § 59-801, *et seq.*;

xv.      Nevada Revised Statutes Annotated § 598A.010, *et seq.*;

xvi.     New Mexico Statutes Annotated § 57-1-1, *et seq.*;

xvii.    New York Donnelly Act, New York General Business Law § 340, *et seq.*;

xviii.   North Carolina General Statutes § 75-1, *et seq.*;

xix.     North Dakota Century Code § 51-08.1-01, *et seq.*;

xx.      Oregon Revised Statutes § 646.705, *et seq.*;

xxi.     Rhode Island General Laws § 6-36-4, *et seq.*;

xxii.    South Dakota Codified Laws § 37-1-3.1, *et seq.*;

xxiii.   Tennessee Code Annotated § 47-25-101, *et seq.*;

xxiv.   Utah Code Annotated § 76-10-3104, *et seq.*;

xxv.    Vermont Statutes Annotated, tit. 9, § 2451, *et seq.*;

xxvi.   West Virginia Code § 47-18-1, *et seq.*; and

xxvii.  Wisconsin Statutes § 133.01, *et seq.*

## FIFTH CLAIM FOR RELIEF
### (State Unfair Trade Practices Laws)

146.   Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

147.   By reason of the foregoing alleged herein, Defendant has violated, and Plaintiff and Class members are entitled to relief pursuant to the Unfair Trade Practices and Consumer Protection Laws of the States of Arkansas, California, Connecticut, Florida, Massachusetts, Missouri, Montana, New Mexico, New York, North Carolina, Rhode Island, South Carolina, and Vermont, and the District of Columbia, as follows:

    i.      Arkansas Code Annotated, § 4-88-101, *et seq.*;

    ii.     California Business and Professions Code § 17200, *et seq.*;

    iii.    Connecticut Unfair Trade Practices Act, Conn Gen. Stat. § 42-110a, *et seq.*;

    iv.    District of Columbia Code § 28-3901, *et seq.*;

    v.     Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*;

    vi.    Massachusetts Consumer Protection Act, Mass. Gen. L. Ch. 93A, *et seq.*;

    vii.   Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*;

    viii.   Montana Code, §30-14-103, *et seq.*, and § 30-14-201, *et seq.*;

    ix.    New Mexico Statutes Annotated § 57-12-1, *et seq.*;

    x.     New York General Business Law § 349, *et seq.*;

    xi.    North Carolina General Statutes § 75-1.1, *et seq.*;

    xii.   Rhode Island General Laws § 6-13.1-1, *et seq.*;

    xiii.   South Carolina Code Annotated § 39-5-10, *et seq.*; and

    xiv.   Vermont Statutes Annotated, tit. 9, § 2451, *et seq.*

## PRAYER FOR RELIEF

Plaintiff, on behalf of itself and members of the Class, respectfully demands relief as follows:

A.    That the Court certify this lawsuit as a class action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, that Plaintiff be designated as Class Representative, that the undersigned be named Lead Class Counsel, and that reasonable notice of this action, as provided by Rule 23(c)(2), be given to members of the Class;

B.    That Defendant's unlawful conduct alleged herein be adjudged and decreed to violate the federal antitrust laws as set forth herein;

C.    That Defendant's unlawful conduct alleged herein be adjudged and decreed to violate the state antitrust and unfair trade practices laws as set forth herein;

D.    That the Court award Plaintiff and members of the Class actual, treble, and exemplary damages;

E.    That the Court award Plaintiff and members of the Class their costs of suit, including reasonable attorneys' fees and expenses, and including expert fees, as provided by law;

F.    That the Court award Plaintiff and members of the Class pre- and post-judgment interest at the maximum rate allowable by law;

G.    That the Court enjoin Defendant from its violations of law; and

H.    That the Court directs such further relief as it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated April 24, 2020

**CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP**

*s/      Jennifer W. Sprengel*
Jennifer W. Sprengel (Ill. Bar No. 06204446)
150 S. Wacker, Suite 3000
Chicago, IL 60606
Telephone: 312-782-4880
jsprengel@caffertyclobes.com

*Designated as Local Counsel*

Barbara J. Hart (*pro hac vice* forthcoming)
Christian Levis (*pro hac vice* forthcoming)
Frank Strangeman (*pro hac vice* forthcoming)
Andrea Farah (*pro hac vice* forthcoming)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, New York 10601
Telephone: 914-997-0500
bhart@lowey.com
clevis@lowey.com
fstrangeman@lowey.com
afarah@lowey.com

*Counsel for Plaintiff Amalgamated Bank*

# EXHIBIT D

# UNITED STATES DISTRICT COURT FOR
# THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| Alcoa Community Federal Credit Union, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FAIR ISAAC CORPORATION,<br><br>Defendant. | Civil Action No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff brings this class action to challenge an anticompetitive scheme by defendant Fair Isaac Corporation ("Fair Isaac") to enhance and maintain Fair Isaac's monopoly power in the U.S. market for business-to-business credit scores ("B2B Credit Scores") in violation of the antitrust laws of the United States. Plaintiff purchased B2B Credit Scores directly from Fair Isaac or its co-conspirator agents, during the Class Period (defined below). Plaintiff brings this case on behalf of itself and a class of similarly situated direct purchasers of B2B Credit Scores, to recover overcharges resulting from the anticompetitive conduct alleged herein.

## INTRODUCTION

1. Credit scores are derived from the application of algorithms to credit histories and are used for the purpose of assessing creditworthiness. There are two distinct domestic markets for credit scores: (1) the market for the sale of credit scores to lenders, financial institutions, and other businesses (the "B2B Credit Score Market"); and (2) the market for the sale of credit scores to consumers to monitor their own credit records (the "business-to-consumer" or "B2C Credit Score Market").

2.     Fair Isaac's FICO Credit Scores ("FICO Scores") have dominated the B2B Credit Score Market for decades. Fair Isaac stated in 2017 that it has "maintained a 90-plus percent market share for at least 13 years." Fair Isaac executives have stated that their FICO Scores are "the 800-pound gorilla" and are "deeply embedded in the system in North America." Fair Isaac advertises that its FICO Scores are used for 90% of all lending decisions in the United States.

3.     Fair Isaac has enjoyed monopoly power (*i.e.*, the power to control price or exclude competition) in the United States B2B Credit Score Market since at least 2006.  Fair Isaac has unlawfully maintained its monopoly power in the B2B Credit Score Market through anticompetitive and exclusionary agreements with TransUnion, Experian, and Equifax. TransUnion, Experian, and Equifax are the three dominant credit bureaus (collectively, the "Credit Bureaus") in the U.S.  They compile and sell information regarding consumer credit and on behalf of Fair Isaac, distribute to lenders, financial institutions, and other businesses Fair Isaac's FICO Scores.  The Credit Bureaus also distribute or sell competing B2B Credit Scores. Their ability to fairly and effectively do so, however, has been substantially impeded by anticompetitive contract terms imposed upon them by Fair Isaac.  These anticompetitive contract provisions have allowed Fair Isaac to obtain or maintain its monopoly power over the U.S. B2B Credit Score Market.

4.     More specifically, the Credit Bureaus have contracted with Fair Isaac in ways that restrain the Credit Bureaus' ability to develop or distribute competitive Credit Scores; prohibit the Credit Bureaus from individually negotiating royalty rates for access to FICO Scores; require that customers, such as Plaintiff, be charged discriminatory and prohibitively high Fair Isaac royalty rates if the customer also acquires  a competing Credit Score; and also requires that

an increased royalty rate be paid by the Credit Bureaus.  The Credit Bureaus have agreed with Fair Isaac to these restraints.

5.     The restraints set forth above were designed to impair, and have in fact impaired, Fair Isaac's competition in the U.S. These anticompetitive and exclusionary contract terms have impeded the ability of all purchasers to obtain B2B Credit Scores from Fair Isaac's competitors because they require the Credit Bureaus and the customer to incur substantial penalties if the Credit Bureau distributes to customers the B2B Credit Scores of Fair Isaac's competitors.

6.     Fair Isaac has obtained and maintained its monopoly power by engaging in anticompetitive and exclusionary conduct including entering into the anticompetitive and exclusionary contract terms referenced  above. Fair Isaac has suppressed competition, stymied innovation, and limited access to credit for millions of Americans – all in violation of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2), as well as numerous state antitrust and unfair trade practices laws.

7.     In 2006, VantageScore Solutions, LLC ("VantageScore") launched a competitive Credit Score it called VantageScore. VantageScore was reliable, competitively priced, and highly predictive. Moreover, VantageScore has access to the Credit Bureaus' consumer data, which far exceeds the consumer data available to Fair Isaac. As a result, VantageScore maintains Credit Scores for 30 million domestic consumers who do not have FICO scores. VantageScore's product was more widely disseminated, millions of creditworthy consumers who now have restrained access to credit would have the opportunity to apply for mortgages, loans, or other forms of credit, and at a lower cost.

8.     Fair Isaac responded to VantageScore's entry into the B2B Credit Score Market by engaging in anticompetitive conduct that has persisted for over more than a decade. In particular,

Fair Isaac restrained the Credit Bureaus' ability to distribute VantageScore, and publicly and falsely disparaged VantageScore's viability and reliability, so as to discourage B2B Credit Score consumers from purchasing VantageScore.

9.     Fair Isaac's anticompetitive and exclusionary conduct has prevented the sales growth and market penetration that VantageScore would have achieved through competition on the merits and discouraged whatever other competition would have emerged. As a result, Fair Isaac has been able to significantly raise the price that customers, such as the Plaintiff, paid for FICO scores.  But for Fair Isaac's suppression of competition and exclusionary contracts with the Credit Bureaus, VantageScore or another credit scoring system would have earned substantial market share, which would have resulted in lower prices for B2B Credit Scores for Plaintiff and members of the Class.

10.   On March 15, 2020, Fair Isaac disclosed that the Antitrust Division of the United States Department of Justice had opened an investigation based at least in part on the exclusionary conduct alleged herein.[1]

## **JURISDICTION AND VENUE**

11.   This action arises under sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) and section 4 of the Clayton Act (15 U.S.C. § 15(a)) and seeks to recover treble damages, costs of suit, and reasonable attorneys' fees for the injuries sustained by Plaintiff and members of the Class (defined below) resulting from Fair Isaac's anticompetitive conduct. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), 1407, and 15 U.S.C. § 15.

---

[1] *See* Press Release, Fair Isaac Corporation, FICO Statement Regarding Antitrust Investigation, https://www.prnewswire.com/news-releases/fico-statement-regarding-antitrust-investigation-301024452.html (Mar. 15, 2020).

12.   Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. §§ 1391(b), (c), and (d) because during the Class Period, the Defendant resided, transacted business, was found, or had agents in this District, and a substantial portion of the alleged activity affected interstate trade and commerce discussed below has been carried out in this District.

13.   During the Class Period, Defendant sold B2B Credit Scores in a continuous and uninterrupted flow of interstate commerce, including in this District. Defendant's conduct had direct, substantial, and reasonably foreseeable effects on interstate commerce in the United States, including in this District.

14.   This Court has *in personam* jurisdiction over Defendant because it, either directly or through the ownership and/or control of its subsidiaries, *inter alia*: (a) transacted business throughout the United States, including in this District; (b) participated in the sale of B2B Credit Scores throughout the United States, including in this District; (c) had and maintained substantial aggregate contacts with the United States as a whole, including in this District; or (d) was engaged in an illegal price-fixing conspiracy or abuse of its monopoly power that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendant also conducts business throughout the United States, including in this District, and has purposefully availed itself of the laws of the United States.

15.   By reason of the unlawful activities alleged herein, Defendant substantially affected commerce throughout the United States, causing injury to Plaintiff and members of the Class. Defendant, directly and through its agents, engaged in activities affecting all states, to restrict

5

output and fix, raise, maintain and/or stabilize prices in the United States for B2B Credit Scores, which unreasonably restrained trade and adversely affected the market for B2B Credit Scores.

16.    Defendant's unlawful conduct described herein adversely affected persons and entities in the United States who directly purchased B2B Credit Scores sold by Defendant, including Plaintiff and the members of the Class.

## THE PARTIES

17.    Plaintiff Alcoa Community Federal Credit Union is a Federal Credit Union with its principal place of business in Benton, Arkansas. Plaintiff makes loans and other credit-related facilities available to consumers. During the Class Period, Plaintiff directly purchased B2B Credit Scores from Defendant through a Credit Bureau. Plaintiff has been injured in its business or property as a proximate result of the unlawful conduct alleged herein.

18.    Defendant Fair Isaac Corporation is a Delaware corporation, with its principal place of business in San Jose, California.

## CREDIT BUREAUS

19.    Fair Isaac uses the Credit Bureaus to distribute its B2B Credit Scores to its customers. Fair Isaac's relationship with B2B Purchasers is, therefore, contractually interrelated with its relationships with the Credit Bureaus.

20.    When a B2B Purchaser requires a Credit Score, it purchases a report from a Credit Bureau, and the Credit Score jointly from Fair Isaac, distributed by the Credit Bureau. Although a single transaction may encompass both purchases, the sale of the Fair Isaac Credit Scores to B2B Purchasers is made by Fair Isaac.  In the alternative, the sale of the Fair Isaac Credit Scores is made jointly by both the Credit Bureau and Fair Isaac.

6

21.     B2B Purchasers' contracts for FICO Scores are referenced as Credit Scoring

Services Agreements ("CSSAs"). CSSAs provide for both the method of payment and fee model

for the delivery of Credit Score services. They also establish the relationship between Fair Isaac

and the B2B Purchasers.

22.     For example, the CSSA between Plaintiff and its Credit Bureau, details performance

due between Plaintiff and Fair Isaac. Plaintiff acknowledges that the FICO Scores are proprietary

and the intellectual property of Fair Isaac, agrees not to reverse engineer the FICO Scores or

Models, and agrees only to use them in the manner specifically permitted under the agreement,

including requiring Plaintiff to explicitly obtain the approval of Fair Isaac for certain uses of the

FICO Scores. Fair Isaac, in return, grants Plaintiff the limited license for the use of the FICO

Scores, and issues representations and warranties that the scores are statistically sound and

empirically derived. Finally, Plaintiff and its Credit Bureau explicitly agree that Fair Isaac has

unconditional enforceable rights, which survive any termination of the agreement.

## FACTUAL ALLEGATIONS

### Credit Scores

23.     Credit Scores are typically three-digit numbers that are designed to assess credit

risk. Higher scores generally indicate that a consumer poses less credit risk. Credit Scores are

produced using credit scoring systems that apply a credit scoring algorithm to a consumer credit

report. Credit Scores are usually accompanied by "reason codes," which inform the lender about

the reasons that contributed most significantly to reducing a particular consumer's Credit Score.

24.     Credit Scores are the most widely used indicators of consumers' creditworthiness in

the United States. Lenders, financial institutions, and other businesses rely on Credit Scores to

decide whether and on what terms to extend credit to consumers. Consumers, in contrast, rely on

Credit Scores to determine whether they will be able to get a mortgage, credit card, auto loan, or other credit product and the rate they will pay.

25.    The Credit Bureaus collect and supply aggregated consumer credit data in the form of consumer reports. The Credit Bureaus continuously gather credit and financial data about consumers from creditors, governmental entities, public records, collection agencies, and other third parties. This information is then compiled into a "credit file." The Credit Bureaus sell credit reports, which include information gathered from a consumer's credit file, to businesses and consumers.

26.    While Credit Scores are sometimes sold together with credit reports, credit reports are different from Credit Scores and can be sold independently. A credit report is a statement that has detailed information about a consumer's credit activity and current credit situation. A consumer's credit report might, for example, include information about that consumer's history of mortgage payments, credit card balances, credit card payments, and credit inquiries. A Credit Score takes the detailed information in a credit report and turns it into a single three-digit number.

**Credit Score Markets**

27.    There are two distinct markets for Credit Scores in the United States: (1) the B2B Credit Score Market and (2) the B2C Credit Score Market. B2B and B2C Credit Scores are priced, purchased, and used very differently and serve very different purposes. The lenders, financial institutions, and other businesses in the B2B Credit Score Market that purchase and use Credit Scores to assess creditworthiness and make decisions about whether and on what terms to extend credit or otherwise take on risk do not consider credit reports, insurance scores, or any other information about borrowers, to be a substitute for Credit Scores.

8

28.    Consumers in the B2C Credit Score Market purchase their own Credit Scores to better understand their own creditworthiness and how they likely will be viewed by potential lenders.

29.    The United States is the relevant geographic market in which B2B Credit Scores are provided. The restraints on competition in the B2B Credit Score Market contained in Fair Isaac's contracts relate to the provision of B2B Credit Scores to businesses throughout the United States.

30.    Purchasers in the B2B Credit Score Market are comprised of lenders, financial institutions, and other businesses that purchase B2B Credit Scores in order to make risk management decisions ("B2B Purchasers"). Lenders, financial institutions, and other businesses that purchase Credit Reports from Defendant and/or the Credit Bureaus generally purchase Credit Scores in order to determine the credit-worthiness and identity of qualified borrowers to whom a preapproved credit offer will be extended ("pre-screening"), make lending decisions ("lending"), or review the risk associated with existing borrowers for purposes such as extending additional credit or changing other account terms ("account management").

31.    Customers in the B2C Credit Score Market, in contrast, purchase Credit Scores in order to manage their credit, protect their identity, or assess their likelihood of obtaining credit. Today, American consumers have signed up for over 160 million credit monitoring or identity protection accounts from businesses such as Capital One, Credit Karma, and LifeLock. Many of those accounts include access to the consumer's own Credit Score.

32.    The credit risk scoring industry, industry analysts, policy analysts, and investors recognize the B2B Credit Score Market as distinct from the B2C Credit Score Market. Fair Isaac also regularly acknowledges that the B2B Credit Score Market is distinct from the B2C Credit

Score Market. For example, in its 2019 Form 10-K, Fair Isaac distinguished between its "business- to-business scoring solutions and services" and "business-to-consumer scoring solutions and services including myFICO solutions for consumers."

33.   The B2B Credit Score Market is characterized by significant barriers to entry. B2B Purchasers encounter significant "switching costs" if they adopt a new Credit Score that has different score-to-risk relationships or that uses different reason codes – regardless of whether it is an updated version of the score they already use or an entirely new brand of Credit Score (unlike consumers in the B2C Credit Score Market). These switching costs arise because employees have to be trained in the properties and characteristics of a new score; B2B Purchasers must ensure that the new score will be adequately predictive of the creditworthiness of their own customer base; B2B Purchasers often conduct extensive, costly, and time-consuming validation tests to determine whether the new score is cost-effective; and B2B Purchasers may need to invest in updating their internal systems to ensure technical compatibility between those systems and a new score.

34.   Network effects also characterize the B2B Credit Score Market. For example, in the mortgage and auto loan industries the consistent use of particular Credit Scores with similar score-to-risk relationships and reason codes facilitates the bundling of large groups of mortgage and auto loans from different originators into securities that can be sold to investors. Because of the consistent use of a single type of Credit Score, marketing materials for these securities can include data on the average and stratified Credit Scores of the borrowers associated with the underlying loans.

**Fair Isaac's Monopoly Power**

35.     Fair Isaac has maintained monopoly power over the B2B Credit Score Market in the United States for roughly three decades, largely through the unlawfully achieved dominance of its FICO product line, which includes many different types of FICO Scores. Introduced in the 1980s, Fair Isaac's "FICO Classic" Credit Scores are the best known and most widely used B2B Credit Scores in the United States. FICO Classic applies an algorithm to each Credit Bureau's data and generates a score between 300 and 850 that purports to be an indicator of the individual's credit risk. It also generates a set of "reason codes" that explain the reasons the consumer has not been assigned the maximum score.

36.     Fair Isaac advertises its monopoly share of the B2B Credit Score Market. On its website, Fair Isaac advertises: 10 billion FICO Scores are sold each year, which is four times the number of hamburgers that McDonald's sells worldwide each year; 27.4 million FICO Scores are sold every day, which is over twice the number of cups of coffee Starbucks sells worldwide in a day; and 90% of all lending decisions in the United States rely on FICO Scores.

37.     Similarly, in its 2019 Form 10-K, Fair Isaac described its "FICO Scores" as "the standard measure in the U.S. of consumer credit risk" and reported that "FICO Scores are used . . . by nearly all of the major banks, credit card organizations, mortgage lenders, and auto loan originators."

38.     Fair Isaac representatives have described Fair Isaac's FICO score as "the 800-pound gorilla" in the market for B2B Credit Scores and bragged about Fair Isaac's 90% market share. For example, in November 2017, at the JPMorgan Ultimate Services Investor Conference, Fair Isaac's CFO and Executive Vice President, Michael Pung, stated that Fair Isaac's FICO Scores are:

- The "most widely used credit scoring system here in the U.S.";

- Used by "[v]irtually every major lender in the U.S."; and that

- Fair Isaac has "maintained a 90-plus percent market share for at least . . . 13 years."

39.   Fair Isaac representatives have also recognized that FICO Scores have benefited from the network effects created by the widespread use of FICO Scores in many industries. For example, in November 2011, then-CEO of Fair Isaac, Mark Greene, explained that the "network effect" of "FICO Scores . . . being sort of the standard language" and "having everybody . . . standardize on a FICO Score, that's magic."

40.   Fair Isaac's monopoly position in the B2B Credit Score Market for Credit Scores has given it the power to control prices. Indeed, Fair Isaac's CEO, Will Lansing, has noted that in the B2B Credit Score Market Fair Isaac has "quite a bit of discretion in whether we want our margins to be higher or lower or where they are."  Fair Isaac's monopoly position has also given it the power to exclude competition from competitors, such as VantageScore.

**Fair Isaac's Anticompetitive and Exclusionary Conduct**

41.   In March 2006, VantageScore introduced the VantageScore Credit Score and credit scoring system. VantageScore is a competitor to FICO Scores in the B2B Credit Score Market.

42.   From the time it was first released in 2006, VantageScore scored millions more consumers than the FICO scoring systems. Whereas Fair Isaac's FICO scoring systems would not generate a score if a consumer had not used credit in more than six months or if a credit account was fewer than six months old, VantageScore calculated scores for consumers that had not used credit for up to two years. It also reached more consumers by using utility and telecommunications payment histories when reported to the Credit Bureaus.

12

43.    Today, VantageScore scores 30 million more Americans than traditional FICO scoring systems. Fair Isaac's outdated FICO Classic credit scoring systems – which are still used by many lenders – exclude many creditworthy Americans that VantageScore can reliably score. About one-quarter of American adults – some 65 million people – do not have a traditional FICO score. VantageScore is capable of reducing the number of adults without a Credit Score by almost half. Ten million of those newly scored individuals are "prime" borrowers that should be attractive to traditional lenders.

44.    Without a Credit Score, it is difficult or impossible to apply for or successfully obtain a mortgage, car loan, or reasonable interest rates on personal lines of credit. Not having a Credit Score can also have drastic effects outside of the credit market. For example, Credit Scores are increasingly used by landlords to screen potential tenants.

45.    Those excluded by Fair Isaac's traditional FICO scoring systems – who face an increased risk of being denied access to credit in the form of credit cards, auto and home loans, and apartment housing – include disproportionate numbers of low-income and minority consumers.

46.    Indeed, one advocacy group focused on making it possible for people with limited incomes, especially people of color, to achieve financial security has observed: "Black and Hispanic individuals are . . . significantly more likely than white individuals to be credit invisible" – meaning that they have "no established credit history," are "unscored," and "lack[] sufficient or recent enough credit history to be given a [FICO] Credit Score." VantageScore calculates a score for 9.5 million Hispanic and Black consumers who do not have a FICO score, including 2.7 million minority consumers who should be considered "prime" borrowers.

13

47.     Despite the potential advantages of using VantageScore, Fair Isaac continues to maintain its monopoly and monopoly power in the B2B Credit Score Market. In February 2013, at a Morgan Stanley Conference, Fair Isaac's CEO, Will Lansing, explained that despite the existence of VantageScore, "there [is] not that much competition around our [B2B] scores business" because "FICO scores are very much part of the fabric of the banking industry" and "really deeply imbedded."

48.     Fair Isaac has used its monopoly power to coordinate a multi-faceted campaign to prevent and eliminate competition from VantageScore and/or other competitors. Fair Isaac has been explicit that this is its goal. In April 2015, Will Lansing informed investors on a quarterly earnings conference call that Fair Isaac's strategic goal was to ensure that "the entire industry adopts FICO scores instead of [other] scores." To achieve this goal, Fair Isaac has enlisted the Credit Bureaus to agree to anticompetitive contract terms that: prevent them from developing or selling alternative Credit Scores that could be seamlessly integrated into many lenders' systems or used interchangeably with FICO Scores; prevent them from competing with each other to negotiate better terms from FICO; and create a pricing scheme that effectively forecloses B2B Purchasers from choosing to use FICO Scores in their lending decisions at the same time as providing customers with a competing Credit Score, including VantageScore. Fair Isaac also has waged a media campaign against VantageScore that makes false and misleading statements about the quality and reliability of VantageScore's Credit Score product. By its anticompetitive and exclusionary conduct, Fair Isaac has injured competition in the B2B Credit Score Market, increased prices for Plaintiff and the Class, and limited access to credit for millions of consumers.

14

### *Exclusion of Other Credit Scores*

49.     Fair Isaac has imposed a similar or identical No Equivalent Products clause on each of the Credit Bureaus. By imposing a No Equivalent Products term, Fair Isaac has sought to block the Credit Bureaus from offering alternative Credit Score products, such as VantageScore, that would allow B2B Purchasers to easily switch from FICO Scores to VantageScore without incurring the cost of redesigning their lending programs and systems, or to use VantageScore alongside or interchangeably with FICO Scores. The Credit Bureaus have agreed to these anticompetitive terms, with the resulting anticompetitive effects.

50.     The No Equivalent Products clause provides that a Credit Bureau may not internally develop a credit scoring system that is aligned to the odds-to-score relationship of any Fair Isaac Analytic or that uses more than a limited number of reason codes that "match" reason codes used by any Fair Isaac Analytic. It also prohibits a Credit Bureau from distributing any competing analytic (i.e., credit scoring system) that is aligned with FICO Scores or uses too many of the same reason codes, and the clause expressly names VantageScore Solutions LLC as a developer of such a scoring system that may not be distributed if VantageScore were to offer an "Equivalent Product."

51.     For example, if a competing Credit Score product used a 700 score to indicate a less-than-five-percent risk of credit delinquency, and if a 700 FICO score also indicated the same risk of delinquency, then the No Equivalent Products clause prevents a Credit Bureau from distributing the competing product. Similarly, if a competing Credit Score product used reason codes that match 20% or more of the reason codes used by FICO scoring systems, the No Equivalent Products clause prohibits a Credit Bureau from distributing the product.

15

52.     The No Equivalent Products clause effectively prevents a Credit Bureau from developing (contrary to the original goal of VantageScore and the easy ability to do so) or selling an alternative to FICO's Credit Scores that would (i) be compatible with many B2B Purchasers' systems, models, and processes; and (ii) allow B2B Purchasers to have a legitimate choice between using FICO Scores and an alternative score. Many B2B Purchasers have spent substantial effort and resources to develop systems, models, and processes that are designed for FICO Scores. B2B Purchasers' systems, models, and processes are tailored to FICO's odds-to-score relationship (i.e., each given score has a given ratio of non-defaulting consumers to defaulting consumers), and reason codes (the particular reasons cited for increased risk of default). For example, a bank's software might be designed to accept one or more FICO Scores and reason codes, combine this information with data it collects internally, and automatically produce a lending decision.

53.     The No Equivalent Products clause protects and sustains Fair Isaac's monopoly power. The odds-to-score relationship is an arbitrary mapping between risk and score and does not reflect protectable intellectual property. Similarly, the reason codes that may not be used by an Equivalent Product were not invented by Fair Isaac but reflect well-established industry best practices for lending.

***Bundling and Penalty Pricing***

54.     Fair Isaac's contracts with each Credit Bureau include a similar or identical Dynamic Royalty Schedule clause and a similar or identical Pre-Qualification royalty category. Through the Pre-Qualification royalty category, Fair Isaac has effectively foreclosed lenders from purchasing and using a FICO score in their lending decision while also providing a consumer with a competing Credit Score, which drives lenders to exclusively purchase Fair

Isaac's FICO Scores and not purchase competing Credit Scores. As a consequence of Fair
Isaac's imposition of the Pre-Qualification royalty category, VantageScore has lost sales of
Credit Scores to major banks to provide to consumers.

55. In 2015, Fair Isaac and the Credit Bureaus agreed to a new Pre-Qualification royalty
category, which Fair Isaac defines as an End User's qualification of a potential consumer
customer for an End User's own internal lending offering. This royalty category distinguishes
between: (1) lenders that use FICO Scores for Pre- Qualification without providing any Credit
Score or credit data to consumers; and (2) lenders that use FICO Scores for Pre-Qualification
while also providing Credit Scores or credit data to consumers in connection with the Pre-
Qualification. Certain banks and lenders offer consumers opportunities to apply to qualify for
credit opportunities (e.g., a credit card or loan) and, at the same time, receive their personal
Credit Score. The offer of a free Credit Score to a consumer can entice consumers to apply for
credit opportunities.

56. The royalty price associated with a FICO score used for Pre-Qualification depends
on whether other Credit Scores or credit data are provided to consumers. If a lender purchases a
FICO score for use in Pre-Qualification and does not provide any Credit Score or credit data to
the consumer "in connection" with the Pre-Qualification, there is one per-score royalty rate. If
the lender purchases a FICO score for use in Pre-Qualification and provides any other Credit
Score (such as a VantageScore) to the consumer in connection with the Pre- Qualification, there
is a different per-score royalty rate that is higher – a penalty rate.

57. The penalty rate can be avoided in one of two ways, both of which involve
purchasing exclusively FICO Scores. First, the B2B Purchaser could purchase a FICO score for
use in "Pre-Qualification" and provide no Credit Score or credit data to the consumer. Second,

17

the B2B Purchaser could purchase a bundled FICO product from Fair Isaac. Fair Isaac offers bundled products to lenders that combine the use of scores by lenders with the provision of scores to consumers.

58.   There is no legitimate business justification for the penalty rate agreed upon by Fair Isaac and the Credit Bureaus when the lender also purchases any other Credit Score to disclose to consumers. The transparent purpose of the Pre-Qualification royalty category is to drive all B2B Purchasers engaging in Pre-Qualification to purchase exclusively FICO Scores and make it cost-prohibitive for B2B Purchasers engaging in Pre-Qualification to purchase a competing Credit Score for disclosure to consumers. This scheme has been effective, and few, if any, B2B Purchasers have opted to pay the penalty rate.

### Fair Isaac's Prices are Supracompetitive

59.   Fair Isaac's Level Playing Field requires that pricing made available to one Credit Bureau be made available to the other Credit Bureaus. Taken together, the Dynamic Royalty Schedule and the Level Playing Field clauses enable Fair Isaac to increase above the competitive level the royalty prices it charges for FICO Scores. Fair Isaac's contracts with TransUnion, Equifax, and Experian include similar or identical Level Playing Field and Dynamic Royalty Schedule provisions.

60.   Fair Isaac has used the Level Playing Field and Dynamic Royalty Schedule provisions in its contracts with the Credit Bureaus to extract supracompetitive monopoly prices from B2B Purchasers. These provisions disincentivize a Credit Bureau from negotiating for lower pricing terms because each knows that even if it succeeds, it will not gain a competitive advantage over the other Credit Bureaus.

*Fair Isaac's Disparagement of VantageScore*

61.    Despite having successfully induced the Credit Bureaus to agree with Fair Isaac to restrain VantageScore's ability to compete with FICO, Fair Isaac has gone further and has waged an aggressive campaign to spread false and disparaging statements about VantageScore and mislead B2B Purchasers about the qualities and characteristics of FICO Scores and VantageScore. In advertisements, letters, and blog posts, Fair Isaac has disparaged VantageScore by calling it a "Fako" score, falsely claimed that VantageScore is an unreliable measure of creditworthiness, and misrepresented the information considered by VantageScore's credit scoring system.

62.    On December 12, 2017, Fair Isaac took out a full-page advertisement in The Wall Street Journal addressed to "Lenders, Policymakers and Consumer Advocates" that disparaged VantageScore without identifying it by name. The advertisement contrasted Fair Isaac, which "is not owned by the credit bureaus" and whose FICO Scores have been used "by lenders and securitization investors for decades," with an alternative Credit Score, which is "owned by the credit bureaus," is less reliable than FICO Scores in evaluating credit risk, and fails to use "sound practices" or "science-based credit evaluation." To anyone familiar with the market for Credit Scores, the advertisement unambiguously conveys the false message that VantageScore is "[w]eakening scoring standards, [and] harm[ing] consumers, and the lending system," particularly in the B2B Credit Score Market.

63.    The Wall Street Journal advertisement directed readers to "Learn more at FICO.com/independent," a Fair Isaac-owned website that connects visitors to articles and blog posts that disparage VantageScore by name. One such blog post asserts: "Despite claims by

19

VantageScore, weakening the minimum scoring criteria will not empower millions of low-risk mortgage credit seekers."

64.     Moreover, the implication that FICO Classic scoring systems provide Credit Scores for as many consumers as VantageScore is false and misleading. VantageScore provides Credit Scores for millions of American consumers that are not scored by FICO Classic scoring systems.

65.     Fair Isaac's website includes numerous posts disparaging VantageScore and making false or misleading statements about VantageScore's features. For example, one blog post claims that "[r]esearch results consistently showed that scoring models relying solely on sparse or old credit data were weak and did a poor job forecasting future performance." This statement is false and misleading because it conveys the message that VantageScore's scoring model is "weak" and does a "poor job forecasting future performance" because it considers a consumer's full credit history even if the consumer has not used a traditional credit line in the last six months. In fact, studies have shown that VantageScore is strongly predictive.

66.     Another blog post claims that whereas "FICO Score 9 differentiates medical from non-medical collections," "VantageScore does not." This statement conveys the false message that VantageScore does not differentiate medical from non-medical collections. In fact, VantageScore 3.0 was the first credit scoring system to address medical debt. VantageScore 4.0, the most recent version of VantageScore, distinguishes medical collection accounts from non-medical collection accounts and penalizes medical collections less than non-medical ones.

67.     Fair Isaac's campaign against VantageScore is not new. In 2006, just months after the launch of VantageScore, Fair Isaac filed a meritless lawsuit against the Credit Bureaus and VantageScore in the United States District Court for the District of Minnesota. See Fair Isaac Corporation v. Equifax Inc., No. 06-cv-04112 (D. Minn.). This was the monopolist's first

attempt to kill the nascent competitor. Fair Isaac's numerous claims included a claim that the

development of VantageScore violated the antitrust laws and a claim that the development of

VantageScore constituted trademark infringement. In its prayer for relief, Fair Isaac sought

nothing less than the end of VantageScore: it requested that the "Defendants be ordered to

dissolve VantageScore."

68.    All of Fair Isaac's claims failed. In fact, the jury concluded that Fair Isaac was the

wrongdoer. In support of its trademark infringement claim, Fair Isaac had alleged that

VantageScore's use of a scoring range of 501-990 constituted trademark infringement because it

was similar to FICO's scoring range of 300-850. The Credit Bureaus and VantageScore

counterclaimed for fraud on the United States Patent and Trademark Office ("PTO"), alleging

that Fair Isaac had misrepresented to the PTO that only FICO used the 300-850 score range. The

jury concluded that Fair Isaac had committed fraud on the PTO by making false statements as

part of its application to register the score range of 300-850 as a trademark.

69.    The public statements described in the foregoing paragraphs were transmitted to and

seen by a substantial number of businesses and consumers nationwide.

*Harm to Competition*

70.    Fair Isaac's campaign of anticompetitive and exclusionary conduct to maintain and

expand its monopoly power has harmed and continues to harm competition and participants in

the B2B Credit Score Market. Fair Isaac's unlawful conduct, including that which has been taken

in concert with the Credit Bureaus, has foreclosed competition in the B2B Credit Score Market

by restraining the Credit Bureaus from selling VantageScore or any other competitive products.

The anticompetitive and exclusionary conduct has allowed Fair Isaac to maintain its monopoly

power and charge supracompetitive monopoly prices for B2B Credit Scores to B2B Purchasers during the Class Period.

71.   Fair Isaac's conduct, in concert with the Credit Bureaus, has reduced choice for B2B Purchasers. The anticompetitive terms to which Fair Isaac and the Credit Bureaus agreed have frustrated the ability of B2B Purchasers to purchase VantageScore or any other competitive Credit Score that could be seamlessly integrated into lenders' existing processes and systems. Fair Isaac's disparagement campaign against VantageScore has been successful in sowing fear, uncertainty, and doubt about VantageScore in the marketplace and has resulted in fewer sales by VantageScore and a lesser degree of competition from VantageScore.

72.   Media sources, financial blogs, and consumers have absorbed Fair Isaac's false and disparaging message that VantageScore is a "Fako" score merely because it is not a FICO score. For example, thebalance.com – a website devoted to personal finance issues – posted in February 2017, and continues to display as of the date of this filing: "If you purchased your Credit Score anywhere but MyFICO.com, then it's a Fako score."

## FRAUDULENT CONCEALMENT AND TOLLING

73.   A cause of action accrued for Plaintiff each time Fair Isaac and/or a Credit Bureau sold a B2B Credit Score to plaintiff at a supracompetitive price made possible by their anticompetitive conduct. Each such sale constituted an overt act in furtherance of their anticompetitive scheme. Accordingly, Plaintiff is entitled to recover all damages on all sales that Fair Isaac and/or its co-conspirators made to Plaintiff at supracompetitive prices within four years of the filing of this action.

74.   Due to Fair Isaac's concealment of its unlawful conduct, however, Plaintiff and members of the Class are entitled to recover damages reaching back even beyond the four-year

statute of limitations period. Fair Isaac's violations were not reasonably discoverable until February 12, 2018, when TransUnion disclosed the misconduct in a suit against Fair Isaac. Plaintiff and members of the Class had no knowledge of the unlawful self-concealing scheme and could not have discovered the scheme and conspiracy through the exercise of reasonable diligence more than four years before the filing of this action.

75. That is true, at least in part, because the nature of the scheme was self-concealing and because Fair Isaac employed deceptive tactics and techniques of secrecy to avoid detection of, and to conceal, its scheme.

76. Because the scheme was both self-concealing and affirmatively concealed by Fair Isaac, Plaintiff and members of the Class had no knowledge of the scheme more than four years before the filing of this complaint; nor did they have the facts or information that would have caused a reasonably diligent person to investigate.

77. Plaintiff and members of the class also lacked the facts and information necessary to form a good faith basis for believing that any legal violations had occurred. Reasonable diligence on the part of Plaintiff and members of the class would not have uncovered those facts more than four years before the filing of this complaint.

78. As a result of Fair Isaac's fraudulent concealment, all applicable statutes of limitations affecting Plaintiff's and class members' claims have been tolled.

79. The federal government's antitrust investigation of Fair Isaac's unlawful conduct also tolls any federal statute of limitations pursuant to 15 U.S.C. § 16.

## CLASS ALLEGATIONS

80.    Plaintiff brings this action on behalf of itself and all others similarly situated

pursuant to Rule 23 of the Federal Rules of Civil Procedure as representative of a class (the

"Class") defined as follows:

> All persons or entities in the United States and its territories that purchased B2B
> Credit Scores directly from Fair Isaac and/or a Credit Bureau, or any of their
> respective divisions, subsidiaries, predecessors, or affiliates, during the period
> from January 1, 2006, through such time as the effects of Fair Isaac's illegal
> conduct have ceased, and excluding all governmental entities, Fair Isaac, and Fair
> Isaac's divisions, subsidiaries, predecessors, and affiliates.

81.    On information and belief, hundreds or thousands of entities in the U.S. have

purchased B2B Credit Scores directly from Fair Isaac and/or its co-conspirators, the Credit

Bureaus. Thus, the Class is so numerous that joinder is impracticable.

82.    Plaintiff's claims are typical of those of the Class.

83.    Plaintiff and all members of the Class were injured in the form of overcharges by

the same conduct of the Defendant.

84.    Plaintiff will fairly and adequately protect and represent the interests of the Class.

The interests of the Plaintiff are not antagonistic to the Class.

85.    Plaintiff is represented by counsel who are experienced and competent in the

prosecution of complex class action antitrust litigation.

86.    Questions of law and fact common to the members of the Class predominate over

questions, if any, that may affect only individual members because Fair Isaac has acted and

refused to act on grounds generally applicable to the entire Class. Such generally applicable

conduct is inherent in Fair Isaac's exclusionary and anticompetitive conduct in monopolizing and

attempting to monopolize the B2B Credit Score Market, as more fully alleged herein.

87.    Questions of law and fact common to the Class include:

    a. whether Fair Isaac intentionally and unlawfully impaired or impeded competition in the B2B Credit Score Market;

    b. whether Fair Isaac maintained or enhanced monopoly power in the B2B Credit Score Market through anticompetitive or exclusionary conduct;

    c. whether Fair Isaac engaged in anticompetitive conduct in order to unlawfully disadvantage its competitors and maintain monopoly power in the B2B Credit Score Market;

    d. whether Fair Isaac had and has monopoly power in the B2B Credit Score Market;

    e. whether Fair Isaac had any legitimate, procompetitive reasons for its conduct;

    f. the effects of Fair Isaac's anticompetitive conduct on in the B2B Credit Score prices;

    g. whether Plaintiff and other members of the Class have been overcharged and thus damaged by paying artificially inflated prices for B2B Credit Scores as a result of Fair Isaac's unlawful behavior; and

    h. the proper measure of damages.

88. Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

25

89.  Plaintiff knows of no difficulty to be encountered in the maintenance of this action as a class action.

## CLAIMS FOR RELIEF

### COUNT 1
### Violation of Section 2 of the Sherman Act: Monopolization

90.  Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

91.  The relevant product market is the market for the sale of B2B Credit Scores.

92.  The relevant geographic market for the sale of B2B Credit Scores is the United States.

93.  The B2B Credit Score Market in the United States is the relevant market.

94.  Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market in the United States.

95.  Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

96.  Fair Isaac has had and continues to have the power to control prices or exclude competition in the B2B Credit Score Market.

97.  Through unlawful, interconnected, and mutually reinforcing anticompetitive and exclusionary acts and agreements, Fair Isaac has substantially foreclosed competition in the market for B2B Credit Scores in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. §2.

98.  Fair Isaac has demonstrated its ability to control prices and exclude competition by raising prices without a corresponding increase in demand and to supracompetitive levels.

26

99. Fair Isaac's monopoly power is not due to growth or development because of a superior product, business acumen, or historic accident.

100. Fair Isaac's acts of monopolization have injured and will continue to injure competition in the relevant market.

101. Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

102. The anticompetitive conduct raised the prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

103. Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's violation of Section 2 of the Sherman Act within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15.

104. Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendant's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

**COUNT 2**
**Violation of Section 2 of the Sherman Act: Conspiracy to Monopolize**

105. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

106. The relevant product market is the market for the sale of B2B Credit Scores.

107. The relevant geographic market for the sale of B2B Credit Scores is the United States.

108. The B2B Credit Score Market in the United States is the relevant market.

27

109.  Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market.

110.  Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

111.  Fair Isaac has demonstrated its ability to control prices and exclude competition by raising prices without a corresponding increase in demand and to supracompetitive levels.

112.  Through unlawful, interconnected, and mutually reinforcing anticompetitive and exclusionary acts and agreements, Fair Isaac has substantially foreclosed competition in the market for B2B Credit Score Market in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. §2.

113.  Fair Isaac combined, conspired or agreed with the Credit Bureaus so as to maintain its monopoly power in the B2B Credit Score Market. Fair Isaac created and maintained this conspiracy through a series of agreements with the Credit Bureaus. In these agreements, the Credit Bureaus and Fair Isaac agreed that the Credit Bureaus would not offer or sell VantageScore or any other competing Credit Score to Plaintiff and members of the Class. Fair Isaac and the Credit Bureaus further agreed that the Credit Bureaus would act as Fair Isaac's agent in the sale of FICO Scores to Plaintiff and members of the Class.

114.  These agreements foreclosed competition in a substantial portion of the B2B Credit Score Market and unlawfully maintained Fair Isaac's monopoly, resulting in Fair Isaac extracting supracompetitive prices for FICO Scores from Plaintiff and members of the Class.

115. Fair Isaac's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

116. Fair Isaac's conspiracy to monopolize has injured and will continue to injure competition in this market.

117. Fair Isaac has acted with the specific intent of monopolizing the market for B2B Credit Scores in the United States.

118. Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

119. The conspiracy raised the prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

120. Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's violation of Section 2 of the Sherman Act within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

121. Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendant's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

## COUNT 3
### Violation of Section 2 of the Sherman Act: Attempt to Monopolize

122. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

123. Fair Isaac's actions as alleged herein constitute attempted monopolization in violation of Section 2 of the Sherman Antitrust Act.

124. Fair Isaac's activities as alleged herein were and are within the flow of interstate and foreign commerce and have substantially adversely affected interstate and foreign commerce.

125. The relevant product market is the market for the sale of B2B Credit Scores.

29

126. The relevant geographic market for the sale of B2B Credit Scores is the United States.

127. The B2B Credit Score Market in the United States is the relevant market.

128. Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market in the United States.

129. Fair Isaac's conduct was specifically intended to acquire monopoly power in the relevant market. Fair Isaac has acted with the specific intent of monopolizing the market for B2B Credit Scores in the United States.

130. There is a dangerous probability that Fair Isaac will succeed in obtaining monopoly power in the relevant market.

131. Fair Isaac's monopoly power is not due to growth or development because of a superior product, business acumen, or historic accident.

132. Fair Isaac's attempt to monopolize has injured and will continue to injure competition in this market.

133. Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's attempt to monopolize the relevant market.

134. Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendant's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

## COUNT 4
### Violation of Section 1 of the Sherman Act: Unreasonable Restraint of Trade

135. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

136. The relevant product market is the market for the sale of B2B Credit Scores.

137. The relevant geographic market for the sale of B2B Credit Scores is the United States.

138. The B2B Credit Score Market in the United States is the relevant market.

139. Fair Isaac had and continues to have at least a 90% market share in the B2B Credit Score Market in the United States.

140. Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

141. Fair Isaac has had and continues to have the power to control prices or exclude competition in the relevant market.

142. Fair Isaac entered into agreements with TransUnion, Experian, and Equifax that contained anticompetitive and exclusionary terms whereby each Credit Bureau agreed not to offer or sell VantageScore as a competing product to Plaintiff and members of the Class.

143. The agreements between Fair Isaac and the Credit Bureaus had substantial anticompetitive effects. The agreements excluded VantageScore, a significant competitor, from a substantial portion of competition in the B2B Credit Score Market.

144. The agreements raised the price for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

145. Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

146. Plaintiff and members of the Class continue to suffer damage, and will continue to do so, if Fair Isaac does not cease its anticompetitive conduct.

147. Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's violation of Section 1 of the Sherman Act, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15.

31

148.  Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendant's continuing violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

**COUNT 5**
**Violations of State Antitrust Laws**

149.  Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

150.  By reason of the foregoing, Defendant has violated, and Plaintiff and members of the Class are entitled to relief under, the antitrust laws of the States of Arizona, California, Connecticut, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin, as well as the District of Columbia, as follows:

   a.  Arizona Revised Statutes § 44-1401, *et seq*.;

   b.  California Cartwright Act, California Business & Professions Code § 16700, *et seq*.;

   c.  Connecticut Antitrust Act, Conn. Gen. Stat. 35-24, *et seq*.;

   d.  District of Columbia Code § 28-4501, *et seq*.;

   e.  Hawaii Revised Statutes § 480-2, *et seq*.;

   f.  Illinois Antitrust Act, Illinois Complied Statutes § 740, Ill. Comp. Stat. 1011, *et seq*.;

   g.  Iowa Competition Law, Iowa Code § 553.1, *et seq*.;

   h.  Kansas Statutes Annotated § 50-101, *et seq*.;

   i.  Maine Revised Statutes Annotated, tit. 10, § 1101, *et seq*.;

j.  Maryland Code Annotated, Commercial Law, § 11-204, *et seq.*;

k.  Michigan Compiled Laws § 445.771, et seq.;

l.  Minnesota Antitrust Law of 1971, Minnesota Statutes § 325D.49, *et seq.*;

m.  Mississippi Code Annotated § 75-21-1, *et seq.*;

n.  Nebraska Revised Statutes § 59-801, *et seq.*;

o.  Nevada Revised Statutes Annotated § 598A.010, *et seq.*;

p.  New Mexico Statutes Annotated § 57-1-1, *et seq.*;

q.  New York Donnelly Act, New York General Business Law § 340, *et seq.*;

r.  North Carolina General Statutes § 75-1, *et seq.*;

s.  North Dakota Century Code § 51-08.1-01, *et seq.*;

t.  Oregon Revised Statutes § 646.705, *et seq.*;

u.  Rhode Island General Laws § 6-36-4, *et seq.*;

v.  South Dakota Codified Laws § 37-1-3.1, *et seq.*;

w.  Tennessee Code Annotated § 47-25-101, *et seq.*;

x.  Utah Code Annotated § 76-10-3104, *et seq.*;

y.  Vermont Statutes Annotated, tit. 9, § 2451, *et seq.*;

z.  West Virginia Code § 47-18-1, *et seq.*; and

aa.  Wisconsin Statutes § 133.01, *et seq.*

**COUNT 6**
**Violation of State Unfair Trade Practices Laws**

151.  Plaintiff incorporates by reference the allegations contained in the preceding
paragraphs as if fully set forth herein.

152.  By reason of the foregoing, Defendant has violated, and Plaintiff and members of
the Class are entitled to relief under, the Unfair Trade Practices and Consumer Protection Laws

33

of the States of Arkansas, California, Connecticut, Florida, Massachusetts, Missouri, Montana, New Mexico, New York, North Carolina, Rhode Island, South Carolina, and Vermont, as well as the District of Columbia, as follows:

     a. Arkansas Code Annotated, § 4-88-101, *et seq.*;

     b. California Business and Professions Code § 17200, *et seq.*;

     c. Connecticut Unfair Trade Practices Act, Conn Gen. Stat. § 42-110a, *et seq.*;

     d. District of Columbia Code § 28-3901, *et seq.*;

     e. Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*;

     f. Massachusetts Consumer Protection Act, Mass. Gen. L. Ch. 93A, *et seq.*;

     g. Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*;

     h. Montana Code, § 30-14-103, et seq., and § 30-14-201, *et seq.*;

     i. New Mexico Statutes Annotated § 57-12-1, *et seq.*;

     j. New York General Business Law § 349, *et seq.*;

     k. North Carolina General Statutes § 75-1.1, *et seq.*;

     l. Rhode Island General Laws § 6-13.1-1, *et seq.*;

     m. South Carolina Code Annotated § 39-5-10, *et seq.*; and

     n. Vermont Statutes Annotated, tit. 9, § 2451, *et seq.* .

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.     The Court determine that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23, that Plaintiff be appointed as class representative, and that Plaintiff's counsel be appointed as counsel for the Class;

B.      The conduct alleged herein be declared, adjudged, and/or decreed to be unlawful under Section 1 and Section 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

C.      Plaintiff and the Class recover their overcharge damages, trebled, and the costs of the suit, including reasonable attorneys' fees as provided by law; and

D.      Plaintiff and the Class be granted such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## JURY DEMAND

Plaintiff demands trial by jury of all issues so triable.

Dated: April 27, 2020

Respectfully submitted,


 */s/ Paul E. Slater* 
Paul E. Slater
Joseph M. Vanek
Michael G. Dickler
Matthew T. Slater
SPERLING & SLATER
55 West Monroe Street
Suite 3200
Chicago, IL 60603
(312) 641-3200
pes@sperling-law.com
jvanek@sperling-law.com
mdickler@sperling-law.com
mslater@sperling-law.com

Linda P. Nussbaum
Bart D. Cohen
NUSSBAUM LAW GROUP, P.C.
1211 Avenue of the Americas, 40th Floor
New York, NY 10036
(917) 438-9102
lnussbaum@nussbaumpc.com
bcohen@nussbaumpc.com

Michael L. Roberts
Karen Sharp Halbert
ROBERTS LAW FIRM, P.A.
20 Rahling Circle
Little Rock, AR 72223
(501) 821-5575
mikeroberts@robertslawfirm.us
karenhalbert@robertslawfirm.us

*Counsel for Plaintiff Alcoa Community
Federal Credit Union and the Proposed Class*

# EXHIBIT E

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| Getten Credit Company, individually and on behalf of all others similarly situated, | Civil Action No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| FAIR ISAAC CORPORATION, | |
| Defendant. | |

Plaintiff Getten Credit Company brings this class action complaint against Defendant Fair Isaac Corporation ("Fair Isaac"), on behalf of itself and all entities who paid for a FICO Score from Defendant and/or a credit bureau in the U.S. from at least as early as January 1, 2006 until the present (the "Class Period") for commercial use. Plaintiff brings this action under the Sherman Act and various state antitrust laws against Fair Isaac for injunctive relief and damages, and demands a trial by jury. Based upon personal knowledge, information and belief, investigation by counsel, proceedings and admissions made in *Fair Isaac Corp. v. Trans Union LLC*, 17-cv-08318 (N.D. Ill.), and related ongoing federal government investigations, Plaintiff alleges:

## NATURE OF ACTION

1.  Plaintiff is informed and believes, and thereon alleges, that Fair Isaac has monopolized, conspired to monopolize, and unreasonably restrained trade in the business-to-business market for supplying credit scores to lenders, financial institutions, and other businesses for risk management decisions ( the "B2B Credit Score Market").

2.     Fair Isaac's ubiquitous credit scoring model known as the FICO Score is what most businesses use to size up the creditworthiness of consumers. Fair Isaac's FICO Scores have dominated the market for almost three decades. Defendant has, as its executives have touted, been able to maintain a 90-plus percent market share in the B2B Credit Score Market for at least 13 years. Defendant achieved this by abusing its illegal monopoly and engaging in anticompetitive conduct including, but not limited to, exclusionary agreements with credit bureaus and other distributors of Defendant's FICO Scores and false and misleading media campaigns against its competitors.

3.     As a result of its illegal actions, Defendant's unlawful monopoly share has suppressed competition, stymied innovation, limited access to credit for millions of Americans, and increased the prices of FICO Scores to the detriment of Plaintiff and Class members.

4.     On March 15, 2020, Fair Isaac disclosed in a press release that the Antitrust Division of the United States Department of Justice had opened an investigation based at least in part on the exclusionary conduct alleged herein.

## JURISDICTION AND VENUE

5.     This action arises under sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) and section 4 of the Clayton Act (15 U.S.C. § 15(a)) and seeks to recover treble damages, costs of suit, and reasonable attorneys' fees for the injuries sustained by Plaintiff and members of the Class resulting from Fair Isaac's anticompetitive conduct. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), 1407, and 15 U.S.C. § 15.

6.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. §§ 1391(b), (c), and (d) because during the Class Period, the Defendant resided, transacted business, was found, or had agents in this District, and a substantial portion of the alleged

activity affected interstate trade and commerce discussed below has been carried out in this District.

7.     During the Class Period, Defendant's conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States, including in this District.

8.     During the Class Period, Defendant used the instrumentalities of interstate commerce, including interstate wires, wireless spectrum, and the U.S. mail, to effectuate its illegal scheme.

9.     This Court has personal jurisdiction over Defendant because Defendant transacted business, maintained substantial contacts, and is located and/or committed unlawful conduct in this District. The unlawful scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States.

10.     Plaintiff purchased at least one FICO Score from Fair Isaac and TransUnion, which is headquartered in this District. Defendant employs persons who work in its credit score business in this District. Defendant is also registered to do business in Illinois.

11.     Defendant selected this District to institute Case No. 1:17-cv-08318, to which this case is filed as related by Plaintiff.

## PARTIES

**A.**  **Plaintiff**

12.     Plaintiff Getten Credit Company is a corporation with its principal place of business in Mendota, Minnesota. Plaintiff is a small, family-owned independent finance company that specializes in helping consumers with various financial needs including debt consolidation, purchasing vehicles, and rebuilding credit.

3

13.     During the Class Period, Plaintiff paid for FICO Scores from Defendant and TransUnion.

**B.  Defendant**

14.     Defendant Fair Isaac Corporation is a publicly traded Delaware corporation, with its principal place of business in San Jose, California. Defendant is a leading data analytics company focused on credit scoring services. Its FICO Score has become the standard measure of consumer credit risk in the United States.

## FACTUAL ALLEGATIONS

15.     As described in greater detail below, Plaintiff has been harmed in several respects because Fair Isaac and credit bureaus have entered into anticompetitive agreements with the goal of eliminating all competition in the B2B Credit Score Market. Defendant's conspiracy has permitted it to charge supracompetitive prices to credit bureaus and companies that rely on credit scores, such as Plaintiff, and tilt the table in favor of Defendant's own credit scoring products that they develop.

16.     In support of Plaintiff's claims that Defendant have engaged in illegal, anticompetitive conduct, Plaintiff sets forth below the relevant product market—the B2B Credit Market—involved in Defendant's conspiracy; the details of Defendant's anticompetitive conduct and the harm to competition caused by Defendant's anticompetitive conduct; and that there is no pro-competitive justification for Defendant's actions.

**I.  The B2B Credit Market Overview**

**A.  Credit Scores, Reports, and Credit Bureaus**

17.     Credit scores are designed to assess credit risk and are the most widely used indicators of consumers' creditworthiness in the United States. Lenders, financial institutions,

4

and other businesses rely on credit scores to decide whether and on what terms to extend credit to consumers. Consumers, in contrast, rely on credit scores to determine whether they will be able to get a mortgage, credit card, auto loan, or other credit product and the rate they will pay.

18.     Credit reports and credit scores are different; credit scores can be sold together with credit reports or independently. A credit report is a statement with detailed information about a consumer's credit activity and current credit situation, and might, for example, include information about a consumer's history of mortgage payments, credit card balances, credit card payments, and credit inquiries. Credit scoring systems apply an algorithm to the credit report to produce a credit score. These credit scores are usually three digits and accompanied by "reason codes," which inform the lender of significant contributions to the reduction of a consumer's credit score.

19.     Credit reporting agencies ("credit bureaus")—which include TransUnion, Equifax, and Experian—collect and supply aggregated consumer credit data in the form of consumer reports. The credit bureaus maintain sophisticated databases of consumer credit data to provide comprehensive information on consumers' financial behavior by continuously gathering credit and financial data about consumers from creditors, government entities, public records, collection agencies, and other third parties. This information is then compiled into a "credit file." The credit bureaus sell credit reports, which include information from a consumer's credit file, to businesses and consumers.

### B.  The B2B Credit Score Market is a Distinct Product Market

20.     There are two distinct markets for credit scores in the United States: (1) the B2B Credit Score Market and (2) the B2C ("business-to-consumer") Credit Score Market. B2B and

5

B2C credit scores are priced, purchased, and used very differently and serve very different purposes.

21.     Purchasers in the B2B Credit Score Market are comprised of lenders, financial institutions, and other businesses that purchase B2B credit scores in order to make risk management decisions ("B2B Purchasers"). Lenders, financial institutions, and other businesses that purchase credit reports from Defendant and/or the credit bureaus generally purchase credit scores in order to determine the credit-worthiness and identity of qualified borrowers to whom a preapproved credit offer will be extended ("pre-screening"), make lending decisions ("lending"), or review the risk associated with existing borrowers for purposes such as extending additional credit or changing other account terms ("account management").

22.     Customers in the B2C Credit Score Market, in contrast, purchase credit scores in order to manage their credit, protect their identity, or assess their likelihood of obtaining credit. American consumers often use credit monitoring or identity protection accounts from, for example, Capital One, Credit Karma, and LifeLock which often include access to the consumer's own credit score.

23.     The lenders, financial institutions, and other businesses in the B2B Credit Score Market that purchase and use credit scores to assess creditworthiness and make decisions about whether and on what terms to extend credit or otherwise take on risk do not consider credit reports, insurance scores, or any other information about borrowers, to be a substitute for credit scores.

24.     The credit risk scoring industry, industry analysts, policy analysts, and investors recognize the B2B Credit Score Market as distinct from the B2C Credit Score Market. Fair Isaac

also regularly acknowledges that the B2B Credit Score Market is distinct from the B2C Credit Score Market.

25. The B2B Credit Score Market is characterized by significant barriers to entry. B2B Purchasers encounter significant "switching costs" if they adopt a new credit score that has different score-to-risk relationships or that uses different reason codes – regardless of whether it is an updated version of the score they already use or an entirely new brand of credit score (unlike consumers in the B2C Credit Score Market).

26. Network effects also characterize the B2B Credit Score Market. As more banks and consumers use a particular type of credit score, that credit score becomes a de facto "industry standard."

## II. **Fair Isaac Has a Monopoly in the B2B Credit Score Market**

27. Fair Isaac has maintained a monopoly over the B2B Credit Score Market in the United States for roughly three decades, largely through the unlawfully achieved dominance of its FICO product line, which includes many different types of FICO Scores.

28. Introduced in the 1980s, Fair Isaac's "FICO Classic" credit scores are the best known and most widely used B2B Credit Scores in the United States. FICO Classic applies an algorithm to each credit bureau's data and generates a score between 300 and 850 that purports to give an indication of the individual's credit risk. It also generates a set of "reason codes" that explain the reasons the consumer has not been assigned the maximum score.

29. Fair Isaac advertises its monopoly in the B2B Credit Score Market on its website: 90% of all lending decisions in the United States rely on FICO Scores, 27.4 million FICO Scores are sold every day, 10 billion FICO Scores are sold each year, and 100 billion FICO Scores sold to date—making FICO the most used credit score in the world.

7

30.     Similarly, in its 2019 Form 10-K, Fair Isaac described its "FICO Scores" as "the standard measure in the U.S. of consumer credit risk" and reported that "FICO Scores are used . . . by nearly all of the major banks, credit card organizations, mortgage lenders, and auto loan originators."

31.     Fair Isaac representatives have described Fair Isaac's FICO score as "the 800-pound gorilla" in the market for B2B Credit Scores and bragged about Fair Isaac's 90% market share. For example, at the JPMorgan Ultimate Services Investor Conference, Fair Isaac's CFO and Executive Vice President Michael Pung stated that the FICO scoring system "is the most widely used credit scoring system here in the U.S.," "[v]irtually every major lender in the U.S. [uses] the FICO Score for some sort of credit lending decision," and Fair Isaac has "maintained a 90-plus percent market share for at least the [last] 13 years."

32.     Fair Isaac representatives have also recognized that FICO scores have benefited from the network effects created by the widespread use of FICO scores in many industries. For example, in November 2011, then-CEO of Fair Isaac Mark Greene explained that the "network effect" of "FICO Scores . . . being sort of the standard language" and "having everybody . . . standardize on a FICO Score, that's magic."

33.     Fair Isaac's monopoly in the B2B Credit Score Market has given it the power to control prices. Indeed, Fair Isaac's CEO, Will Lansing, has noted that in the B2B Credit Score Market Fair Isaac has "quite a bit of discretion in whether we want our margins to be higher or lower or where they are."

### III. Fair Isaac's Anticompetitive Conduct

#### A. Fair Isaac Has Contracted with Credit Bureaus as Agents and Co-Conspirators in its Scheme to Monopolize

34.    With its dominant position in the B2B Credit Score Market, Fair Isaac uses and enlists the assistance of the credit bureaus (TransUnion, Equifax, and Experian) to perpetuate and extend its monopoly. Fair Isaac's relationship with B2B Purchasers like Plaintiff is often dependent on B2B Purchasers' relationships with credit bureaus, who help to facilitate the sale of Defendant's FICO Scores.

35.    When a B2B Purchaser requires a credit score, it purchases the report from a credit bureau, and the credit score jointly from the credit bureau and Fair Isaac. Although the payment may at times occur in a single transaction, the practical reality, as expressly set forth in contracts governing the sale of credit scores to B2B Purchasers, is that both the credit bureau and Fair Isaac act as the provider of the FICO Score.

36.    B2B Purchasers' contracts for FICO Scores are often known as Credit Scoring Services Agreements ("CSSAs"). CSSAs provide for the method of payment and fee model for the delivery of credit score services and establish the relationship between Fair Isaac and the B2B Purchasers.

37.    For example, the CSSA between Plaintiff, its credit bureau TransUnion, and Fair Isaac makes clear that the "the Fair Isaac Scores are the property of Fair Isaac and are proprietary to Fair Isaac" and that Fair Isaac grants to Plaintiff a "limited license to use, internally, the Fair Isaac Scores solely for the particular purpose . . . for which the Fair Isaac Scores were obtained."

38.    In Plaintiff's and Class Members' procurement of FICO Scores, the credit bureaus act as co-conspirators and agents of Fair Isaac.

**B. Fair Isaac Has Leveraged its Monopoly Power to Eliminate Competition from VantageScore**

39.     Fair Isaac has used its monopoly power to coordinate a multi-faceted campaign to eliminate competition from VantageScore. The anticompetitive agreements that Defendant and the credit bureaus entered into include contract terms that restrict the credit bureaus' ability to compete and sell VantageScore, penalty pricing and bundling to foreclosure competition from competitors, and permits Fair Isaac to extract monopoly prices.

40.     Fair Isaac has been explicit that this is its goal. In April 2015, Will Lansing informed investors on a quarterly earnings conference call that Fair Isaac's strategic goal was to ensure that "the entire industry adopts FICO scores instead of [other] scores." To achieve this goal, Fair Isaac has enlisted its competitors (the credit bureaus, which jointly own and control VantageScore) to agree to anticompetitive contracts that: prevent them from developing or selling alternative credit scores that could be seamlessly integrated into many lenders' systems or used interchangeably with FICO Scores; prevent them from competing with each other to negotiate prices from FICO; and create a pricing scheme effectively foreclosing B2B Purchasers from choosing to use FICO Scores in their lending decisions at the same time as providing customers with a competing credit score, including VantageScore. At the same time, Fair Isaac has waged a media campaign against VantageScore and made false and misleading statements in order to sow fear, uncertainty, and doubt about VantageScore's reliability. By its anticompetitive and exclusionary conduct, Fair Isaac has injured competition in the B2B Credit Score Market, increased prices for Plaintiff and the Class, and limited access to credit for millions of Americans.

41.     In March 2006, VantageScore introduced the VantageScore credit score and credit scoring system. VantageScore is a competitor to FICO Scores in the B2B Credit Score Market.

42.     From the time it was first released in 2006, VantageScore scored millions more consumers than the FICO scoring systems. Whereas Fair Isaac's FICO scoring systems would not generate a score if a consumer had not used credit in more than six months or if a credit account was fewer than six months old, VantageScore calculated scores for consumers that had not used credit for up to two years. It also reached more consumers by using utility and telecommunications payment histories when reported to the credit bureaus.

43.     Today, VantageScore scores 30 million more Americans than traditional FICO scoring systems. Fair Isaac's outdated FICO Classic credit scoring systems—which are still used by many lenders—exclude many creditworthy Americans that VantageScore can reliably score. About one-quarter of American adults—some 65 million people—do not have a traditional FICO score. VantageScore is capable of reducing the number of adults without a credit score by almost half. Ten million of those newly scored individuals are "prime" borrowers that should be attractive to traditional lenders.

44.     Without a credit score, it is difficult or impossible to apply for or successfully obtain a mortgage, car loan, or reasonable interest rates on personal lines of credit. Not having a credit score can also have drastic effects outside of the credit market. For example, credit scores are increasingly used by landlords.

45.     Those excluded by Fair Isaac's traditional FICO scoring systems—who face an increased risk of being denied access to credit in the form of credit cards, auto and home loans, and apartment housing—include disproportionate numbers of low-income and minority

11

consumers, many of whom VantageScore has calculated scores for, including 2.7 million that should be considered "prime borrowers."

46.    Despite the advantages of using VantageScore, Fair Isaac continues to have a monopoly in the B2B Credit Score Market. In February 2013, at a Morgan Stanley Conference, Fair Isaac's CEO Will Lansing explained that despite the existence of VantageScore, "there [is] not that much competition around our scores business" because "FICO scores are very much part of the fabric of the banking industry" and "really deeply imbedded."

### C.    Fair Isaac's Anticompetitive Agreements Restrict the Credit Bureaus' Ability to Develop or Sell Other Credit Scores Compatible with B2B Purchasers' Existing Systems

47.    In January 2015, Fair Isaac and TransUnion entered into a contract, the Analytic and Data License Agreement. With TransUnion's prior contracts with Fair Isaac set to expire on December 31, 2014, Fair Isaac demanded that the parties enter into a new contract rather than renew their existing contracts. Fair Isaac represented to TransUnion that Experian and Equifax had already agreed to materially similar new contracts with Fair Isaac. If TransUnion did not agree to the terms demanded by Fair Isaac, it would lose substantial business from customers that depend on FICO Scores. On information and belief, TransUnion, Equifax, and Experian all agreed to Fair Isaac's plan to exclude competitors and maintain its monopoly.

48.    Fair Isaac has imposed a similar or identical "No Equivalent Products" clause on each of the credit bureaus. By imposing a "No Equivalent Products" term, Fair Isaac has sought to block the credit bureaus from offering alternative credit score products, such as VantageScore, that would allow B2B Purchasers to easily switch from FICO Scores to VantageScore without incurring the cost of redesigning their lending programs and systems, or to use VantageScore

12

alongside or interchangeably with FICO Scores. The credit bureaus have agreed to and acquiesced in these anticompetitive agreements, terms, and resulting anticompetitive effects.

49. The "No Equivalent Products" clause provides that a credit bureau may not internally develop a credit scoring system that is aligned to the odds-to-score relationship of any Fair Isaac Analytic or that uses more than a limited number of reason codes that "match" reason codes used by any Fair Isaac Analytic. It also prohibits a credit bureau from distributing any competing analytic (i.e., credit scoring system) that is aligned with FICO Scores or uses too many of the same reason codes, and the clause expressly names Vantage Score Solutions LLC as a developer of such a scoring system that may not be distributed if VantageScore were to offer an "Equivalent Product."

50. For example, if a competing credit score product used a 700 score to indicate a less-than-five-percent risk of credit delinquency, and if a 700 FICO score also indicated the same risk of delinquency, then the "No Equivalent Products" clause prevents a credit bureau from distributing the competing product. Similarly, if a competing Credit Score product used reason codes that match 20% or more of the reason codes used by FICO scoring systems, the "No Equivalent Products" clause prohibits a credit bureau from distributing the product.

51. The "No Equivalent Products" clause effectively prevents a credit bureau from developing (contrary to the original goal of VantageScore and the easy ability to do so) or selling an alternative to FICO's credit scores that would (i) be compatible with many B2B Purchasers' systems, models, and processes; and (ii) allow B2B Purchasers to have a legitimate choice between using FICO Scores and an alternative score. Many B2B Purchasers have spent substantial effort and resources to develop systems, models, and processes that are designed for FICO Scores. B2B Purchasers' systems, models, and processes are tailored to FICO's odds-to-

13

score relationship (i.e., each given score has a given ratio of non-defaulting consumers to defaulting consumers), and reason codes (the particular reasons cited for increased risk of default). For example, a bank's software might be designed to accept one or more FICO Scores and reason codes, combine this information with data it collects internally, and automatically produce a lending decision.

52.     The "No Equivalent Products" clause protects and sustains Fair Isaac's monopoly. The odds-to-score relationship is an arbitrary mapping between risk and score and does not reflect protectable intellectual property. Similarly, the reason codes that may not be used by an "Equivalent Product" were not invented by Fair Isaac but reflect well-established industry best practices for lending.

### D.   Agreements Between Fair Isaac and Credit Bureaus Include Provisions Foreclosing Competition Including Penalty Pricing and Bundling

53.     Fair Isaac's contracts with each credit bureau include a similar or identical "Dynamic Royalty Schedule" clause and a similar or identical "Pre-Qualification" royalty category. Through the "Pre-Qualification" royalty category, Fair Isaac has effectively foreclosed lenders from the ability to purchase and use a FICO score in their lending decision while providing a consumer with a competing Credit Score, which drives lenders to buy exclusively Fair Isaac's FICO Scores and not to purchase competing Credit Scores. As a consequence of Fair Isaac's imposition of the "Pre-Qualification" royalty category, TransUnion has lost sales of VantageScore to major banks to provide to consumers.

54.     In 2015, Fair Isaac unilaterally imposed, and the credit bureaus have complied with, a new "Pre-Qualification" royalty category, which Fair Isaac defines to "mean an End User's qualification of a potential consumer customer for an End User's own internal lending offering." This royalty category distinguishes between: (1) lenders that use FICO Scores for

14

"Pre- Qualification" without providing any Credit Score or credit data to consumers; and (2) lenders that use FICO Scores for "Pre-Qualification" while also providing Credit Scores or credit data to consumers "in connection" with the "Pre-Qualification." Certain banks and lenders offer consumers opportunities to apply to qualify for credit opportunities (e.g., a credit card or loan) and, at the same time, receive their personal Credit Score. The offer of a free Credit Score to a consumer can entice consumers to apply for credit opportunities.

55.     The royalty price associated with a FICO score used for "Pre-Qualification" depends on whether other Credit Scores or credit data are provided to consumers. If a lender purchases a FICO score for use in "Pre-Qualification" and does not provide any Credit Score or credit data to the consumer "in connection" with the "Pre-Qualification," there is one per-score royalty rate. If the lender purchases a FICO score for use in "Pre-Qualification" and provides any other Credit Score (such as a VantageScore) to the consumer "in connection" with the "Pre-Qualification," there is a different per-score royalty rate that is higher – a penalty rate.

56.     The penalty rate can be avoided in one of two ways, both of which involve purchasing exclusively FICO Scores. First, the B2B Purchaser could purchase a FICO score for use in "Pre-Qualification" and provide no Credit Score or credit data to the consumer. Second, the B2B Purchaser could purchase a bundled FICO product from Fair Isaac. Fair Isaac offers bundled products to lenders that combine the use of scores by lenders with the provision of scores to consumers.

57.     There is no legitimate business justification for the penalty rate agreed upon by Fair Isaac and the credit bureaus when the lender also purchases any other Credit Score to disclose to consumers. The transparent purpose of the "Pre-Qualification" royalty category is to drive all B2B Purchasers engaging in "Pre-Qualification" to purchase exclusively FICO Scores

15

and make it cost-prohibitive for B2B Purchasers engaging in "Pre-Qualification" to purchase a competing Credit Score for disclosure to consumers. This scheme has been effective, and few, if any, B2B Purchasers have opted to pay the penalty rate.

58.  Fair Isaac's "Level Playing Field," requires that the prices that are made available to one credit bureau be made available to the other credit bureaus. Taken together, the "Dynamic Royalty Schedule" and the "Level Playing Field" clauses enable Fair Isaac to unilaterally increase the royalty prices it charges for FICO Scores. Fair Isaac's contracts with TransUnion, Equifax, and Experian include similar or identical "Level Playing Field" and "Dynamic Royalty Schedule" provisions.

59.  Fair Isaac has used the "Level Playing Field" and "Dynamic Royalty Schedule" provisions in its contracts with the credit bureaus to extract monopoly prices from B2B Purchasers. These provisions disincentivize a credit bureau from negotiating for a lower price because it knows that even if it succeeds, it will not gain a competitive advantage over the other credit bureaus.

### E.  Fair Isaac Has Waged a Media Campaign to Discredit VantageScore's Reliability Among B2B Purchasers

60.  Despite having successfully induced the credit bureaus to agree with Fair Isaac and with each other to impose restrictions on VantageScore's ability to compete with FICO, Fair Isaac has gone even further and waged an aggressive public relations and advertising campaign to spread false statements, convey false impressions, and mislead B2B Purchasers about the qualities and characteristics of FICO Scores and VantageScore. In advertisements, letters, and blog posts, Fair Isaac has disparaged VantageScore by calling it a "Fako" score, falsely claimed that VantageScore is an unreliable measure of creditworthiness, and misrepresented the information considered by VantageScore's credit scoring system.

61.     On December 12, 2017, Fair Isaac took out a full-page advertisement in The Wall Street Journal addressed to "Lenders, Policymakers and Consumer Advocates" that disparaged VantageScore without identifying it by name. The advertisement contrasted Fair Isaac, which "is not owned by the credit bureaus" and whose FICO Scores have been used "by lenders and securitization investors for decades," with an alternative Credit Score, which is "owned by the credit bureaus," is less reliable than FICO Scores in evaluating credit risk, and fails to use "sound practices" or "science-based credit evaluation." To anyone familiar with the market for Credit Scores, the advertisement unambiguously conveys the false message that VantageScore is "[w]eakening scoring standards, [and] harm[ing] consumers, and the lending system," particularly in the B2B Credit Score Market.

62.     The Wall Street Journal advertisement directed readers to "Learn more at FICO.com/independent," a Fair Isaac-owned website that connects visitors to articles and blog posts that disparage VantageScore by name. One such blog post asserts: "Despite claims by VantageScore, weakening the minimum scoring criteria will not empower millions of low-risk mortgage credit seekers."

63.     Moreover, the implication that FICO Classic scoring systems provide Credit Scores for as many consumers as VantageScore is false and misleading. VantageScore provides Credit Scores for millions of American consumers that are not scored by FICO Classic scoring systems.

64.     Fair Isaac's website includes numerous posts disparaging VantageScore and making false or misleading statements about VantageScore's features. For example, one blog post claims that "[r]esearch results consistently showed that scoring models relying solely on sparse or old credit data were weak and did a poor job forecasting future performance." This

statement is false and misleading because it conveys the message that VantageScore's scoring model is "weak" and does a "poor job forecasting future performance" because it considers a consumer's full credit history even if the consumer has not used a traditional credit line in the last six months. In fact, studies have shown that VantageScore is strongly predictive.

65.    Another blog post claims that whereas "FICO Score 9 differentiates medical from non-medical collections," "VantageScore does not." This statement conveys the false message that VantageScore does not differentiate medical from non-medical collections. In fact, VantageScore 3.0 was the first credit scoring system to address medical debt. VantageScore 4.0, the most recent version of VantageScore, distinguishes medical collection accounts from non-medical collection accounts and penalizes medical collections less than non-medical ones.

66.    Fair Isaac's campaign against VantageScore is not new. In 2006, just months after the launch of VantageScore, Fair Isaac filed a meritless lawsuit against the credit bureaus and VantageScore in the United States District Court for the District of Minnesota. See Fair Isaac Corporation v. Equifax Inc., No. 06-cv-04112 (D. Minn.). This was the monopolist's first attempt to kill the nascent competitor. Fair Isaac's numerous claims included a claim that the development of VantageScore violated the antitrust laws and a claim that the development of VantageScore constituted trademark infringement. In its prayer for relief, Fair Isaac sought nothing less than the end of VantageScore: it requested that the "Defendants be ordered to dissolve VantageScore."

67.    All of Fair Isaac's claims failed; in fact, the jury concluded that Fair Isaac was the wrongdoer. In support of its trademark infringement claim, Fair Isaac had alleged that VantageScore's use of a scoring range of 501-990 constituted trademark infringement because it was similar to FICO's scoring range of 300-850. The credit bureaus and VantageScore

18

counterclaimed for fraud on the United States Patent and Trademark Office ("PTO"), alleging that Fair Isaac had misrepresented to the PTO that only FICO used the 300-850 score range. The jury concluded that Fair Isaac had committed fraud on the PTO by making false statements as part of its application to register the score range of 300-850 as a trademark.

68.     The public statements described in the foregoing paragraphs were transmitted to and seen by a substantial number of businesses and consumers nationwide.

## II. Fair Isaac's Anticompetitive and Exclusionary Conduct Harms Competition

69.     Fair Isaac's campaign of exclusionary conduct to maintain and expand its monopoly has harmed and continues to harm participants in the B2B Credit Score Market. Fair Isaac's unlawful conduct, including that which has been taken in concert with the credit bureaus, has foreclosed competition in the B2B Credit Score Market by foreclosing opportunities for the credit bureaus to sell VantageScore or any other competitive products. The anticompetitive and exclusionary conduct has allowed Fair Isaac to maintain its monopoly and charge monopoly prices for B2B Credit Scores to B2B Purchasers during the Class Period.

70.     Fair Isaac's conduct, in concert with the credit bureaus, including by the contracts entered into by the credit bureaus, has reduced choice for B2B Purchasers. The anticompetitive terms agreed to between Fair Isaac and the credit bureaus have frustrated the ability of B2B Purchasers to purchase VantageScore or any other competitive Credit Score that could be seamlessly integrated into lenders' existing processes and systems. Fair Isaac's media and advertising campaign against VantageScore has been successful in sowing fear, uncertainty, and doubt about VantageScore in the marketplace.

71.     Media sources, financial blogs, and consumers have absorbed Fair Isaac's message that VantageScore is a "Fako" score merely because it is not a FICO score. For

19

example, thebalance.com – a website devoted to personal finance issues – posted in February 2017, and continues to display as of the date of this filing: "If you purchased your Credit Score anywhere but MyFICO.com, then it's a Fako score."

## FRAUDULENT CONCEALMENT AND TOLLING

72. A cause of action accrued for Plaintiff each time Fair Isaac and/or a credit bureau sold a B2B Credit Score to plaintiff at a supracompetitive price made possible by their anticompetitive conduct. Each such sale constituted an overt act in furtherance of their anticompetitive scheme. Accordingly, Plaintiff is entitled to recover all damages on all sales that Fair Isaac and/or its co-conspirators made to Plaintiff at supracompetitive prices within four years of the filing of this action.

73. Due to Fair Isaac's concealment of its unlawful conduct, however, Plaintiff and members of the Class are entitled to recover damages reaching back even beyond the four-year statute of limitations period. Fair Isaac's violations were not reasonably discoverable until February 12, 2018, when TransUnion disclosed the misconduct in a suit against Fair Isaac. Plaintiff and members of the Class had no knowledge of the unlawful self-concealing scheme and could not have discovered the scheme and conspiracy through the exercise of reasonable diligence more than four years before the filing of this action.

74. That is true, at least in part, because the nature of the scheme was self-concealing and because Fair Isaac employed deceptive tactics and techniques of secrecy to avoid detection of, and to conceal, its scheme.

75. Because the scheme was both self-concealing and affirmatively concealed by Fair Isaac, Plaintiff and members of the Class had no knowledge of the scheme more than four years

before the filing of this complaint; nor did they have the facts or information that would have caused a reasonably diligent person to investigate.

76.     Plaintiff and members of the Class also lacked the facts and information necessary to form a good faith basis for believing that any legal violations had occurred. Reasonable diligence on the part of Plaintiff and members of the Class would not have uncovered those facts more than four years before the filing of this complaint.

77.     As a result of Fair Isaac's fraudulent concealment, all applicable statutes of limitations affecting Plaintiff's and Class members' claims have been tolled.

78.     The federal government's antitrust investigation of Fair Isaac's unlawful conduct also tolls any federal statute of limitations pursuant to 15 U.S.C. § 16.

## CLASS ACTION ALLEGATIONS

79.     Plaintiff brings this action on behalf of itself, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a) and (b) on behalf of:

> All entities who paid for a FICO Score from Defendant and/or a credit bureau in the United States during the Class Period for commercial use.

80.     Specifically excluded from the Class are the Defendant; the officers, directors or employees of the Defendant; any entity in which the Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of the Defendant. Also excluded from the Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action. Also expressly excluded are any natural persons that purchased their own credit score solely via myFico.com, the credit bureaus, or other entities for their personal use.

81.     Members of the Class are readily identifiable from Defendant's records.

82.     Members of the Class are so numerous that individual joinder of all the members is impracticable. Although the precise number and identification of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery of Defendant.

83.     This action is brought and may properly be maintained as a class action pursuant to the provision of Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(1)-(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions. Common questions of fact and law exist as to all Class members which predominate over all questions affecting only individual Class members.  These common legal and factual questions, which do not vary from Class member to Class member, and which may be determined without reference to the individual circumstances of any Class member, include the following:

    a.   whether Defendant monopolized, conspired to monopolize, or unreasonably restrained trade in violation of certain state antitrust laws;

    b.   whether Defendant engaged in unfair or deceptive trade practices in violation of certain state laws;

    c.   the duration of the alleged unlawful conduct;

    d.   injury suffered by Plaintiff and members of the Class;

    e.   damages suffered by Plaintiff and members of the Class;

    f.   whether Plaintiff and the other members of the Class are entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief; and

    g.   the appropriate class-wide measure of damages.

84.     These and other questions of law or fact, which are common to the members of the Class, predominate over any questions affecting only individual Class members.

85.     Plaintiff's claims are typical of the claims of the Class members. Plaintiff and other Class members must prove the same facts in order to establish the same claims, described herein, which similarly apply to all Class members.

86.     Plaintiff is an adequate representative of the Class because it is a member of the Class and its interests do not conflict with the interests of the Class members it seeks to represent. Plaintiff has retained counsel competent and experienced in the prosecution of complex class action litigation, and together Plaintiff and its counsel intend to prosecute this action vigorously for the benefit of the Class. The interests of Class members will be fairly and adequately protected by Plaintiff and its counsel.

87.     A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual litigation of the claims of all Class members is impracticable. Even if every Class member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts, in which individual litigation of hundreds of cases would proceed. Individual litigation presents a potential for inconsistent or contradictory judgments, the prospect of a race for the courthouse, and an inequitable allocation of recovery among those with equally meritorious claims. Individual litigation increases the expense and delay to all parties and the court system in resolving the legal and factual issues common to all Class members' claims relating to Defendant's unlawful conduct. By contrast, the class action device presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

88.     The various claims asserted in this action are additionally or alternatively certifiable under the provisions of Federal Rules of Civil Procedure 23(b)(1) and/or 23(b)(2) because:

89.     The prosecution of separate actions by numerous individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, thus establishing incompatible standards of conduct for Defendant;

90.     The prosecution of separate actions by individual Class members would also create the risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interest of other Class members who are not a party to such adjudications and would substantially impair or impede the ability of such non-party Class members to protect their interests; and

91.     Defendants have acted on grounds generally applicable to the entirety of the Class, thereby making appropriate final declaratory and injunctive  relief with respect to the Class as a whole.

## CLAIMS FOR RELIEF

### COUNT I – MONOPOLIZATION
### Violation of the Sherman Act, 15 U.S.C. § 2

92.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

93.     As described above, from at least as early as January 1, 2006 until the present, Defendant possessed monopoly power in the market for B2B Credit Scores. No other competitor has been able to restrain Defendant's ability to charge supracompetitive monopoly prices for its credit scores during the relevant time period. Fair Isaac had and has the ability to control prices and exclude competitors.

94.     Fair Isaac willfully and unlawfully maintained its market power in the B2B Credit Score market by engaging in an anticompetitive scheme to prevent legitimate competition on the merits. Fair Isaac's monopoly have been maintained by its anticompetitive conduct and not as a result of providing a superior product, business acumen, or historical accident.

95.     Fair Isaac has demonstrated its ability to control prices and exclude competition by raising prices without a corresponding increase in demand and to supracompetitive levels.

96.     Fair Isaac's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

97.     Fair Isaac's course of anticompetitive conduct include anticompetitive agreements with credit bureaus, requiring those entities to exclusively or nearly exclusively exclude competitors like VantageScore and maintain its monopoly. Collectively, Fair Isaac's contracts with credit bureaus substantially foreclose the B2B Credit Score market from actual and potential competition.

98.     There are no valid procompetitive justifications for Defendant's exclusionary conduct in the B2B Credit Score market and even if there were (and there are not), any such procompetitive benefit could have been obtained through less restrictive means.

99.     Through unlawful, interconnected, and mutually reinforcing anticompetitive and exclusionary acts and agreements, Fair Isaac has substantially foreclosed competition in the market for B2B Credit Scores in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

100.     Plaintiff and members of the Class have been injured in their property by Defendant's antitrust violations. Their injury consists of having paid, and continuing to pay, higher prices for B2B Credit Scores than they would have paid absent Defendant's scheme. Such

injury is of the type antitrust laws were designed to prevent and flows from that which makes Defendant's conduct unlawful. Plaintiffs are the proper entities to bring a private case concerning this conduct.

101.    Fair Isaac's monopolization has injured and will continue to injure competition in this market. Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

102.    Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's violation of Section 2 of the Sherman Act within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15. Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendant's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

## COUNT II – CONSPIRACY TO MONOPOLIZE
### Violation of the Sherman Act, 15 U.S.C. § 2

103.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

104.    Fair Isaac entered into a combination or conspiracy with the credit bureaus to maintain its monopoly power in the B2B Credit Score Market. Fair Isaac created and maintained this conspiracy through a series of agreements with each of the credit bureaus. In these agreements, the credit bureaus and Fair Isaac agreed that the credit bureaus would not offer or sell VantageScore or any other competing Credit Score to Plaintiff and members of the Class. Fair Isaac and the credit bureaus (the top three being TransUnion, Experian, and Equifax) further agreed that they would act as Fair Isaac's agent in the sale of FICO Scores to Plaintiff and members of the Class.

26

105.     These agreements foreclosed competition in a substantial portion of the B2B Credit Score market and unlawfully maintained Fair Isaac's monopoly, resulting in Fair Isaac extracting supracompetitive prices for FICO Scores from Plaintiff and members of the Class.

106.     Fair Isaac's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

107.     Fair Isaac's monopolization conspiracy has injured and will continue to injure competition in this market.

108.     Fair Isaac has acted with the specific intent of monopolizing the market for B2B Credit Scores in the United States.

109.     Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

110.     The conspiracy raised the prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

111.     Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's violation of Section 2 of the Sherman Act within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15.

112.     Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendant's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26.

## COUNT III – UNREASONABLE RESTRAINT OF TRADE
### Violation of the Sherman Act, 15 U.S.C. § 1

113.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

114.     Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2006, and continuing through the present, the exact dates being unknown to Plaintiff, Defendant and its co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, and stabilize prices in the B2B Credit Score Market in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

115.     In formulating and carrying out the alleged agreement, understanding, and conspiracy, the Defendant and its co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others: entering into agreements with credit bureaus TransUnion, Experian, and Equifax that contained anticompetitive terms whereby each credit bureau agreed not to offer or sell VantageScore as a competing product to Plaintiff and members of the Class.

116.     The combination and conspiracy alleged herein has had the following effects, among others: (1) price competition in the sale of B2B Credit Scores has been restrained, suppressed, and/or eliminated in the United States; (2) prices for B2B Credit Scores sold by Defendant and credit bureaus have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and (3) those who purchased B2B Credit Scores from Defendant and credit bureaus have been deprived of the benefits of free and open competition.

117.     The agreements between Fair Isaac and the credit bureaus had substantial anticompetitive effects. The agreements excluded VantageScore, a significant competitor, from a substantial portion of competition in the B2B Credit Score Market.

28

118.    The agreements raised the price for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

119.    Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

120.    Plaintiff and members of the Class continue to suffer damage, and will continue to do so, if Fair Isaac does not cease its anticompetitive conduct.

121.    Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's violation of Section 1 of the Sherman Act, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15.

122.    Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendant's continuing violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26.

### COUNT IV – VIOLATIONS OF STATE ANTITRUST LAWS

123.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

124.    By reason of the foregoing, Defendant has violated, and Plaintiff and members of the Class are entitled to relief under, the antitrust laws of the States of Arizona, California, Connecticut, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin, as well as the District of Columbia, as follows:

    a.   Arizona Revised Statutes § 44-1401, *et seq*.;

b. California Cartwright Act, California Business & Professions Code § 16700, *et seq*.;

c. Connecticut Antitrust Act, Conn. Gen. Stat. 35-24, *et seq*.;

d. District of Columbia Code § 28-4501, *et seq*.;

e. Hawaii Revised Statutes § 480-2, *et seq*.;

f. Illinois Antitrust Act, Illinois Complied Statutes § 740, Ill. Comp. Stat. 1011, *et seq*.;

g. Iowa Competition Law, Iowa Code § 553.1, *et seq*.;

h. Kansas Statutes Annotated § 50-101, *et seq*.;

i. Maine Revised Statutes Annotated, tit. 10, § 1101, *et seq*.;

j. Maryland Code Annotated, Commercial Law, § 11-204, *et seq*.;

k. Michigan Compiled Laws § 445.771, et seq.;

l. Minnesota Antitrust Law of 1971, Minnesota Statutes § 325D.49, *et seq*.;

m. Mississippi Code Annotated § 75-21-1, *et seq*.;

n. Nebraska Revised Statutes § 59-801, *et seq*.;

o. Nevada Revised Statutes Annotated § 598A.010, *et seq*.;

p. New Mexico Statutes Annotated § 57-1-1, *et seq*.;

q. New York Donnelly Act, New York General Business Law § 340, *et seq*.;

r. North Carolina General Statutes § 75-1, *et seq*.;

s. North Dakota Century Code § 51-08.1-01, *et seq*.;

t. Oregon Revised Statutes § 646.705, *et seq*.;

u. Rhode Island General Laws § 6-36-4, *et seq*.;

v. South Dakota Codified Laws § 37-1-3.1, *et seq*.;

w.  Tennessee Code Annotated § 47-25-101, *et seq.*;

x.  Utah Code Annotated § 76-10-3104, *et seq.*;

y.  Vermont Statutes Annotated, tit. 9, § 2451, *et seq.*;

z.  West Virginia Code § 47-18-1, *et seq.*; and

aa. Wisconsin Statutes § 133.01, *et seq.*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and all others similarly situated, prays that:

1.      The Court determine that this action may be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure with respect to Plaintiff's claims for injunctive relief, and Rule 23(b)(3) of the Federal Rules of Civil Procedure with respect to the claims for damages, and declaring Plaintiff as the representative of the Class and its counsel as counsel for the Class;

2.      The Court declare the conduct alleged herein to be unlawful in violation of the laws as set forth above;

3.      Plaintiff and each member of the Class recover punitive and treble damages to the extent such are provided by the law;

4.      Defendant be enjoined from continuing the illegal activities alleged herein;

5.      Plaintiff and the Class recover their costs of suit, including reasonable attorneys' fees and expenses as provided by law;

6.      Pre- and post-judgment interest, to the extent allowable; and

7.      Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff, on behalf of itself and all others similarly situated, hereby demands a trial by jury as to all issues so triable.

Dated: May 1, 2020

Respectfully submitted,

*/s/ Kenneth A. Wexler*
Kenneth A. Wexler
Melinda J. Morales
Michelle Perkovic
**WEXLER WALLACE LLP**
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222
kaw@wexlerwallace.com
mjm@wexlerwallace.com
mp@wexlerwallace.com

Dennis Stewart
**GUSTAFSON GLUEK PLLC**
600 B Street
17th Floor
San Diego, CA 92101
Telephone: (619) 595-3200
dstewart@gustafsongluek.com

Daniel E. Gustafson
Daniel C. Hedlund
Michelle J. Looby
Joshua J. Rissman
Ling S. Wang
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Fax: (612)
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com
lwang@gustafsongluek.com

Garrett D. Blanchfield
Brant D. Penney
**REINHARDT, WENDORF & BLANCHFIELD**
332 Minnesota Street. Suite W-1050
St. Paul, MN 55101
Tel: (651) 287-2100
Fax: (651) 287-2103
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com

***Counsel for Plaintiff and the Proposed Class***

33

# EXHIBIT F

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

SKY FEDERAL CREDIT UNION,

     *Plaintiff*,

v.

FAIR ISAAC CORPORATION,

     *Defendant*.

Case No. 1:20-cv-02114

Honorable Edmond E. Chang

## DEFENDANT FAIR ISAAC CORPORATION'S MOTION TO REASSIGN AND CONSOLIDATE RELATED CASES

Pursuant to Local Rule 40.4 and Fed. R. Civ. P. 42(a)(2), Defendant Fair Isaac Corporation ("FICO"), by and through its undersigned counsel, respectfully requests that this Court designate *First Choice Federal Credit Union v. Fair Isaac Corp.*, No. 1:20-cv-02516, and *Alcoa Community Federal Credit Union v. Fair Isaac Corp*., No. 1:20-cv-02259, as related cases to this action, and reassign those cases to Judge Chang, as the presiding Judge over the lowest-filed related case. As discussed below, the complaints filed in the *First Choice* and *Alcoa* cases are materially identical to the complaints filed in this action and in another case that is already pending before Judge Chang, *Amalgamated Bank v. Fair Isaac Corp.*, No. 1:20-cv-02533. All four complaints (collectively, the "Related Actions") also seek to certify the same putative class.

In addition, in the interests of judicial and party economy, FICO further requests that following reassignment the Court consolidate the Related Actions into No. 1:20-cv-02114 and order plaintiffs to file a consolidated complaint or direct counsel representing the parties in these cases to meet and confer and propose a schedule for plaintiffs to file a consolidated complaint.

In further support of this motion, FICO states as follows:

1

1.      On April 2, 2020, Sky Federal Credit Union filed a complaint against FICO in the instant action. Dkt. 1. The complaint brought claims under the Sherman Act for monopolization, conspiracy to monopolize, and unreasonable restraint of trade in the market for business to business ("B2B") credit scores, as well as parallel claims under state law.

2.      On April 23, 2020, First Choice Federal Credit Union filed a materially identical complaint against FICO, *First Choice Federal Credit Union v. Fair Isaac Corp.*, No. 1:20-cv-02516 (N.D. Ill.), bringing monopolization, conspiracy to monopolize, and unreasonable restraint of trade claims in the same market and based on the same contractual provisions. A copy of the complaint is attached hereto as Exhibit A. The *First Choice* case is pending before Chief Judge Pallmeyer.

3.      On April 24, 2020, Amalgamated Bank filed another materially identical complaint against FICO, *Amalgamated Bank v. Fair Isaac Corp.*, No. 1:20-cv-02533 (N.D. Ill.), bringing the same monopolization, conspiracy to monopolize, and unreasonable restraint of trade claims as in *First Choice* and *Sky Federal*. A copy of the *Amalgamated Bank* complaint is attached hereto as Exhibit B. The case is pending before Judge Chang and thus does not need to be reassigned.

4.      On April 27, 2020, Alcoa Community Federal Credit Union filed a fourth materially identical complaint against FICO, *Alcoa Community Federal Credit Union v. Fair Isaac Corp.*, No. 1:20-cv-02259 (N.D. Ill.), bringing the same monopolization, conspiracy to monopolize, and unreasonable restraint of trade claims as in the foregoing cases, as well as an attempted monopolization claim. A copy of the complaint in *Alcoa* is attached as Exhibit C. The *Alcoa* case is pending before Judge Norgle.

5.      Under LR 40.4(b), "[a] case may be reassigned to the calendar of another judge if it is found to be related to an earlier-numbered case assigned to that judge." Cases are related if

(among other things) they (a) involve some of the same issues of fact or law, or (b) in class action suits, if one or more of the classes involved is the same. LR 40.4(a). The decision to reassign cases is within the discretion of the Court. *See Gautreaux v. Chicago Housing Authority*, 2013 WL 5567771, at *3 (N.D. Ill. Oct. 9, 2013).

(a)      All of the Related Actions involve the same issues of fact and law. Each brings identical claims for monopolization, conspiracy to monopolize, and unreasonable restraint of trade. *See* Ex. A ¶¶ 99-145; Ex. B ¶¶ 97-143; Ex. C ¶¶ 90-121, 135-148; Dkt. 1 ¶¶ 101-147. In particular, each complaint challenges the same provisions in FICO's agreements with credit bureaus as the source of the allegedly anticompetitive restrictions. *See* Ex. A ¶¶ 99-145; Ex. B ¶¶ 97-143; Ex. C ¶¶ 90-121; Dkt. 1 ¶¶ 101-147. Each complaint's allegations are otherwise materially similar, with multiple passages that appear to be copied verbatim from each other. *See generally* Dkt. 1 and Ex. A-C.

(b)      In addition, all plaintiffs in the Related Actions seek to represent an identical class of "B2B Purchasers residing in the United States that directly purchased a FICO Score from Fair Isaac and/or a Credit Bureau during the Class Period." Ex. A ¶ 84; Ex. B ¶ 86; Dkt. 1 ¶ 86; *see also* Ex. C ¶ 80 (defining the class as "[a]ll persons or entities in the United States and its territories that purchased B2B Credit Scores directly from Fair Isaac and/or a Credit Bureau . . . .").

6.      Related cases may be reassigned to the judge overseeing the lowest-numbered case if (i) both cases are pending in this Court; (ii) the handling of both cases by the same judge is likely to result in a substantial saving of judicial time and effort; (iii) the earlier case has not progressed to the point where designating a later filed case as related would be likely to delay the proceedings in the earlier case substantially; and (iv) the cases are susceptible of disposition in a single proceeding. LR 40.4(b). Under this test, reassignment of the Related Actions to Judge Chang, who

is presiding over the lowest-numbered case (*Sky Federal*) as well as the *Amalgamated Bank* case, will best facilitate the just and efficient resolution of these actions.

(i) All of the Related Actions are pending in this Court.

(ii) Reassignment of the Related Actions before Judge Chang will result in substantial judicial economy, especially in light of the identical class definitions in the complaints, whereas allowing these cases to proceed separately would create a significant risk of duplicate motions practice and inconsistent judgments within this district.

(iii) Designating and transferring *First Choice* and *Alcoa* would not delay proceedings in any of the Related Actions. Pursuant to the Court's April 17 order and Third Amended General Order 20-0012 issued by Chief Judge Pallmeyer on April 24, FICO's response to the complaint in *Sky Federal* is not due until June 23, 2020 and the initial status conference is currently scheduled for June 2. FICO waived service in the *First Choice* case, making its response to the complaint currently due on June 23. FICO has not yet been served or asked to waive service in *Amalgamated Bank* or *Alcoa*.

(iv) Given the nearly complete overlap in allegations and claims, the Related Actions can be resolved in a single proceeding through a coordinated motion to dismiss and, if necessary, coordinated discovery, summary judgment, class certification, and trial.

7. The cover sheet in the *Sky Federal* action identifies another case, *Fair Isaac Corp. v. TransUnion LLC*, No. 1:17-cv-08318 (N.D. Ill.), as potentially related. *See* Dkt. 2. The *TransUnion* case is currently pending before Judge Coleman. FICO does not believe transfer of the Related Actions to Judge Coleman is appropriate under LR 40.4(b) for two reasons.

(a) First, the Related Actions raise numerous issues not present in the *TransUnion* litigation and vice versa. *TransUnion* started as a commercial dispute between FICO

4

and TransUnion for breach of contract, violation of the Copyright Act, and other asserted claims. In response to FICO's claims, TransUnion filed a number of counterclaims, including monopolization under Section 2 of the Sherman Act, breach of contract, Lanham Act and false advertising claims, and a request for contract reformation. *See* No. 1:17-cv-08318, Dkt. 38 (public redacted version). Unlike the antitrust claims in the Related Actions, TransUnion does not bring any Section 1 claims or a conspiracy to monopolize claim. Indeed, according to the plaintiffs in the Related Actions, one of FICO's alleged co-conspirators *is* TransUnion. By the same token, the *TransUnion* case raises a host of contract and other questions not present in the Related Actions. Moreover, unlike the Related Actions, the *TransUnion* case is not a putative class action.

Because of these factual and procedural differences, FICO does not believe that having the same judge handle the Related Actions and *TransUnion* would lead to substantial savings of judicial time and effort. *See, e.g.*, *Martin v. Midland Funding LLC*, 2011 WL 3876965, at *2 (N.D. Ill. Aug. 31, 2011) (declining to reassign cases where "aside from a single cause of action against the same defendant, the cases are very different"); *Teamsters Local 705 Pension v. A.D. Conner, Inc.*, 2011 WL 1674839, at *2 (N.D. Ill. May 4, 2011) (same where cases would require "different legal findings and damages calculations"); *Hollinger Int'l, Inc. v. Hollinger, Inc.*, 2004 WL 1102327, at *3 (N.D. Ill. May 5, 2004) (same where cases involved distinct claims and one would "require the Court to decide whether to certify a class" while the other would not); *cf. Karamelion LLC v. Elexa Consumer Prods., Inc.*, No. 1:19-cv-6329 (N.D. Ill.), Dkt. 23 (Jan. 29, 2020) (Chang, J.) (declining to reassign where, though there "is some overlap in the asserted claims and the anticipated defenses," "it is not likely that a single trial would be convened to resolve the dispute").

(b) Second, unlike the Related Actions, which have not progressed beyond the recent filing of the complaints, the *TransUnion* case has been pending for three years. Written

discovery and document production in *TransUnion* is scheduled for substantial completion in June, and would have been completed sooner but for automatic extensions issued in response to the COVID-19 pandemic. The parties also were in the midst of preparing for an upcoming mediation before Magistrate Judge Jantz in April before it was taken off calendar in light of the pandemic; a telephonic hearing is currently scheduled to proceed on May 4.

Given the advanced state of the *TransUnion* litigation and these impending deadlines, FICO expects that reassignment of the Related Actions to Judge Coleman would delay the proceedings in *TransUnion* substantially. *See, e.g.*, *Williams v. Walsh Construction*, 2007 WL 178309, at *2-3 (N.D. Ill. Jan. 16, 2007) (declining to reassign case where the parties in the first case had unsuccessfully attempted settlement and discovery was shortly scheduled to close).

8.       Finally, the Court has authority to consolidate separately captioned lawsuits into one case when, as here, the actions "involve a common question of law or fact." Fed. R. Civ. P. 42(a)(2). "The question of whether to grant consolidation is a matter of discretion for the trial court" and "[i]n exercising that discretion, a court should consider whether the proposed consolidation would promote convenience and judicial economy, and whether it would cause prejudice to any party." *Sylverne v. Data Search. N.Y., Inc.*, 2008 WL 4686163, at *1 (N.D. Ill. May 28, 2008) (citations omitted). Because consolidation would promote significant party and judicial economy and would not prejudice any party, FICO asks that the Court order consolidation of the cases discussed herein and direct plaintiffs to file a consolidated complaint. *See N. Miami Beach Gen. Employees Retirement Fund v. Parkinson*, 2011 WL 12465137, at *3 (N.D. Ill. July 5, 2011) (ordering consolidation of related class actions and filing of consolidated complaint); *see also Smith v. State Farm Mut. Automobile Ins. Co.*, 301 F.R.D. 284, 286 (N.D. Ill. 2014) (ordering plaintiffs to file consolidated complaint following consolidation of separate class actions).

9. Prior to filing this motion, counsel for FICO conferred with counsel for plaintiffs in the Related Actions. Plaintiffs have advised FICO that they do not oppose reassignment and consolidation of these actions before the same District Judge, are amenable to filing a consolidated complaint, and agree that FICO's responsive pleading obligations should be suspended pending the filing of a consolidated complaint. However, plaintiffs contend that the Related Actions should be re-assigned to Judge Coleman, who as discussed is presiding over *Fair Isaac Corp. v. TransUnion LLC*, 1:17-cv-08318 (N.D. Ill.). FICO disagrees, and respectfully submits that the actions should be consolidated before Judge Chang for the reasons set forth above.

## CONCLUSION

For the foregoing reasons, FICO respectfully requests that this Court enter an order:

(a) Finding that *First Choice Federal Credit Union v. Fair Isaac Corp.*, No. 1:20-cv-02516 (N.D. Ill.), and *Alcoa Community Federal Credit Union v. Fair Isaac Corp.*, No. 1:20-cv-02559 (N.D. Ill.), are related cases to this action;

(b) Transferring *First Choice* and *Alcoa* to Judge Chang for further proceedings pursuant to L.R. 40.4(d);

(c) Consolidating this action and the *First Choice*, *Amalgamated Bank*, and *Alcoa* actions (collectively, the "Related Actions") into the lowest-numbered case, No. 1:20-cv-02114; and

(d) Directing plaintiffs in the Related Actions to file a consolidated complaint, or directing counsel for the parties to meet and confer regarding a proposed schedule for the plaintiffs in the Related Actions to file a consolidated complaint.

7

Dated: April 29, 2020

Respectfully submitted,

/s/  *Britt M. Miller*

Michael A. Olsen
Britt M. Miller
J. Gregory Deis
Matthew D. Provance
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
molsen@mayerbrown.com
bmiller@mayerbrown.com
gdeis@mayerbrown.com
mprovance@mayerbrown.com
*Counsel for Defendant Fair Isaac*
*Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I, Britt M. Miller, an attorney, hereby certify that on April 29, 2020, I caused a true and correct copy of the foregoing **DEFENDANT FAIR ISAAC CORPORATION'S MOTION TO REASSIGN AND CONSOLIDATE RELATED CASES** to be filed and served electronically via the Court's CM/ECF system.

In addition, a courtesy copy of this filing has been delivered by electronic mail to counsel of record in *First Choice Federal Credit Union v. Fair Isaac Corp.*, No. 1:20-cv-02516 (N.D. Ill.), *Alcoa Community Federal Credit Union v. Fair Isaac Corp.*, No. 1:20-cv-02259 (N.D. Ill.), and *Amalgamated Bank v. Fair Isaac Corp.*, No. 1:20-cv-02533 (N.D. Ill.).

/s/ *Britt M. Miller*
Attorney for Fair Isaac Corporation

9

# EXHIBIT G

ℹ Cited
As of: May 4, 2020 2:17 PM Z

# *KPASA, LLC v. United States*

United States District Court for the Northern District of Illinois, Eastern Division

May 13, 2004, Decided ; May 17, 2004, Docketed

No. 04 C 109

**Reporter**

2004 U.S. Dist. LEXIS 8720 *; 93 A.F.T.R.2d (RIA) 2004-2294

KPASA, LLC, Petitioner, v. UNITED STATES OF AMERICA, Respondent.

**Disposition:** [*1] Petitioner's motion to consolidate granted.

## Core Terms

consolidation, cases, reassignment, summons, petitions, summonses, contends, handling, motions

## Case Summary

### Procedural Posture

Petitioner corporate taxpayer filed a motion, pursuant to *Fed. R. Civ. P. 42*, to consolidate its action against respondent United States, which sought to quash a summons, with two other cases brought by corporate taxpayers against the government, which also sought to quash summonses.

### Overview

The Internal Revenue Service issued summonses to an accounting firm, requesting the production of documents concerning the taxpayer and two other taxpayers. All three taxpayers filed actions on the same day, seeking to quash the summonses. Although the government did not oppose consolidation, it claimed that all three cases should be stayed pending proper service of process and that reassignment of all three cases should be made to another federal district judge, who presided over an earlier-filed, allegedly related case. In granting the motion to consolidate, the court held that it could think of no compelling reason, even if proper service had not yet been effected, for staying the case and declining to consolidate three cases that the parties agreed should be consolidated. The court held that, if the government decided to challenge service in all three cases, consolidation of the cases would facilitate a more economical and expeditious handling of that challenge, as it would take the form of a single motion to dismiss. The court also held that it would be improper to rule upon the relatedness of the three cases to the earlier-filed case.

### Outcome

The court granted the taxpayer's motion to consolidate.

## LexisNexis® Headnotes

Civil Procedure > Trials > Consolidation of Actions

**HN1**[⬇] **Trials, Consolidation of Actions**

See *Fed. R. Civ. P. 42*.

2004 U.S. Dist. LEXIS 8720, *1

Civil Procedure > Trials > Consolidation of Actions

Governments > Courts > Judges

Civil Procedure > Judicial
Officers > Judges > General Overview

**HN2**[ ] **Trials, Consolidation of Actions**

U.S. Dist. Ct., N.D. Ill., E. Div., R. 40.4(a), defines when cases are "related" and sets forth the circumstances under which reassignment of cases is appropriate. In part, it provides that two or more civil cases are related if they involve some of the same issues of fact or law or grow out of the same transaction or occurrence. It further provides that a case may be reassigned to the calendar of another judge if it is related to an earlier-numbered case assigned to that judge and: (1) both cases are pending in the court; (2) the handling of both cases by the same judge is likely to result in a substantial saving of judicial time and effort; (3) the earlier case has not progressed to the point where designating a later filed case as related would be likely to delay the proceedings in the earlier case substantially; and (4) the cases are susceptible of disposition in a single proceeding. U.S. Dist. Ct., N.D. Ill., E. Div., R. 40.4(b). Finally, the rule sets forth certain requirements for motions to reassign and provides that such motions must be presented to the district judge presiding over the lowest-numbered case among the cases targeted for consolidation. U.S. Dist. Ct., N.D. Ill., E. Div., R. 40.4(c), (d).

Tax Law > ... > Audits & Investigations > Administrative Summons > Third Party Summonses

Tax Law > ... > Audits & Investigations > Administrative Summons > General Overview

**HN3**[ ] **Administrative Summons, Third Party Summonses**

See *26 U.S.C.S. § 7609(b)(2)(B)*.

Civil Procedure > Trials > Consolidation of Actions

**HN4**[ ] **Trials, Consolidation of Actions**

General commentary to U.S. Dist. Ct., N.D. Ill., E. Div., R. 40.4, concerning the timing of motions to reassign, by its terms, does not prohibit the reassignment or consolidation of cases prior to the filing of a responsive pleading.

**Counsel:** For KPASA INC, plaintiff: Robert E. McKenzie, Richard Keith Hellerman, Patrick John Cotter, Arnstein & Lehr, Chicago, IL. David D Aughtry, Chamberlain, Hrdlicka, White, Williams and Martin, Atlanta, GA.

**Judges:** David H. Coar, United States District Judge.

**Opinion by:** David H. Coar

# Opinion

## MEMORANDUM OPINION AND ORDER

Petitioner KPASA, LLC filed a Petition to Quash Summons issued by respondent United States of America. [1] Petitioner has now moved pursuant to *Fed. R. Civ. P. Rule 42* to consolidate the instant case with *SRK Wilshire Partners v. United States of America* (Case No. 04 C 110) and *Shahid R. Khan and Ann C. Khan v. United States of America* (Case No. 04 C 115), both of which are also pending in the United States District Court for the Northern District of Illinois. For the foregoing reasons, this court grants petitioner's motion to consolidate.

[*2] **I. Background**

---

[1] Although the parties, in their submissions to the court, have designated KPASA, LLC "plaintiff" and the United States "defendant," due to the nature of this action, these parties are more properly described as "petitioner" and "respondent," respectively.

## A. The Three Petitions to Quash

KPASA commenced the instant action on January 8, 2004. On the same day, SRK Wilshire Partners and the Khans commenced their respective actions against the United States by filing Petitions to Quash Summons, as well. As explained by petitioner, KPASA, SRK Wilshire Partners, and the Khans are all related entities. Moreover, all three entities are represented by the same counsel in their respective actions. [2]

 [*3] Petitioner contends that all three actions emanate from the same set of operative facts and seek the same remedy. A cursory review of the three petitions supports petitioner's characterization. Specifically, on or about December 19, 2003, the Internal Revenue Service ("IRS") issued summonses to BDO Seidman, the public accounting firm utilized by KPASA, SRK Wilshire Partners, and the Khans to handle their accounting needs. The IRS summonses requested production of documents concerning KPASA, SRK Wilshire Partners, and the Khans (including their tax returns), as well as testimony concerning the requested documents. Each of the three actions seeks an order quashing three respective underlying summonses, and the three actions are premised on precisely the same legal grounds (*i.e.,* that the summonses were issued for an improper purpose, improperly seek documents that are not relevant to the IRS' determinations, seek information already within the IRS' possession, do not comply with administrative and statutory requirements, seek privileged information and materials, *etc.*).

## B. KPASA's Motion to Consolidate

KPASA seeks the consolidation of the three above-referenced actions. [*4] First, KPASA contends that all three actions share common questions of fact and law

and involve the same issues as to the propriety of the IRS' summonses. Moreover, it notes that all three actions involve the same respondent and the same attorneys. Finally, petitioner argues that consolidation of the three matters and resolution of the same before this court (which presides over the first-filed of the three cases) is in the best interests of all the parties and serves the interest of judicial economy. On these grounds, petitioner contends that the three actions may be consolidated in line with the standard set forth in *Rule 42 of the Federal Rules of Civil Procedure.*

## C. The United States' Response

In its "Memorandum of Law in Opposition to [KPASA's] Motion to Consolidate," the government expressly states that it does *not* oppose consolidation of the above three actions (*i.e.,* Case Nos. 04 C 109, 04 C 110, and 04 C 115). (Mem., p.1) ("the United States does not oppose consolidation of these three cases"). *See also* Mem., p. 2. The government nonetheless raises two collateral points, purportedly in opposition to petitioner's [*5] motion: (1) all three cases should be stayed pending proper service of process; and (2) "if and when a proper motion to reassign has been made," reassignment of all three cases should be made to the Honorable Judge James F. Holderman, who presides over an earlier-filed, allegedly related case also pending in the United States District Court for the Northern District of Illinois, *United States v. BDO Seidman,* LLP (Case No. 02 CV 4822) ("the BDO case"). *See* Mem., p. 1. Implicit in the government's arguments is its assent to the notion that the three actions are related and should be consolidated.

## II. Relevant Standards

*Rule 42 of the Federal Rules of Civil Procedure* provides that "*HN1*[↑] when actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay." *Fed. R. Civ. P. 42(a).* Local *Rule 40.4* is also relevant to the disposition of KPASA's motion, as it *HN2*[↑] defines when cases are "related" and sets forth the circumstances under which reassignment of cases is appropriate. In relevant part, it provides that two or more civil cases are related if they "involve some of the same issues of fact or law" or "grow out of the

---

[2] In an affidavit submitted with petitioner's reply memorandum, petitioners' counsel testified that he made an inquiry at the Clerk's Office of the United States District Court for the Northern District of Illinois concerning the proper procedure for service of the underlying Petitions to Quash. He further testified that the Clerks' Office unequivocally advised him that it would not issue a summons for a petition to quash an IRS summons and that the proper method of service of such a petition to quash was service with the petitions of notices of motion advising the government of the date and time for presentment of the petitions.

same transaction or occurrence." L.R. 40.4(a). It further provides that a case may be reassigned to the calendar of another judge if it is related to an earlier-numbered case assigned to that judge and: "(1) both cases are pending in this Court; (2) the handling of both cases by the same judge is likely to result in a substantial saving of judicial time and effort; (3) the earlier case has not progressed to the point where designating a later filed case as related would be likely to delay the proceedings in the earlier case substantially; and (4) the cases are susceptible of disposition in a single proceeding." L.R. 40.4(b). Finally, this Local Rule sets forth certain requirements for motions to reassign and provides that such motions must be presented to the district judge presiding over the lowest-numbered case among the cases targeted for consolidation. *See* L.R. 40.4(c) & (d).

### III. Analysis

### [*7] A. The Parties and the Court Agree that the Cases Are Related and that Consolidation and Reassignment Are Appropriate.

As set forth above, the United States has expressly declined to interpose any objection to the consolidation of these three cases and, in fact, has conceded that they are related and should be consolidated. Against the backdrop of the parties' unequivocal agreement on this point, the court also agrees and finds that the three cases are related and should be consolidated.

First, these three cases clearly "involve a common question of law or fact." *See Rule 42(a)*. All three petitions challenge the enforceability of the December 2003 summonses issued by the IRS to BDO Seidman requesting documents relating to the three petitioners (related entities) and do so on precisely the same legal grounds. Consolidating these actions will also serve the interest of judicial economy, in that it will prevent duplication of judicial effort in handling what will likely be the same or similar legal issues. Moreover, consolidation and reassignment of the actions is consistent with Local Rule 40.4(a), in that the actions "involve some of the same issues of fact or law" *and* [*8] "grow out of the same transaction or occurrence." L.R. 40.4(a). Reassignment is also appropriate under the criteria set forth in L.R. 40.4(b), as all three cases are pending in the United States District Court for the Northern District of Illinois, the handling of these cases by the same judge is likely to result in a substantial saving of judicial time and effort, no delay will result from consolidation and reassignment (as all

three cases are at precisely the same stage of litigation), and the cases are susceptible of disposition in a single proceeding. Based upon these considerations, and after consulting with the judges presiding over the other two cases, this court concludes that the cases are related and that consolidation and reassignment are appropriate.

### B. The United States' Collateral Arguments Are Irrelevant to the Court's Disposition of KPASA's Motion.

Notwithstanding its lack of any objection to the consolidation of the three cases, the United States contends that it has not yet been properly served and offers this purported fact as a basis for staying or dismissing the instant proceeding, in lieu of granting KPASA's motion at this time. [3] Citing *Fed. R. Civ. P. Rule 4(i)(1)(A)* [*9] , the government contends that service upon the United States may be commenced only by properly serving the United States with a copy of both a complaint and a summons. The government further contends that this requirement applies with equal force to a petition to quash an IRS summons. As support for this proposition, the government cites two cases from outside of the Seventh Circuit -- *Smith v. Rossotte, 250 F. Supp. 2d 1266, 1268 (D. Oregon 2003)* (granting motion to dismiss petition to quash notice of levy issued by IRS on account of the petitioner's failure to properly serve the United States in the manner prescribed by *Rule 4*); and *Kish v. United States, No. 1:95:MC:109, 1996 U.S. Dist. LEXIS 2530, at *3-4 (W.D. Mich. 1996)* (recommending that petition to quash IRS summons be dismissed based upon the petitioner's failure to serve the United States in the manner prescribed by *Rule 4*).

 [*10] Here, the government apparently is not quarreling with how (*i.e.,* by mail, *etc.*) or upon whom (*i.e.,* which person and/or office) KPASA sought to effect service, but only with the fact that the petition was not accompanied by a summons. That is, the government premises its contention that KPASA failed to comply

---

[3] The United States contends that, with respect to all three of the related actions filed on January 8, 2004, it has not yet answered because it has not yet been served with process. Regardless of the government's strategic representations herein, at least one reason that it has not yet filed a responsive pleading in the instant case is that this court ordered that the time for doing so be held in abeyance until the court ruled on KPASA's pending motion to consolidate.

with the dictates of *Rule 4(i)(1)* solely upon KPASA's failure to serve a summons. On that basis, the government requests that the instant action be dismissed or stayed pending effective service.

However, KPASA contends that its service upon the United States complied with the requirements of *section 7609*, which authorizes and governs both the issuance of IRS summonses and petitions to quash the same. *Section 7609* provides, in pertinent part, as follows:

> *HN3*[↑] (2) Proceeding to quash.
>
> . . .
>
> (B) Requirement of notice to person summoned and to Secretary. If any person begins a proceeding under subparagraph (A) with respect to any summons, not later than the close of the 20-day period referred to in subparagraph (A) such person shall mail by registered or certified mail a copy of the petition to the person summoned and to such office as the Secretary may direct in the **[*11]** notice referred to in subsection (a)(1).

*26 U.S.C. § 7609(b)(2)(B)*. Citing the squarely on-point decision in *Vano v. United States, 181 F. Supp. 2d 956, 958 (N.D. Ind. 2001)*, KPASA contends that petitions to quash IRS summonses need not be accompanied by service of a summons because *section 7609* does not so require and, instead, sets forth specific procedural requirements for service of petitions to quash, with which KPASA complied in this case. [4] *See also Jones v. United States, No. 03 C 2876, 2003 U.S. Dist. LEXIS 20854, at *4 (N.D. Ill. Sept. 26, 2003)* ("it appears . . . that *§ 7609(b)(2)(B)* governs [the petitioner's action to quash IRS summons], not *Rule 4*") (J. Holderman).

 **[*12]** At this juncture, it is unnecessary for the court to

---

[4] Claiming that *Vano* was wrongly decided, the government argues that *section 7609* merely interposes an additional jurisdictional threshold to bring a petition to quash (*i.e.,* that the petition must be filed within 20 days of receipt of notice of the administrative summons), but does not alter the service requirements. This court finds the government's anemic argument on this point much less persuasive than the two district court cases from within this Circuit that reached the opposite conclusion. Moreover, only one of the two cases from outside of this Circuit cited by the United States (*Kish*) even dealt with a petition to quash an IRS summons, and the magistrate judge in that case did not mention *section 7609* in analyzing the propriety of service there (rendering that decision relatively less persuasive herein, as well).

add its voice to the dissonant authority concerning whether *section 7609* exclusively establishes the service requirements for petitions to quash IRS summons or whether *section 7609* and *Rule 4* together establish those requirements. This is so because the government has failed to cite any authority for the rather illogical proposition that all three cases should be stayed, and not yet consolidated, pending proper service of process. Indeed, this court can think of no compelling reason, even if proper service has not yet been effected, for staying the instant case and declining to consolidate three cases that the parties agree should be consolidated. To the contrary, even if service was improper, consolidation of the cases would better serve the interests of judicial economy. If the government decides to *properly* challenge petitioners' service in all three cases, consolidation of the cases would facilitate a more economical and expeditious handling of that challenge, as it would take the form of a single motion to dismiss.

The only other obstacle thrown up by the government to consolidation of the three cases and the concomitant **[*13]** reassignment of the two later-filed cases is a rather confusing dual contention. The government argues that a motion to reassign should generally follow the service of responsive pleadings (suggesting, therefore, that reassignment here is not yet proper) and that, once proper service has occurred in the present case, all three cases should be consolidated with the BDO case (a two-year old case currently before Judge Holderman).

The government's circuitous attack upon the consolidation of these three actions and their reassignment before this court is unavailing. First, *HN4*[↑] the Local Rule's general commentary concerning the timing of motions to reassign does, by its terms, not prohibit the reassignment or consolidation of cases prior to the filing of a responsive pleading. Further, in quoting this Local Rule, the government conspicuously omitted language expressing its general purpose -- *i.e., "In order that all parties to a proceeding be permitted to respond on the questions of relatedness and possible reassignment,* such motions should not generally be filed until after the answer or motions in lieu of answer have been filed in each of the proceedings involved." *LR 40.4(c)(2)* (emphasis **[*14]** added). That interest is simply not implicated here, where the United States has clearly weighed in on the issue of the cases' relatedness and has, in fact, agreed that the cases are related and should be consolidated.

2004 U.S. Dist. LEXIS 8720, *14

Moreover, it would be entirely improper for this court, at this point in the litigation or ever, to rule upon the relatedness of these three cases to the BDO case and/or, on that basis, to consolidate the three cases with the BDO case. The BDO case was initiated by the United States' filing on July 9, 2002 of a Petition to Enforce Internal Revenue Service Summons and is currently pending before Judge Holderman. [5] Under the Local Rule cited by the government, a motion for reassignment may only "be filed with the judge before whom the lowest-number case of the claimed related set is pending" -- with respect to the BDO case, Judge Holderman. *LR 40.4(c)(2)*. In any event, the government has not filed a motion to consolidate the three cases with the BDO case and/or to reassign the consolidated action to Judge Holderman, and the possibility that it may choose to do so in the future presents no bar to this court's consolidation of the three cases on KPASA's motion for the **[*15]** same.

## IV. Conclusion

For the foregoing reasons, this court finds that Case Nos. 04 C 109, 04 C 110, and 04 C 115 are related and should be consolidated, with the consolidated action to be reassigned to this court. Consistent with Local *Rule 40.4*, the court will forward a copy of this decision to the Executive Committee, along with a request for reassignment, as set forth herein.

**David H. Coar**

**United States District Judge**

**Dated: May 13, 2004**

---

End of Document

---

[5] In that case, which was filed approximately one and a half years prior to the instant case and the other two related cases filed on that date, the United States seeks to enforce a series of twenty summonses issued on May 2, 2002.

John Bjork

# EXHIBIT H



Neutral
As of: May 4, 2020 2:19 PM Z

# *Murry v. America's Mortg. Banc, Inc.*

United States District Court for the Northern District of Illinois, Eastern Division

February 27, 2004, Decided ; March 1, 2004, Docketed

03 C 5811

**Reporter**
2004 U.S. Dist. LEXIS 3148 *; 2004 WL 407010

WILLIE C. MURRY and WYLODEAN MURRY, Plaintiffs, v. AMERICA'S MORTGAGE BANC, INC.; THE LOAN ARRANGER, INC.; CLEARWATER TITLE COMPANY; PARAGON HOME LENDING, LLC; HOMECOMINGS FINANCIAL NETWORK, INC., MICHAEL ROBINS; and JOHN DOES 1-5; Defendants.

**Subsequent History:** Dismissed by, in part *Murry v. America's Mortg. Banc, Inc., 2004 U.S. Dist. LEXIS 12045 (N.D. Ill., June 25, 2004)*

**Disposition:** [*1] Motion granted.

## Core Terms

cases, Mortgage, reassignment, charges, title insurance, finance charge, financed

## Case Summary

### Procedural Posture

In a putative class action, plaintiff homeowners sued defendants, a mortgage broker, a title company, an individual, three mortgage companies, and five John Does, alleging violations of the *15 U.S.C.S. § 1637* of the Truth in Lending Act (TILA), Federal Reserve Board Regulation Z, *12 C.F.R. § 226.13*, and § 2 of the Illinois Consumer Fraud Act (ICFA), *815 Ill. Comp. Stat. 505/2*.

Defendants moved for reassignment of the case.

### Overview

Defendants argued that the present case and another case were related within meaning of U.S. Dist. Ct., N.D. Ill., R. 40.4(a). The present case met the requirement or relatedness under Rule 40.4(a). It was undisputed that both cases involved some of the same issues of law. Plaintiffs in both cases allege that the mortgage broker, in procuring a mortgage loan for each plaintiff, overstated the amount financed and understated the finance charge in violation of TILA and ICFA. Thus, any resolution of both disputes would necessarily require a determination of the legality of the same defendants' actions under the same statutes and regulations. The present case also satisfied the four requirements of U.S. Dist. Ct., N.D. Ill., R. 40.4(b).

### Outcome

Defendants' motion for reassignment was granted.

## LexisNexis® Headnotes

Civil Procedure > Trials > Consolidation of Actions

*HN1*[ ] **Trials, Consolidation of Actions**

2004 U.S. Dist. LEXIS 3148, *1

Under U.S. Dist. Ct., N.D. Ill., R. 40.4(a), cases may be related if they involve any one of the following conditions: (1) the cases involve the same property; (2) the cases involve some of the same issues of fact or law; (3) the cases grow out of the same transaction or occurrence; or (4) in class action suits, one or more of the classes involved in the cases is or are of the same.

Banking Law > Consumer Protection > Truth in Lending > General Overview

Civil Procedure > Trials > Consolidation of Actions

HN2[⬇] Consumer Protection, Truth in Lending

Once relatedness is established under U.S. Dist. Ct., N.D. Ill., R. 40.4(a), the case or cases may be reassigned if all four of the following criteria are met: (1) both cases are pending in the United States District Court for the Northern District of Illinois, (2) reassignment will result in substantial saving of judicial resources, (3) reassignment will not cause a substantial delay, and (4) it is possible for disposition of both cases in a single proceeding. U.S. Dist. Ct., N.D. Ill., R. 40.4(b).

Civil Procedure > Trials > Consolidation of Actions

HN3[⬇] Trials, Consolidation of Actions

U.S. Dist. Ct., N.D. Ill., R. 40.4 does not require complete identity of issues in order for cases to be considered related.

Counsel: For WILLIE C MURRY, WYLODEAN MURRY, plaintiffs: Cathleen M. Combs, Daniel A. Edelman, James O. Latturner, Francis Richard Greene, Edelman, Combs & Latturner, Chicago, IL.

For AMERICA'S MORTGAGE BANC, INC, defendant: Tod H. Rottman, Best, Vanderlaan & Harrington, Chicago, IL. James S Kreamer, Aaron C McKee, Baker, Sterchi & Cowden, Kansas City, MO.

For LOAN ARRANGER, INC., THE, CLEARWATER TITLE COMPANY, MICHAEL J ROBINS, defendants:

Raymond John Ostler, John Joseph Lydon, Gomberg, Shafman, Gold & Ostler, P.C., Chicago, IL.

For PARAGON HOME LENDING, LLC, defendant: Daniel Joseph Neppl, Jamie A. Robinson, Michael Best & Friedrich, LLC, Chicago, IL.

For HOMECOMINGS FINANCIAL NETWORK, INC., defendant: Arthur F. Radke, Richard Eric Gottlieb, Ralph T. Wutscher, Julie C Keller, Dykema Gossett PLIC, Chicago, IL. Miles W Hughes, Dykema Gossett, Chicago, IL.

Judges: HON. RONALD A. GUZMAN, United States Judge.

Opinion by: RONALD A. GUZMAN

# Opinion

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on The Loan Arranger, Inc., Clearwater Title Company, Inc., Michael Robins, and BWM Mortgage, LLC's motion for a finding of relatedness and motion to reassign [*2] the present case with *Blondell Greenleaf v. BWM Mortgage, LLC* (03 C 6186) pursuant to Northern District of Illinois Local Rule 40.4 ("LR 40.4"). For the reasons set forth herein, the Court grants the motion.

## BACKGROUND

In the instant case, Willie and Wylodean Murry, on behalf of themselves and a putative class of similarly situated individuals, defendants America's Mortgage Banc, Inc., The Loan Arranger, Inc., Clearwater Title Company, Paragon Home Lending, LLC, Homecomings Financial Network, Inc., Michael Robins, and five John Doe defendants. There are two putative classes. Class A consists of all who obtained loans from America's Mortgage Banc secured by their residences, on or after

2004 U.S. Dist. LEXIS 3148, *2

a date three years before the instant action was commenced, involving Loan Arranger and Clearwater Title, where the charge for title insurance was excluded from the finance charge. Class B consists of all who obtained loans secured by their residences, on or after three years before this action was commenced, involving Loan Arranger and Clearwater, where the charge for title insurance was excluded from the finance charge.

Prior to April 3, 2002, the Murrys hired Loan Arranger as a mortgage **[*3]** loan broker. On April 3, 2002, the Murrys closed on a loan that was arranged by Loan Arranger and that was secured by their primary household residence. The Murrys received a Truth in Lending Statement from America's Mortgage Banc, Inc. that listed charges in the amount of $ 1,145 for obtaining title insurance from Clearwater Title. This amount was in addition to title insurance charges of $ 450 to Lakeshore title. America's Mortgage Banc, Inc. did not label these charges as "finance charges," but rather included them in the total amount financed. Clearwater Title is a company under common ownership with the Loan Arranger. The Murrys contend that these charges were unreasonable and duplicitous and were included in an overstated amount financed to disguise compensation that was being paid to Loan Arranger in violation of, inter alia, _15 U.S.C. § 1637_ of the Truth in Lending Act ("TILA"), Federal Reserve Board Regulation Z, _12 C.F.R. § 226.13, and Section 2_ of the Illinois Consumer Fraud Act ("ICFA"), _815 ILL. COMP. STAT. 505/2_. They now seek rescission of the mortgage loan transactions, damages in the **[*4]** form of attorney's fees, and other statutory damages on behalf of all putative class members.

_Greenleaf v. BWM Mortgage, LLC_ (03 C 6186), pending before Judge Amy St. Eve, is a putative class action brought by a plaintiff against defendants BWM Mortgage, LLC ("BWM"), Lenders Network USA, Inc., Clearwater Title Co., The Loan Arranger, Inc., Michael Robins, and five John Doe defendants. Ms. Greenleaf hired Loan Arranger to act as a mortgage loan broker. On or about September 11, 2002, Loan Arranger arranged for such a loan from BWM that was to be secured by the plaintiff's household residence.

Not unlike the Murrys, Greenleaf now alleges that Loan Arranger understated the finance charge amount and overstated the amount financed. On a Truth In Lending Statement received from BWM, there are charges in the amount of $ 540 to Lakeshore and $ 800 to Clearwater, both for title insurance. Ms. Greenleaf alleges that these

charges are likewise duplicitous and, in light of what Chicago Title charges for the same title insurance, unreasonably high. The inclusion of these charges in the amount financed was designed to disguise compensation paid to Loan Arranger, in violation of _15 U.S.C. § 1637_ **[*5]** of the TILA, _12 C.F.R. § 226.13, and Section 2_ of ICFA, _815 ILL. COMP. STAT. 505/2_. Ms. Greenleaf also seeks the same remedies, in the form of rescission of the transaction, attorney's fees, and statutory damages.

## ANALYSIS

The applicable Local Rule of the Northern District of Illinois is _LR 40.4_, which provides for reassignment of cases as related. **HN1**[⬆] Under LR 40.4(a), cases may be related if they involve any one of the following conditions:

(1) the cases involve the same property;
(2) the cases involve some of the same issues of fact or law;
(3) the cases grow out of the same transaction or occurrence; or
(4) in class action suits, one or more of the classes involved in the cases is or are of the same.

LR 40.4(a). **HN2**[⬆] Once relatedness is established, the case or cases may be reassigned if all four of the following criteria are met: (1) both cases are pending in this court; (2) reassignment will result in substantial saving of judicial resources; (3) reassignment will not cause a substantial delay; and (4) it is possible for disposition of both cases in a single proceeding. LR 40.4(b).

The present **[*6]** case meets the requirement of LR 40.4(a) for relatedness. It is undisputed that both cases involve some of the same issues of law. Plaintiffs in both cases allege that Loan Arranger, in procuring a mortgage loan for each plaintiff, overstated the amount financed and understated the finance charge in violation of TILA and ICFA. Thus, any resolution of both disputes will necessarily require a determination of the legality of the same defendants' actions under the same statutes and regulations. What's more, **HN3**[⬆] the rule does not require complete identity of issues in order for cases to be considered related. _See, e.g., Fairbanks Capital Corp. v. Jenkins, 2002 U.S. Dist. LEXIS 26297, No. 02 C 3930, 2002 WL 31655277, at *2 (N.D. Ill. Nov. 25, 2002)_. Finally, the _Murry_ Class B, all those who procured loans through Loan Arranger, includes the entire _Greenleaf_ class.

The present case also satisfies the requirements of LR 40.4(b). There is no question that the first of these requirements has been met because both of these cases are pending before this Court. The second requirement under LR 40.4(b) has been met as well because reassignment of the *Greenleaf* case to this Court's docket will result **[*7]** in substantial time savings and promote judicial economy. With the reassignment of *Greenleaf,* only one judge will need to rule on the dispositive motions filed by defendants Homecoming Financial Network and Mortgage Lenders Network. In both cases the plaintiffs will be filing motions for Class Certification that will likely involve substantially identical briefs and issues because the same law firm represents the plaintiffs in both cases subject to this motion.

The third requirement, that the earliest case has not progressed too far, has also been satisfied. *Murry* is still in the preliminary stages, and discovery has just begun. Reassignment of *Greenleaf* to this Court's docket would not, at this point, cause any substantial delay that would otherwise prejudice the resolution of the respective parties' dispute. Finally, the fourth requirement, that it be possible for both cases to be disposed of in a single proceeding, has been met. Both *Murry* and *Greenleaf* require a determination of whether Loan Arranger's pricing schedules are allowable under TILA, Federal Reserve Board Regulation Z, and ICFA. Moreover, the *Greenleaf* class is subsumed in *Murry* Class B. **[*8]** Thus, it is clear that the cases are susceptible of disposition in a single proceeding.

## CONCLUSION

For the reasons set forth above, the Court grants defendants' motion for a finding that case nos. 03 C 5811 and 03 C 6186 are related within the meaning of LR 40.4(a) [doc. no. 31-1] and grants defendants' motion for reassignment of case no. 03 C 6186 to this Court's docket pursuant to LR 40.4(b) [doc. no. 31-2].

**SO ORDERED**

**HON. RONALD A. GUZMAN**

**United States Judge**

2/27/04

---

End of Document

# EXHIBIT I

 Caution
As of: May 4, 2020 2:21 PM Z

## *Fairbanks Capital Corp. v. Jenkins*

United States District Court for the Northern District of Illinois, Eastern Division

November 25, 2002, Decided ; December 3, 2002, Docketed

Case No. 02 C 3930

**Reporter**
2002 U.S. Dist. LEXIS 26297 *; 2002 WL 31655277

FAIRBANKS CAPITAL CORP., Plaintiff, vs. JOHNNY JENKINS and ANNIE J. WESSON-JENKINS, Defendants. JOHNNY JENKINS and ANNIE J. WESSON-JENKINS, Counterclaimants, vs. FAIRBANKS CAPITAL CORP. and NATIONSCREDIT FINANCIAL SERVICES CORP., d/b/a EQUICREDIT CORPORATION OF ILLINOIS, Counterdefendants.

**Prior History:** *Fairbanks Capital Corp. v. Jenkins, 225 F. Supp. 2d 910, 2002 U.S. Dist. LEXIS 19640 (N.D. Ill., 2002)*

**Disposition:** **[*1]** Defendants' motion and second motion to designate Case Nos. 02 C 5023, 02 C 6059 and 02 C 7262 as related to present case granted.

## Core Terms

cases, reassignment, confirmation, mortgage, defendants', rescind, non-rescission, foreclosure, borrowers

## Case Summary

### Procedural Posture
Plaintiff lender sued defendant mortgagors, seeking to foreclose on a mortgage. The mortgagors asserted a Truth in Lending Act (TILA) affirmative defense, and filed a counterclaim for damages under the TILA. The

mortgagors moved pursuant to U.S. Dist. Ct., N.D. Ill., R. 40.4(c), to find that three later-filed cases pending before other judges were related, and moved for reassignment of those cases to the court's docket.

### Overview
All of the cases at issue were pending in the court, and the first of the cases to be filed had not progressed past the discovery stage. The court likewise believed that significant judicial efficiency would result from having one judge handle all four of the cases. None of the cases could be disposed of without determining the legality of the alleged practice regarding non-rescission "confirmation" at the time of the loan. Finally, all of the cases were reasonably subject to disposition in a single proceeding. Even though the lender was entitled to prosecute its foreclosure claim against the mortgagors, that claim could not be determined without addressing the TILA issue raised as part of the mortgagors' affirmative defense of rescission. Determination of the common TILA issues raised in all four cases, whatever the outcome, would be outcome-determinative of the cases, and the evidence regarding the manner in which each of the borrowers allegedly was required to sign the non-rescission confirmation was likely to be admissible in the other cases pursuant to *Fed. R. Evid. 404(b)* to show modus operandi and/or the absence of mistake or accident.

### Outcome
The mortgagors' motion was granted.

2002 U.S. Dist. LEXIS 26297, *1

# LexisNexis® Headnotes

Civil Procedure > Preliminary
Considerations > Venue > Multidistrict Litigation

*HN1*[⬇] **Venue, Multidistrict Litigation**

U.S. Dist. Ct., N.D. Ill., R. 40.4(a) states that two or more civil cases may be related if they involve the same property, the same issues of fact or law, arise from the same transaction or occurrence, or, in the case of class action suits, involve the same classes. U.S. Dist. Ct., N.D. Ill., R. 40.4(a)(1)-(4).

Banking Law > Consumer Protection > Truth in
Lending > General Overview

Civil Procedure > Preliminary
Considerations > Venue > Multidistrict Litigation

*HN2*[⬇] **Consumer Protection, Truth in Lending**

U.S. Dist. Ct., N.D. Ill., R. 40.4(a) does not require complete identity of issues in order for cases to be considered related.

Civil Procedure > Preliminary
Considerations > Venue > Multidistrict Litigation

*HN3*[⬇] **Venue, Multidistrict Litigation**

Under U.S. Dist. Ct., N.D. Ill., R. 40.4(b), reassignment may be ordered if four criteria are met as to all of the cases in question: they are pending in the court; the handling of all the cases by the same judge is likely to result in a substantial saving of judicial time and effort; the earliest case has not progressed to far that designating later cases as related would likely delay substantially the proceedings in the earliest case; and the cases are susceptible of disposition in a single proceeding. U.S. Dist. Ct., N.D. Ill., R. 40.4(b)(1)-(4).

Civil Procedure > Preliminary
Considerations > Venue > Multidistrict Litigation

*HN4*[⬇] **Venue, Multidistrict Litigation**

Reassignment of cases as related does not inexorably lead to their consolidation for all purposes.

Banking Law > Consumer Protection > Truth in
Lending > General Overview

Civil Procedure > Preliminary
Considerations > Venue > Multidistrict Litigation

*HN5*[⬇] **Consumer Protection, Truth in Lending**

Although U.S. Dist. Ct., N.D. Ill., R. 40.4(b) requires a showing that the cases to be reassigned be susceptible of determination in a single proceeding with the earlier case already pending on the judge's docket, it does not require proof that the cases can or should be consolidated. Rather, the rule requires only a finding that the cases are "susceptible" (that is, capable) of determination in a single proceeding.

**Counsel:** For FAIRBANKS CAPITAL CORP., plaintiff: Renee Meltzer Kalman, Thomas James Donahue, Michael Steven Fisher, Erik Edward Blumberg, Ryan Gray Krueger, Marc D. Engel, Kenneth James Johnson, Alycia Alexandra Fitz, Fisher & Fisher, P.C., Chicago, IL.

For FAIRBANKS CAPITAL CORP., plaintiff: Bonita L. Stone, James W. Hutchison, Fritz Edward Berckmueller, Katten Muchin Zavis Rosenman, Chicago, Il.

For FAIRBANKS CAPITAL CORP., plaintiff: Donald C. Brown, David M Souders, Sandra L Brickel, Weiner, Brodksy, Sidman & Kider, Washington, DC.

For JOHNNY JENKINS, ANNIE J WESSON-JENKINS, defendants: Cathleen M. Combs, Daniel A. Edelman, James O. Latturner, Jennifer S Cichowski, Edelman, Combs & Latturner, Chicago, IL.

For JOHNNY JENKINS, ANNIE J WESSON-JENKINS,

defendants: Adela Casandra Lucchesi, Rock, Fusco & Garvey, Chicago, IL.

For JOHNNY JENKINS, ANNIE J WESSON-JENKINS, counter-claimants: Cathleen M. Combs, Daniel A. Edelman, James O. Latturner, Jennifer S Cichowski, Edelman, Combs & Latturner, Chicago, IL.

For **[*2]** JOHNNY JENKINS, ANNIE J WESSON-JENKINS, counter-claimants: Adela Casandra Lucchesi, Rock, Fusco & Garvey, Chicago, IL.

For FAIRBANKS CAPITAL CORP., counter-defendant: Fritz Edward Berckmueller, Bonita L. Stone, James W. Hutchison, Katten Muchin Zavis Rosenman, Chicago, Il.

For FAIRBANKS CAPITAL CORP., counter-defendant: Donald C. Brown, David M Souders, Sandra L Brickel, Weiner, Brodksy, Sidman & Kider, Washington, DC.

For NATIONSCREDIT FINANCIAL SERVICES CORPORATION, counter-defendant: Craig Allen Varga, Paul N. Barger, Varga, Berger, Ledsky, Hayes & Casey, Chicago, IL.

For FAIRBANKS CAPITAL CORP., counter-defendant: Renee Meltzer Kalman, Thomas James Donahue, Michael Steven Fisher, Erik Edward Blumberg, Ryan Gray Krueger, Marc D. Engel, Kenneth James Johnson, Alycia Alexandra Fitz, Fisher & Fisher, P.C., Chicago, IL.

**Judges:** MATTHEW F. KENNELLY, United States District Judge.

**Opinion by:** MATTHEW F. KENNELLY

# Opinion

### MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Fairbanks Capital Corp., the assignee of a mortgage of real estate given to secure payment of a promissory note, sued the mortgagors, Johnny Jenkins and Annie Wesson-Jenkins, seeking **[*3]** to foreclose on the mortgage. The case was filed in this Court based on diversity of citizenship. In their answer, the defendants asserted as an affirmative defense that they were entitled under the _Truth in Lending Act to_ rescind the transaction and were exercising that right. They also counterclaimed against Fairbanks and Nationscredit Financial Services Corp. (which does business as EquiCredit Corp. of Illinois), the original mortgagee, for damages under the TILA. The Court previously denied Fairbanks' motion to strike the affirmative defense and dismiss the counterclaim. _Fairbanks Capital Corp. v. Jenkins, 225 F. Supp. 2d 910, 2002 WL 31260011 (N.D. Ill. Oct. 9, 2002)._

The defendants have now moved this Court pursuant to Northern District of Illinois Local Rule 40.4(c) to find that three later-filed cases pending before other judges of the Court are related to this one and for that reason to request reassignment of those cases to this Court's docket. Fairbanks and EquiCredit have objected to the motion. For the reasons stated below, the Court grants defendants' motion.

The defendants' TILA claim involves EquiCredit's alleged violation of TILA provisions **[*4]** requiring that they be given notice of their right to rescind the transaction within three business days. _See 15 U.S.C. § 1635; 12 C.F.R. § 226.23._ Defendants contend that a document they were asked to sign at closing purportedly "confirming" that they were not rescinding was invalid because it improperly negated their right to rescind. This TILA violation, defendants contend, had the effect of giving them an extended three-year period in which to rescind, _see 15 U.S.C. § 1635(f); 12 C.F.R. § 226.23(a),_ which they contend can be asserted against an assignee like Fairbanks. _See 15 U.S.C. § 1641(c)._ As noted earlier, they seek rescission of the transaction as well as damages and attorney's fees.

_McWethy v. Nationscredit Financial Services Corp.,_ Case No. 02 C 7262, pending before Judge Robert Gettleman, is a putative class action brought on behalf of eight named plaintiffs (two individual mortgagors and three groups of dual mortgagors) who are parties to mortgage loans made by EquiCredit and assigned to Fairbanks. The defendants are Nationscredit **[*5]** d/b/a EquiCredit Corp. of Illinois, EquiCredit Corp. of Missouri;

EquiCredit Corp. of America; and Fairbanks. The plaintiffs' complaint asserts claims under TILA and the *Illinois Consumer Fraud Act* arising from EquiCredit's alleged practice of requiring borrowers to sign confirmation forms effectively giving up their right to rescind.

*Brown v. Nationscredit Financial Services Corp.,* Case No. 02 C 5023, pending before Judge William Hibbler, is a putative class action brought by a single plaintiff against Nationscredit d/b/a EquiCredit Corp. of Illinois; EquiCredit Corp. of America; and Fairbanks. The plaintiff, a homeowner who obtained a mortgage loan from EquiCredit (and assigned to Fairbanks) in order to finance improvements to his home, alleges TILA and ICFA violations based on the practice of requiring borrowers to "confirm" their non-rescission at the time of the transaction. He also alleges that the loan was subject to the *Home Ownership and Equity Protection Act,* which he says EquiCredit violated by failing to make certain HOEPA-required disclosures.

Finally, *Brown v. Nationscredit Financial Services Corp.,* Case No. 02 C 5059, pending before Judge Charles Norgle, is **[*6]** brought on behalf of two plaintiffs against Nationscredit d/b/a EquiCredit Corp. of Illinois; EquiCredit Corp. of America; and Fairbanks. The plaintiffs, who obtained a mortgage loan from EquiCredit which was assigned to Fairbanks, alleges violations of TILA and ICFA arising from the previously-mentioned practice of requiring borrowers to "confirm" non-rescission at the time of the transaction.

The plaintiffs in all of the cases that are subject to this motion are represented by the same law firm. As best we can tell, all of the Nationscredit / EquiCredit entities in all of the cases are represented by a single law firm, and Fairbanks is likewise represented by the same law firm in all of the cases.

**HN1**[⬆] Local Rule 40.4(a) states that two or more civil cases may be related if they involve the same property, the same issues of fact or law, arise from the same transaction or occurrence, or, in the case of class action suits, involve the same classes. N.D. Ill. LR 40.4(a)(1)-(4). EquiCredit and Fairbanks do not argue that the cases are not related within the meaning of Rule 40.4(a), and even if they had done so, the Court would find that the criteria of Rule 40.4(a)(2) have been met, as **[*7]** the cases involve the same issues of law. There is no question that each of these cases will involve the issue of the legality, under TILA and ICFA, of EquiCredit's alleged practice of requiring borrowers to

sign non-rescission "confirmations." **HN2**[⬆] The Rule does not require complete identity of issues in order for cases to be considered related.

EquiCredit and Fairbanks' challenge to defendants' motion turns on the application of Local Rule 40.4(b), which provides the criteria for determining whether assignment of related cases to the judge with the lowest-numbered case is appropriate. **HN3**[⬆] Under Rule 40.4(b), reassignment may be ordered if four criteria are met as to all of the cases in question: they are pending in this Court; the handling of all the cases by the same judge is likely to result in a substantial saving of judicial time and effort; the earliest case has not progressed to far that designating later cases as related would likely delay substantially the proceedings in the earliest case; and the cases are susceptible to disposition in a single proceeding. N.D. Ill. LR 40.4(b)(1)-(4). There is no question that the first and third of these criteria are met here; all of the cases **[*8]** are pending in this Court, and *Fairbanks Capital Corp. v. Jenkins,* the first of the cases to be filed, has not progressed all that far: the Court has ruled on a motion to dismiss the counterclaim, and discovery has just gotten started.

The Court likewise believes that significant judicial efficiency will result from having one judge handle all four of the cases. None of the cases can be disposed of without determining the legality of EquiCredit's alleged practice regarding non-rescission "confirmation" at the time of the loan, as well as the consequences of that practice vis-a-vis Fairbanks as assignee. Reassignment of all of the cases to this Court's calendar will permit these issues to be briefed and determined once, rather than four separate times, which will result in a substantial saving of judicial time and effort -- not to mention a substantial saving of the parties' and their counsels' time and effort. The overall administration of justice will likewise be enhanced by having a single judge determine this issue in all four of the cases. Indeed, the Court of Appeals for the Seventh Circuit recently criticized the judges of this Court for permitting numerous lawsuits involving **[*9]** TILA and ICFA-related challenges to the practices of "payday loan" companies to proceed along different tracks before different judges, resulting in numerous and disparate decisions, as well as multiple appeals. *Smith v. Check-N-Go of Illinois, Inc., 200 F.3d 511, 513 n.* (7th Cir. 1999). The criticism was not entirely justified, as none of the parties in any of those cases had sought reassignment under *Local Rule 40.4* or on any other basis. But the same, of course, cannot be said here.

Finally, all of the cases are reasonably subject to disposition in a single proceeding. EquiCredit and Fairbanks argue strenuously that the fact that the case already pending on this Court's docket is, unlike the other cases, a mortgage foreclosure case, requires denial of defendants' motion for reassignment. They contend that a mortgagee is "the master of his complaint" and is entitled to proceed with the foreclosure without the annoyance of extraneous matters. But even though Fairbanks is entitled to prosecute its foreclosure claim against the Jenkins defendants, that claim cannot be determined without addressing the TILA issue raised as part of defendants' affirmative defense of [*10] rescission. Thus the Court will be required to consider that issue in *Fairbanks v. Jenkins* whether or not the other cases are reassigned to this Court. Determination of that same issue in four cases simultaneously is not likely to prolong the time needed to consider it; the same lawyers appear in all the cases, which can and will be briefed jointly on the common issues. The HOEPA issue raised in one of the *Brown* cases likely can be determined at the same time and thus likewise does not undercut the Court's ability to resolve all of the cases simultaneously.

Fairbanks and Nationscredit also argue that Illinois' mortgage foreclosure laws preclude the assertion of a class action as part of a counterclaim by the mortgagor/defendant. But that is not a necessary result of reassignment; the Jenkins defendants have not asserted a class claim; and *HN4*[↑] reassignment of cases as related does not inexorably lead to their consolidation for all purposes. And *HN5*[↑] although Rule 40.4(b) requires a showing that the cases to be reassigned be susceptible of determination in a single proceeding with the earlier case already pending on the judge's docket, it does not require proof that the cases can or [*11] should be consolidated. Rather, the Rule requires only a finding that the cases are "susceptible" (that is, capable) of determination in a single proceeding. The Court finds that this is so. Determination of the common TILA / ICFA issues raised in all four cases, whatever the outcome, will be outcome-determinative of *McWethy* and both *Brown* cases [1] as well as in *Fairbanks v. Jenkins* (in which the

primary defense to foreclosure is the alleged TILA violation). Moreover, as defendants argue, the evidence regarding the manner in which each of the borrowers allegedly was required to sign the non-rescission confirmation is likely to be admissible in the other cases pursuant to *Federal Rule of Evidence 404(b)* to show *modus operandi* and/or the absence of mistake or accident.

**[*12] Conclusion**

For the reasons stated above, the Court finds that Case Nos. 02 C 5023, 02 C 6059, and 02 C 7262 are related to the present case within the meaning of Local Rule 40.4(a) and that reassignment of those cases to this Court's docket is appropriate under Local Rule 40.4(b) and therefore grants defendants' motion and second motion to designate those cases as related to this one [docket items 22-1, 25-1]. The appropriate request will be submitted to the Executive Committee. This case (as well as the others, assuming they are reassigned by then) is set for a status hearing on December 19, 2002 at 9:30 a.m.

MATTHEW F. KENNELLY

United States District Judge

Date: November 25, 2002

**End of Document**

---

[1] One of the *Brown* cases also involves a HOEPA claim, but this involves the same evidence as the TILA claim, and it likely can and will be determined together with that claim. The presence of the HOEPA claim thus does not suggest that the cases are not susceptible of being determined in a single proceeding.

# EXHIBIT J

 Caution
As of: May 4, 2020 2:22 PM Z

# *Martin v. Midland Funding LLC*

United States District Court for the Northern District of Illinois, Eastern Division

August 31, 2011, Decided; August 31, 2011, Filed

11 C 3104

**Reporter**
2011 U.S. Dist. LEXIS 97789 *; 2011 WL 3876965

NICHOLAS MARTIN, individually and on behalf of a class, Plaintiff, vs. MIDLAND FUNDING LLC, Defendant.

**Subsequent History:** Transferred by *In re Midland Credit Mgmt., 2011 U.S. Dist. LEXIS 118987 (J.P.M.L., Oct. 11, 2011)*

## Core Terms

cases, reassign, Local Rule, purported, cellular telephone, discovery

**Counsel:** **[*1]** For Nicholas Martin, on behalf of himself and others similarly situated, Plaintiff: Alexander Holmes Burke, LEAD ATTORNEY, Burke Law Offices, LLC, Chicago, IL.

For Midland Funding, LLC, Defendant: Theodore Wilson Seitz, LEAD ATTORNEY, Dykema Gossett, PLLC, Lansing, MI; James Michael Golden, Renee Lynn Zipprich, Dykema Gossett PLLC, Chicago, IL.

**Judges:** Charles P. Kocoras, United States District Judge.

**Opinion by:** Charles P. Kocoras

## Opinion

**ORDER**

CHARLES P. KOCORAS, District Judge:

This case comes before the Court on Defendant Midland Funding, LLC's ("Midland") motion to reassign and consolidate a later-filed matter pursuant to *Northern District of Illinois Local Rule 40.4(c)*. For the reasons stated below, the motion is denied.

Midland asks the Court to reassign and consolidate *Scardina v. Midland Credit Management*, No. 11-cv-3149 (N.D. Ill.) (Lindberg, J.) ("*Scardina*"), with the instant matter before this Court, *Martin v. Midland Funding, LLC*, No. 11-cv-3104 (N.D. Ill.) (Kocoras, J.) ("*Martin*"). Plaintiff Dave Scardina ("Scardina") objects. To resolve the pending motion, a summary of the two cases is necessary.

On May 10, 2011, Plaintiff Nicholas Martin ("Martin") filed a purported class action against Midland. The amended **[*2]** complaint asserts class claims under the Telephone Consumer Protection Act, *47 U.S.C. § 227* ("TCPA"), and the Fair Debt Collection Practices Act, *15 U.S.C. § 1692* ("FDCPA"). Martin seeks to hold Midland liable for calling class members' cellular telephones using an automatic telephone dialing system or prerecorded or artificial voice. Martin purports to represent individuals who resided in Illinois between January 1, 2008, and November 24, 2008, received calls during that same time period, and had an alleged debt obtained by Midland during that same time period. The *Martin* action is currently pending before this Court.

One day later, on May 11, 2011, Scardina filed a purported class action against Midland, as well as Midland Credit Management, Inc. ("MCM") and Encore

2011 U.S. Dist. LEXIS 97789, *2

Capital Group, Inc. ("Encore"). Scardina asserts a class claim under the TCPA and seeks to hold all three defendants liable. Scardina seeks to hold MCM liable for calling class members' cellular telephones using an automatic telephone dialing service or an artificial or prerecorded voice without their prior express consent. Scardina also seeks to hold Midland, the owner of the debt, vicariously liable. Finally, Scardina **[*3]** seeks to hold Midland's parent, Encore, liable for raising the capital for the predictive dialing equipment and directing MCM to use the equipment. Scardina purports to represent individuals with Illinois cellular telephone numbers who received automated calls between May 11, 2007, and May 31, 2011. The *Scardina* action is currently pending before Judge Lindberg.

Any party may file a motion for reassignment based on the relatedness of two or more cases. *N.D. Ill. L.R. 40.4(c)*. The party moving for reassignment must show that the standards in *Local Rule 40.4(a)* and *40.4(b)* are satisfied. According to *Local Rule 40.4(a)*, two or more civil cases may be related if one or more of the following conditions are met: (1) the cases involve the same property; (2) the cases involve some of the same issues of fact or law; (3) the cases grow out of the same transaction or occurrence; or (4) in class action suits, the classes are the same. Pursuant to *Local Rule 40.4(b)*, the court may reassign a case related to an earlier-numbered case if: (1) both cases are pending in this Court; (2) the handling of both cases by the same judge is likely to result in a substantial saving of judicial time and effort; **[*4]** (3) the earlier case has not progressed to a point where designating a later-filed case as related would likely substantially delay the proceedings in the earlier case; and (4) the cases are susceptible of disposition in a single proceeding.

Midland argues that the cases are related under *Local Rule 40.4(a)* because the cases involve some of the same issues of fact or law and the classes are the same. Because Martin and Scardina both assert class claims under the TCPA against Midland, some common issues of fact and law exist. However, aside from a single cause of action against the same defendant, the cases are very different. First, Scardina, unlike Martin, asserts a TCPA claim against two additional defendants, MCM and Encore, and has a different theory regarding each defendant's liability. Martin did not sue MCM, the licensed debt collector, or Encore, the parent allegedly directing MCM's use of predictive dialing equipment. Thus, some discovery relating to MCM's and Encore's involvement in *Scardina* will not be relevant in *Martin*.

Second, unlike Scardina, Martin asserts an additional class claim under the FDCPA. The FDCPA claim involves factual issues wholly unrelated to the TCPA claim. **[*5]** In particular, Martin's FDCPA claim deals with false representations Midland allegedly made to consumer reporting agencies regarding the character, amount, or legal status of Martin's purported debt. Martin's FDCPA claim thus varies the scope of discovery in *Martin*.

Finally, the class definitions substantially differ. The class in *Martin* includes individuals who: (1) resided in Illinois between January 1, 2008, and November 24, 2008; (2) received calls during that same time period; and (3) had an alleged debt obtained by Midland during that same time period. Thus, class discovery in *Martin* will focus on the purported class members' residences, the time of the calls, and the time Midland obtained the alleged debts. Different from *Martin*, the class in *Scardina* includes individuals with Illinois cellular telephone numbers who received automated calls between May 11, 2007, and May 31, 2011. Thus, class discovery in *Scardina* will focus on the purported class members' cellular telephone numbers, not their residences, and whether they received calls between May 11, 2007, and May 31, 2011, a much broader time frame. Further, inclusion in the *Scardina* class, unlike the *Martin* class, does not **[*6]** depend on when Midland obtained the alleged debt. For these reasons, *Martin* and *Scardina* are not sufficiently related for reassignment under *Local Rule 40.4(a)*.

Even if the cases were sufficiently related under *Local Rule 40.4(a)*, Midland has not shown that the cases satisfy the standard in *Local Rule 40.4(b)*. For the reasons stated above, the handling of both cases by the same judge will not likely result in a substantial saving of judicial time and effort and the cases are not susceptible to disposition in a single proceeding. Moreover, reassignment would likely delay the proceedings in *Scardina*, since the deadline for the close of discovery is approximately one month away, September 28, 2011.

For the foregoing reasons, the Court denies Midland's motion to reassign and consolidate *Scardina* with *Martin*.

/s/ Charles P. Kocoras

Charles P. Kocoras

United States District Judge

Dated: August 31, 2011

2011 U.S. Dist. LEXIS 97789, *6

---

**End of Document**

# EXHIBIT K

No *Shepard's* Signal™
As of: May 4, 2020 2:23 PM Z

## *Teamsters Local 705 Pension v. A.D. Conner, Inc.*

United States District Court for the Northern District of Illinois, Eastern Division

May 4, 2011, Decided; May 4, 2011, Filed

10 C 6352

**Reporter**

2011 U.S. Dist. LEXIS 47853 *; 2011 WL 1674839

TEAMSTERS LOCAL 705 PENSION and, HEALTH FUND TRUSTEES, Plaintiffs, v. A.D. CONNER, INC., an Illinois corporation, Defendant.

## Core Terms

cases, Consolidate, saving, judicial time

**Counsel:** [*1] For Local 705 International Brotherhood of Teamsters Pension Fund, Local 705 International Brotherhood of Teamsters Health and Welfare Fund, Trustee Joseph Bakes, Trustee Stephen FG Bridge, Trustee Juan Campos, Trustee Gregory R Foster, Trustee William Keenan, Trustee John Naughton, Trustee Stephen E Pocztowski, Trustee Phillip D. Stanoch, Plaintiffs: Catherine Marie Chapman, Patrick N. Ryan, Baum Sigman Auerbach & Neuman, Ltd., Chicago, IL.

For A.D. Conner, Inc., Defendant: L. Steven Platt, LEAD ATTORNEY, Pedersen & Houpt, Chicago, IL.

**Judges:** RONALD A. GUZMAN, District Judge.

**Opinion by:** RONALD A. GUZMAN

## Opinion

### MEMORANDUM OPINION AND ORDER

Before the Court is defendant A.D. Conner, Inc.'s motion to consolidate pursuant to *Local Rule ("LR") 40.4 Teamsters Local Union 705 v. A.D. Conner, Inc.*, 10 C 6916, ("the Teamsters case"), which is currently pending before Judge Kennelly, with this case. For the following reasons, the Court denies the motion.

### Background

In the Teamsters case, the Teamsters Union has sued defendant for allegedly failing to provide its union employees with the sixty-day pre-firing notice before its closing as required by the Worker Adjustment and Retraining Notification ("WARN") Act, *29 U.S.C. § 2101, et. seq.* [*2] (Def.'s Mot. Consolidate Ex. A, Compl. at ¶ 19.) In this case, Teamsters' pension and health fund trustees ("the Funds"), have sued defendant alleging that it was delinquent in making required payments to the Funds in violation of the Employee Retirement Income Security Act ("ERISA") of 1974, *29 U.S.C. §§ 1132, 1145*, because it apparently no longer had money to continue its operations, and therefore had to close its doors (defendant's parent company, which owns 100% of it, filed for bankruptcy a week after defendant terminated its operations). (Pls.' Resp. Def.'s Mot. Consolidate ("Funds' Resp.") at 1- 2, n.4.)

### Discussion

Before a case may be reassigned under *LR 40.4*, the movant must first show that the cases are "related." *LR 40.4(a)*. Two cases may be related if, among other things, the cases "involve some of the same issues of fact or law" or the "cases grow out of the same transaction or occurrence." *LR 40.4(a)*. Both criteria are satisfied here. First, both cases grow out of defendant

2011 U.S. Dist. LEXIS 47853, *2

terminating its operations as discussed above. Second, both cases involve some of the same issues of fact regarding damages. Both claims will require the use of the same collective bargaining agreement **[*3]** to calculate unpaid fringe benefits and possibly accrued vacation pay that both plaintiffs allege they are owed under either ERISA or the WARN Act. (Def.'s Mot. Consolidate Ex. A, Compl. at 4; Funds' Resp. at 5, n.8.) Therefore, the first hurdle of *Local Rule 40.4* is satisfied.

Next, related cases may be reassigned under *LR 40.4(b)* if each of the following criteria is met:

> (1) both cases are pending in this Court;
> (2) the handling of both cases by the same judge is likely to result in a substantial saving of judicial time and effort;
> (3) the earlier case has not progressed to the point where designating a later filed case as related would be likely to delay the proceedings in the earlier case substantially; and
> (4) the cases are susceptible of disposition in a single proceeding.

*LR 40.4(b)*. And under *LR 40.4(c)*, the moving party has an obligation to specifically identify in its motion why each of the four conditions of *LR 40.4(b)* is met. *See Sunstar, Inc. v. Alberto-Culver Co., No. 01 C 0736, 01 C 5825, 2003 U.S. Dist. LEXIS 13492, 2003 WL 21801428, at *3 (N.D. Ill. Aug. 1, 2003)*. Here, the defendant has failed to articulate why this case satisfies any of the conditions set forth in *section (b) of LR 40.4* (or *section (a)* **[*4]** for that matter). Rather the movant, after quoting the entire LR, repeatedly makes conclusory assertions that both cases concern the "same common operative set of facts and circumstances" and that the two cases are "related." (Def.'s Mot. Consolidate at 2-3.) Nothing in the motion, for instance, articulates how the handling of both cases by the same judge would result in substantial saving of judicial time and effort or how the Court could resolve the two cases in a single proceeding. Failure to satisfy this pleading requirement, in and of itself, serves as adequate grounds for denying the motion. *See, e.g., Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc., No. 02 C 5893, 2003 U.S. Dist. LEXIS 7466, 2003 WL 21011757, at *3 (N.D. Ill. May 5, 2003)* (denying a motion to reassign because movant failed to articulate why the four conditions of *LR 40.4(b)* were met as required by *LR 40.4(c)*); *Davis v. Quebecor World, No. 01 C 8014, 2002 U.S. Dist. LEXIS 257, 2002 WL 27660, at *3 (N.D. Ill. Jan. 10, 2002)* (same); *Daniels v. Pipefitters' Ass'n Local Union No. 597, 174 F.R.D. 408, 411 (N.D. Ill. 1997)* (same).

Nevertheless, even if defendant had satisfied the pleading requirement of *LR 40.4(c)*, plaintiffs argue that the motion should be **[*5]** denied because the second and forth conditions of *LR 40.4(b)* are not satisfied. (Funds' Resp. at 6-7.) The Court agrees. First, as to the second condition, the causes of action are fundamentally distinct as they are brought by two different plaintiffs, pursuant to two different statutes, and each requires proof of different factual elements. One of the cases involves the Funds suing for unpaid contributions under ERISA, while the other case involves the Teamsters Union suing for back pay and other benefits on behalf of defendant's employees under the WARN Act. (*Id.* at 7.) Further, defendant has alleged certain defenses in its answer to the Teamsters' complaint that only apply to WARN Act cases. (Def.'s Answer at 5-6.) Although there would be some saving of judicial time and effort because there are some common issues of fact regarding damages, such saving would be minimal at best because ultimately each case will require different discovery, legal findings and damages calculations. *See Hollinger Int'l, Inc. v. Hollinger, Inc., No. 04 C 0698, 2004 U.S. Dist. LEXIS 7883, 2004 WL 1102327, at *3 (N.D. Ill. May 5, 2004)* (finding that although cases involve some of the same factual issues, resolving the issues together **[*6]** will not result in substantial judicial savings because each will require different discovery and legal findings); *Clark v. Ins. Car Rentals, Inc., 42 F. Supp. 2d 846, 848 (N.D. Ill. 1999)* (finding that there would be no substantial saving of judicial time because most of the time will be spent on issues not common to both cases). Accordingly, the Court finds that its handling of both cases would not result in a substantial saving of judicial time and effort.

Second, the fourth condition is satisfied if there are some issues of both law and fact that are the same in the related case. *See Lawrence E. Jaffe Pension Plan, 2003 U.S. Dist. LEXIS 7466, 2003 WL 21011757, at *3* (citing cases). Here, there are no common issues of law, and the fact issues differ substantially. The crux of this case is whether defendant was required to make contributions to the Funds per their collective bargaining agreement and whether it failed to do so. The crux of the Teamsters' case is whether defendant failed to provide its employees with the statutorily-required notice of its closing. (Funds' Resp. at 4-5.) Because the causes of action are fundamentally distinct and involve predominately different issues of fact, it is unlikely that **[*7]** the Court could dispose of both cases in a single proceeding. *See Clark, 42 F. Supp. 2d at 849* (finding that where issues of law and fact were distinct, summary judgment motions would be unique to each

2011 U.S. Dist. LEXIS 47853, *7

case). Accordingly, because defendant has failed to satisfy *LR 40.4(b)* and *(c)*, the Court denies defendant's motion to consolidate.

## Conclusion

Based on the foregoing analysis, the Court denies defendant's motion to consolidate [doc. no. 16]. Defendant has two weeks from the date of this Memorandum Opinion and Order to file its answer.

**SO ORDERED**

**ENTER: May 4, 2011**

/s/ Ronald A. Guzman

**RONALD A. GUZMAN**

**District Judge**

---

**End of Document**

# EXHIBIT L

Ⓐ Neutral
As of: May 4, 2020 2:25 PM Z

## *Hollinger Int'l, Inc. v. Hollinger, Inc.*

United States District Court for the Northern District of Illinois, Eastern Division

May 3, 2004, Decided ; May 5, 2004, Docketed

Case No. 04 C 0698

### Reporter
2004 U.S. Dist. LEXIS 7883 *; 2004 WL 1102327

HOLLINGER INTERNATIONAL, INC., Plaintiff, v. HOLLINGER, INC., et al., Defendants.

**Subsequent History:** Petition dismissed by *Hollinger Int'l v. Hollinger Inc., 2004 U.S. Dist. LEXIS 20825 (N.D. Ill., Oct. 8, 2004)*

**Disposition: [*1]** Defendant's motion for finding of relatedness and reassignment of actions denied.

## Core Terms

class action, cases, reassign, saving

## Case Summary

### Procedural Posture
Defendant corporation filed a motion, pursuant to U.S. Dist. Ct., N.D. Ill., R. 40.4, for a finding of relatedness and reassignment of shareholder class actions in connection with a derivative action the corporation filed against defendant controlling shareholders.

### Overview
The corporation alleged that the controlling shareholders breached their common law fiduciary duties and were unjustly enriched by accepting improper payments from the corporation. Subsequent to the filing of the derivative action, purchasers of the corporation's stock brought class actions alleging misconduct under federal and Illinois securities laws against the corporation, the controlling shareholders, and the corporation's auditor and board members. The court held that although the derivative action and the class actions involved some of the same factual issues, resolving those issues together would not have resulted in substantial judicial savings, as required by U.S. Dist. Ct., N.D. Ill., R. 40.4(b)(2). The actions involved fundamentally distinct claims -- breach of common law duties and securities law claims -- which required different discovery and legal findings. The class actions required the court to decide whether to certify a class and which attorney to appoint as class counsel. Such a determination, which was not required in the derivative action, would have required discovery and substantial time to brief all the relevant legal and factual issues.

### Outcome
The court denied the corporation's motion for a finding of relatedness and reassignment of actions.

## LexisNexis® Headnotes

Civil Procedure > ... > Venue > Federal Venue Transfers > General Overview

2004 U.S. Dist. LEXIS 7883, *1

**HN1**[⬇] **Venue, Federal Venue Transfers**

Whether to reassign a case under U.S. Dist. Ct., N.D. Ill., R. 40.4 lies within the sound discretion of the court.

Civil Procedure > ... > Venue > Federal Venue Transfers > General Overview

**HN2**[⬇] **Venue, Federal Venue Transfers**

To have a case reassigned based on relatedness, the moving parties must meet the requirements of both U.S. Dist. Ct., N.D. Ill., R. 40.4(a) and (b).

Civil Procedure > ... > Venue > Federal Venue Transfers > General Overview

**HN3**[⬇] **Venue, Federal Venue Transfers**

U.S. Dist. Ct., N.D. Ill., R. 40.4(a) and (b) states that two or more civil cases may be related if at least one of the conditions are met: (1) the cases involve the same property; (2) the cases involve some of the same issues of fact or law; (3) the cases grow out of the same transaction or occurrence; or (4) in class action suits, one or more of the classes involved in the cases is or are of the same. U.S. Dist. Ct., N.D. Ill., R. 40.4(a). The second and more onerous of the reassignment criteria states that a case may be reassigned only if each of the following criteria are met: (1) both cases are pending in the court; (2) the handling of both cases by the same judge is likely to result in a substantial saving of judicial time and effort; (3) the earlier case has not progressed to the point where designating a later filed case as related would be likely to delay the proceedings in the earlier case substantially; and (4) the cases are susceptible of disposition in a single proceeding. U.S. Dist. Ct., N.D. Ill., R. 40.4(b).

**Counsel:** For HOLLINGER INTERNATIONAL, INC., plaintiff: Ian Simmons, O'Melveny & Myers, Washington, DC. Jonathan Rosenberg, Andrew J Geist, O'Melveny & Myers, New York, NY. Mark V. Chester, Steven Lawson, Joan M. Meyers, Johnson & Colmar, Chicago, IL. Henry C Thumann, O'Melveny & Myers LLP, Washington, DC.

For HOLLINGER INC., defendant: Nathan P. Eimer, Andrew George Klevorn, Adam B. Deutsch, Vanessa G Jacobsen, Eimer Stahl Klevorn & Solberg, LLP, Chicago, IL.

For RAVELSTON CORPORATION LIMITED, THE, RAVELSTON MANAGEMENT, INC., defendants: Brian L. Crowe, Cary E. Donham, Douglas Michael Ramsey, Shefsky & Froelich, Ltd, Chicago, IL.

For CONRAD M BLACK, defendant: Paula Enid Litt, Veronica Gomez, Lisa Beth Swedenborg, Schopf & Weiss, Chicago, IL. Laurent S Wiesel, John L Warden, Robin D Fessel, Sullivan & Cromwell, New York, NY. David H Braff, Sullivan and Cromwell, New York, NY. James V Masella, III, Sullivan & Cromwell, New York, NY.

For F DAVID RADLER, defendant: Greg A Danilow, Richard A Rothman, Weil, Gotshal & Manges, New York, NY. Anthony Albanese, Weil, Cotshal & Manges LLP, New York, NY. Joseph **[*2]** J. Duffy, Stetler & Duffy, Ltd., Chicago, IL.

For JOHN A BOULTBEE, defendant: Stephen C. Voris, Burke, Warren, MacKay & Serritella, P.C., Chicago, IL. Ira Lee Sorkin, Donald A Corbett, Carter, Ledyard & Milburn, New York, NY.

**Judges:** BLANCHE M. MANNING, U.S. DISTRICT JUDGE.

**Opinion by:** BLANCHE M. MANNING

# Opinion

### MEMORANDUM AND ORDER

The Present matter comes before this Court on Defendant Hollinger, Inc.'s ("Inc.")' Motion for Finding of Relatedness and Reassignment of Actions. Pursuant to *Local Rule 40.4*, Inc. seeks to have the following

shareholder class actions ("the Class Actions") assigned to this Court: *Teachers Retirement System of Louisiana v. Black, et al.,* No. 04 C 0834 (Judge Coar); *Mozingo v. Black, et al.,* No. 04 C 1276 (Judge Manning); and *Washington Area Carpenters Pension and Retirement Fund v. Hollinger International, Inc.,* No. 04 C 2505 (Judge Anderson). [1] For the Reasons set forth below, this Court DENIES this motion on the grounds the Court does not find that all four of the requirements in Local Rule 40.4(b) are met.

**[*3]** Plaintiff Hollinger International, Inc. ("International") brought this diversity action against its controlling shareholders, which includes Inc., the Ravalston Corporation, and Conrad Black, and three other related entities and persons ("the International Action"). International alleges that Defendants breached their common law fiduciary duties and were unjustly enriched by accepting improper payments from International, including "non-compete" payments and "management service fee payments." In all, International seeks to recover over $ 200 million in alleged wrongful payments.

Subsequent to the filing of the International Action, purchasers of International's stock brought the Class Actions alleging misconduct under Federal and Illinois securities laws against International, the International Action Defendants, International's former outside auditor, and International's current and former board members. The Class Action Plaintiffs seek to certify a class consisting of all purchasers of International stock during the relevant time period. The Class Action Plaintiffs also seek to recover the dilution in value of their shares caused by alleged fraudulent and misleading statements **[*4]** by International and its directors, owners, and auditors, which allegedly stem from the "non-compete" payments and "management service fee payments" made to the International Defendants.

*HN1*[⬆] Whether to reassign a case under *Local Rule 40.4* lies within the sound discretion of this Court. *Clark v. Ins. Car Rentals Inc., 42 F. Supp. 2d 846, 847 (N.D. Ill. 1999).* *HN2*[⬆] To have a case reassigned based on relatedness, the moving parties must meet the requirements of both Local Rule 40.4(a) and (b). *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc., 2003 U.S. Dist. LEXIS 7466, No. 02 C 5893, 2002 WL 21011757, at *1 (N.D. Ill. May 5, 2003).* Local Rule

40.4(a) *HN3*[⬆] states that "two or more civil cases may be related if" at least one of the conditions are met:

(1) the cases involve the same property;

(2) the cases involve some of the same issues of fact or law;

(3) the cases grow out of the same transaction or occurrence; or

(4) in class action suits, one or more of the classes involved in the cases is or are of the same.

Local Rule 40.4(a).

The second and more onerous of the reassignment criteria, *see, e.g., Clark, 42 F. Supp. 2d at 848,* states that a case may **[*5]** be reassigned only if "each of the following criteria are met":

(1) both cases are pending in this Court;

(2) the handling of both cases by the same judge is likely to result in a substantial saving of judicial time and effort;

(3) the earlier case has not progressed to the point where designating a later filed case as related would be likely to delay the proceedings in the earlier case substantially; and

(4) the cases are susceptible of disposition in a single proceeding.

Local Rule 40.4(b).

Here, although International admits that all the actions "involve, at least in part, [the International Defendants'] misconduct in diverting International's assets to their own uses through improper non-competition fees and excessive management fees," it contends that factor (2)-(4) of Local Rule 40.4(b) are not met because "there are vast differences between the substantive claims, remedies, and defenses" in the International Action and the Class Actions.

In support of this contention, International cites *Lawrence Jaffe Pension Plan, 2003 U.S. Dist. LEXIS 7466, 2002 WL 21011757,* a case in which Judge Guzman denied a motion to reassign a shareholder class action and a corporate derivative **[*6]** action, on the grounds that subsections (b)(2) and (4) of Local Rule 40.4 were not met. [2] The plaintiff in the derivative

---

[1] The Plaintiffs in case Nos. 04 C 0834 and 04 C 1276 have joined in Inc.'s motion.

[2] The Court notes that *Lawrence Jaffe Pension Plan* is the only case in this district which involved a *Local Rule 40.4* motion to reassign a shareholder class action and a corporate derivative action. Although Inc. attempts to distinguish this case, this

2004 U.S. Dist. LEXIS 7883, *6

action alleged that corporate officers of the defendant corporation breached their duties of loyalty and due care and were unjustly enriched by wasting corporate assets. *2003 U.S. Dist. LEXIS 7466, [WL] at *1*. In the shareholder class action, the plaintiffs alleged that the CEO and CEO made material misrepresentations in violation of federal securities law. *Id.* In finding that the two cases where related under Local Rule 40.4(a), the Court found that both actions involved "some common issues of fact," namely that the underlying wrong doing in each case was the same. *Id.*

Judge Guzman, however, found **[*7]** that reassignment would not result in "substantial saving of judicial time and effort," as required by subsection (b)(2). *2003 U.S. Dist. LEXIS 7466, [WL] at *2*. In making this finding, the court noted that the two actions "are fundamentally distinct" in that the class action alleges violations of federal securities law on behalf of a class of stock purchasers, while the derivative action alleges common law breach of fiduciary duty violations. *Id.* This distinction was important because the facts required to prove a federal securities violation "are clearly substantially different" than the facts needed to hold the defendants liable for breach of fiduciary duty. *Id.* The court also noted that while the cases included some of the same defendants, there were numerous defendants named in the derivative action not named in the securities action. *Id.* Consequently, Judge Guzman held that his "handling of both cases would not be likely to result in substantial saving of judicial time and effort." [3] *Id.*

 **[*8]** The Court also found that subsection (b)(4) was not met because the two actions "are fundamentally distinct . . . making it extremely unlikely that the court could dispose of both cases in a single proceeding . . . . [in that] any motions for summary judgment would be unique to each particular case." *2003 U.S. Dist. LEXIS 7466, [WL] at *3*. Accordingly, Judge Guzman denied the motion to reassign.

Here, this Court finds that, similar to *Lawrence Jaffe Pension Plan,* the criteria of Local Rule 40.4(b) are not met. Although the International Action and the Class Actions involve some of the same factual issues, resolving these issues together will not result in

substantial judicial savings, as required by subsection (b)(2). The actions involve "fundamentally distinct" claims -- breach of common law duties and securities law claims -- which will require different discovery and legal findings. For example, the International Action is an action by International seeking recovery of the funds allegedly misappropriated by the International Defendants, while the Class Actions seek redress for the loss in value of the class members' stock. These different forms of relief will require different discovery and will **[*9]** require this Court to make distinct factual and legal findings. Likewise, the Class Actions will require the Court to decide whether to certify a class and which attorney to appoint as class counsel. Such a determination, which is not required in the International Action, will, in most likelihood, require discovery and substantial time to brief all the relevant legal and factual issues. Similarly, while the International Action names six defendants, the Class Actions seek recovery from not only these six but from International, its former outside auditor, and its current and former board members. Consequently, this Court finds granting the motion to reassign will not likely result in substantial judicial savings, as required by subsection (b)(2).

Accordingly, this Court DENIES the Motion for Finding of Relatedness and Reassignment of Actions.

**CONCLUSION**

For the reasons discussed, the Court DENIES the Motion for Finding of Relatedness and Reassignment of Actions. It is so ordered.

**BLANCHE M. MANNING**

**U.S. DISTRICT COURT JUDGE**

**DATE:** 5-3-04

End of Document

---

Court finds it closely analogous to the present matter.

[3] In making this finding, Judge Guzman acknowledged that "there would be some degree of savings of judicial time and effort," but not "substantial savings" as required by subsection (b)(2).

# EXHIBIT M

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 6.3.1
### Eastern Division

Karamelion LLC

Plaintiff,

v.                                          Case No.: 1:19–cv–06329
                                            Honorable Edmond E. Chang

Elexa Consumer Products, Inc.

Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, January 29, 2020:

 MINUTE entry before the Honorable Edmond E. Chang: On consideration of the joint motion [21] to reassign Karamelion v. Fibar USA, Case No. 19–cv–6330, the Court denies the motion. Although it certainly is understandable why the parties filed the motion, Local Rule 40.4(b)(4) is not satisfied here. Specifically, the cases are not "susceptible of disposition in a single proceeding." It is true that there is some overlap in the asserted claims and the anticipated defenses, but it is not likely that a single trial would be convened to resolve the dispute as to both Defendants, because they have different products. It is worth noting that, in some patent cases asserting infringement of the same patent against separate defendants, the District Court has granted requests for consolidated pretrial discovery (and sometimes has done so sua sponte) and, if appropriate, consolidated claim construction, all under Internal Operating Procedure 13(e) (available online at the same page as the Local Rules). That might be appropriate at some point for these two cases (after the dismissal–motion practice in the Fibar case, assuming the motion is denied), so the parties may consider that possibility later (and nothing prevents the parties in both cases from coordinating as much as practicable amongst themselves). But the motion to reassign [21] is denied. Mailed notice(mw, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

# EXHIBIT N

 Caution
As of: May 4, 2020 2:26 PM Z

# *DBD Franchising, Inc. v. DeLaurentis*

United States District Court for the Northern District of Illinois, Eastern Division

June 23, 2009, Decided; June 23, 2009, Filed

No. 09 C 669

**Reporter**
2009 U.S. Dist. LEXIS 52890 *; 2009 WL 1766751

DBD FRANCHISING, INC. and DINNER BY DESIGN, INC., Plaintiffs, v. SHARYN M. DeLAURENTIS, Defendant.

## Core Terms

cases, reassignment, collusion, parties, diversity jurisdiction, magistrate judge, motion to dismiss, diverse, incorporation, transfers, district judge, dissolved, subject matter jurisdiction, assigned, single proceeding, shareholder, reasons, argues, courts

## Case Summary

### Procedural Posture

Plaintiff Wisconsin corporations filed suit against defendant for breach of contract. Before the court was plaintiffs' motion for reassignment and defendant's motion to dismiss pursuant to *Fed. R. Civ. P.12(b)(1)*.

### Overview

Plaintiffs asserted subject matter jurisdiction based on diversity of the parties. In her motion to dismiss, defendant argued that the shareholders converted one corporation's state of incorporation to Wisconsin and transferred the dissolved a second corporation's Illinois' assets from one shareholder to the newly incorporated Wisconsin corporation in an attempt to manufacture diversity. The court found that defendant had not offered

any evidence to indicate that plaintiffs' change in corporate status was undertaken solely to fabricate diversity jurisdiction, other than pointing to the suspicious timing and circumstances of the transfers. Additionally, one of the shareholders explained that plaintiffs had physically moved to Wisconsin, were not conducting business in Illinois, and had intended to change their corporate status for some time. Next, the court found that plaintiffs satisfied N.D. Ill. Loc. R. 40.4's requirements for reassignment. The court was convinced that judicial economy required that the two cases be decided by the same judge. The court reasoned that the two cases involved interpretation of the same Agreement and involved similar questions of fact and law.

### Outcome

Plaintiffs' motion was granted. Defendant's motion was denied.

## LexisNexis® Headnotes

Civil Procedure > ... > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview

Evidence > Burdens of Proof > Allocation

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

2009 U.S. Dist. LEXIS 52890, *52890

*HN1*[⬇] **Subject Matter Jurisdiction, Jurisdiction Over Actions**

*Fed. R. Civ. P. 12(b)(1)* requires dismissal of claims over which the federal court lacks subject matter jurisdiction. Jurisdiction is the power to decide, and must be conferred upon the federal courts. In reviewing a *Rule 12(b)(1)* motion to dismiss for lack of subject matter jurisdiction, the court may look beyond the complaint to pertinent evidence submitted by the parties. The plaintiff faced with a properly supported *Rule 12(b)(1)* motion to dismiss bears the burden of proving that the jurisdictional requirements have been met.

Civil Procedure > Parties > Joinder of Parties > Collusive Joinder

Civil Procedure > ... > Jurisdiction > Diversity Jurisdiction > General Overview

*HN2*[⬇] **Joinder of Parties, Collusive Joinder**

Pursuant to *28 U.S.C.S. § 1332*, the district courts have original jurisdiction over civil actions between citizens of different states in which the amount in controversy exceeds $ 75,000. *28 U.S.C.S. § 1332(a)*. A corporation is deemed to be a citizen of both the state where it is incorporated and the state where it maintains its principal place of business, and citizenship is determined as of the date the lawsuit is filed. *28 U.S.C.S. § 1332(c)(1)*. Additionally, *28 U.S.C.S. § 1359* provides that a district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court. *28 U.S.C.S. § 1359*.

Business & Corporate Law > Corporations > Dissolution & Receivership > General Overview

*HN3*[⬇] **Corporations, Dissolution & Receivership**

Whatever assets a dissolved corporation has belong to the former shareholders, subject to the rights of creditors.

Business & Corporate

Law > Corporations > Dissolution & Receivership > General Overview

*HN4*[⬇] **Corporations, Dissolution & Receivership**

See *805 ILCS 5/12.30(c)(1)*.

Business & Corporate Law > ... > Dissolution & Receivership > Termination & Winding Up > General Overview

*HN5*[⬇] **Dissolution & Receivership, Termination & Winding Up**

All corporate formalities must be adhered to throughout the winding down process until the ultimate distribution of the proceeds of the sale to the shareholders. To treat corporate funds as personal funds at this stage of the wind down ignores the superior rights of creditors, employees, and others who have claims against the corporation.

Civil Procedure > Parties > Joinder of Parties > Collusive Joinder

Civil Procedure > ... > Jurisdiction > Diversity Jurisdiction > General Overview

*HN6*[⬇] **Joinder of Parties, Collusive Joinder**

*28 U.S.C.S. § 1359* prohibits diversity jurisdiction when an assignor assigns a legal claim but retains an interest in that claim, the assignee had no previous connection to the assigned claim, and the assignment was made solely to create diversity jurisdiction.

Civil Procedure > Parties > Joinder of Parties > Collusive Joinder

Civil Procedure > ... > Jurisdiction > Diversity Jurisdiction > General Overview

*HN7*[⬇] **Joinder of Parties, Collusive Joinder**

A corporation's transfer of its assets to a newly created diverse corporation, followed by the dissolution of the former, non-diverse corporation, was not collusive and did not prohibit diversity jurisdiction under *28 U.S.C.S. § 1332*.

2009 U.S. Dist. LEXIS 52890, *52890

Civil Procedure > Parties > Joinder of Parties > Collusive Joinder

Evidence > Inferences & Presumptions > Presumptions

Civil Procedure > ... > Jurisdiction > Diversity Jurisdiction > General Overview

Evidence > Inferences & Presumptions > Presumptions > Rebuttal of Presumptions

**HN8[⬇]** **Joinder of Parties, Collusive Joinder**

Some circuits have adopted a presumption that transfers and assignments between related entities are collusive. This presumption of collusion can only be rebutted by offering evidence that the transfer was made for a legitimate business purpose unconnected with the creation of diversity jurisdiction. The Seventh Circuit, however, has explicitly rejected the adoption of such a presumption.

Civil Procedure > Parties > Joinder of Parties > Collusive Joinder

Civil Procedure > ... > Jurisdiction > Diversity Jurisdiction > General Overview

**HN9[⬇]** **Joinder of Parties, Collusive Joinder**

In rejecting a presumption of collusion for assignments or transfers between related parties, the Seventh Circuit instructs courts to make a factual determination of whether the assignment was collusive, in the relevant sense of being motivated by the assignor's desire to obtain access to a federal court under the diversity jurisdiction.

Civil Procedure > Judicial Officers > Judges > General Overview

Governments > Courts > General Overview

**HN10[⬇]** **Judicial Officers, Judges**

N.D. Ill. Loc. R. 40.4 provides a mechanism for parties to request the reassignment of a later-filed case to a judge presiding over an earlier-filed, related case. N.D. Ill. Loc. R. 40.4. Typically, such a motion for reassignment is presented to the judge presiding over the lower-numbered case. N.D. Ill. Loc. R. 40.4(c). However, where the lower-numbered case is assigned to a magistrate judge on the consent of the parties and the higher-numbered case is assigned to a district judge, the motion is presented to the district judge. N.D. Ill. Loc. R. 40.4(c). In order for the court to grant a motion for reassignment, the movant must first demonstrate that one of the following conditions is satisfied: (1) the cases involve the same property; (2) the cases involve some of the same issues of fact or law; (3) the cases grow out of the same transaction or occurrence; or (4) in class action suits, one or more of the classes involved in the cases is or are the same.

Civil Procedure > Judicial Officers > Judges > General Overview

Governments > Courts > General Overview

**HN11[⬇]** **Judicial Officers, Judges**

N.D. Ill. Loc. R. 40.4(b) requires that: (1) both cases are pending in the court; (2) the handling of both cases by the same judge is likely to result in a substantial saving of judicial time and effort; (3) the earlier case has not progressed to the point where designating a later filed case as related would be likely to delay the proceedings in the earlier case substantially; and (4) the cases are susceptible of disposition in a single proceeding. N.D. Ill. Loc. R. 40.4(b).

Civil Procedure > Judicial Officers > Magistrates > Trial by Consent

**HN12[⬇]** **Magistrates, Trial by Consent**

Magistrate judges are authorized to conduct any or all proceedings in a jury or nonjury civil matter with the consent of the parties and when they have been specially designated to exercise such jurisdiction by the district court. *28 U.S.C.S. § 636(c)(1)*; *Fed. R. Civ. P. 73*. Without such consent, a magistrate judge does not have full authority to issue dispositive orders, conduct trial, or enter final judgment. Consent can only be vacated when a party shows extraordinary circumstances. *Fed. R. Civ. P. 73(b)(3)*.

Governments > Courts > Rule Application & Interpretation

*HN13*[⬇]  **Courts, Rule Application & Interpretation**

A local rule may not be inconsistent with the Constitution, a statute of the United States, or with a national rule governing the conduct of litigation in the United States courts.

**Counsel: [*1]** For DBD Franchising, Inc., Dinner by Design, Inc., Plaintiffs: Jonathan M. Cyrluk, Joseph J. Duffy, LEAD ATTORNEYS, Stetler & Duffy, Ltd., Chicago, IL; Henry M. Baskerville, Stelter & Duffy, Ltd., Chicago, IL.

For Sharyn M. DeLaurentis, Defendant: William Gibbs Sullivan, LEAD ATTORNEY, Mason N. Floyd, Martin, Brown & Sullivan, Ltd., Chicago, IL.

**Judges:** Honorable Marvin E. Aspen, United States District Judge.

**Opinion by:** Marvin E. Aspen

# Opinion

## MEMORANDUM OPINION AND ORDER

Plaintiffs DbD Franchising, Inc., a Wisconsin corporation ("DbDFI - Wisconsin"), and Dinner by Design, Inc., also a Wisconsin corporation ("DbD - Wisconsin") (collectively, the "DbD Plaintiffs") filed a complaint for breach of contract against Defendant, Sharyn DeLaurentis, on February 2, 2009. Presently before us is the DbD Plaintiffs' motion for reassignment as related and DeLaurentis's motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(1)*. For the following reasons, we deny DeLaurentis's motion and grant the DbD Plaintiffs' motion.

## BACKGROUND

1

In 2003, Julie Duffy incorporated Dinner by Design, Inc. in Illinois ("DbD - Illinois"). (DbD Resp. to DeLaurentis's Mot. to Dismiss at 3 (hereinafter, "DbD Resp."), Ex. A, Julie Duffy Decl. P 2.) DbD - Illinois provided ready-to-cook meals to its customers. (Compl. P 1; DbD Resp. at 3.) At the time of its incorporation, Julie Duffy and her husband, Patrick Duffy, lived in Illinois. (DbD Resp. at 3.) In 2004, Julie Duffy incorporated DbD Franchising, Inc. as an Illinois corporation ("DbDFI - Illinois"), for the purpose of franchising the Dinner by Design concept (DbDFI - Illinois and DbD - Illinois are collectively referred to as the "Illinois companies"). (*Id.*) DbDFI - Illinois sold approximately 90 franchises over the next two years. **[*3]** (*Id.*) However, in 2006, the Duffys sold their business to DeLaurentis, pursuant to a written agreement ("Agreement"). (Compl. P 1.) Although DeLaurentis purchased the Illinois companies' assets, Julie Duffy remained the sole shareholder of both Illinois companies, whose only asset appears to be their Agreement with DeLaurentis. (*See* DbD Resp. at 4; DeLaurentis Reply at 4.)

In February 2008, the Duffys moved to Sister Bay, Wisconsin. (DbD Resp. at 4.) The DbD Plaintiffs contend that when the Duffys moved to Wisconsin, the Illinois companies also moved. (*Id.*) The Illinois companies did not maintain an office in Illinois and all decisions related to the companies were made in Wisconsin. (*Id.*) On April 2, 2008, the Duffys voluntarily dissolved DbD - Illinois, but left the status of DbDFI - Illinois untouched. (*Id.* at 5.) Some time before November 2008, the Duffys discussed whether to transfer DbDFI - Illinois' state of incorporation to Wisconsin and decided to do so. (*Id.* at 4.) However, the Duffys did not actually complete the transfer of

---

1 We may consider matters outside the pleading when "resolving factual questions pertaining to jurisdiction." *English v. Cowell, 10 F.3d 434, 437 (7th Cir. 1993)*; *Capitol Leasing Co. v. FDIC, 999 F.2d 188, 191 (7th Cir. 1993)* **[*2]** (quoting *Grafon Corp. v. Hausermann, 602 F.2d 781, 783 (7th Cir. 1979)* ("'The district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists.'"). Because we must determine whether we have subject matter jurisdiction to hear this case, the facts described are taken from both the complaint and additional filings.

incorporation until January 8, 2009, when DbDFI - Illinois filed a Certificate of Conversion with the Wisconsin Department of Financial Institutions, **[*4]** which created DbDFI - Wisconsin. (*Id.* at 5, Ex. E.) Similarly, on January 7, 2009, Julie Duffy incorporated a new corporation in Wisconsin, DbD - Wisconsin. (*Id.* at 6.) Simultaneously, Julie Duffy and the dissolved DbD - Illinois agreed to transfer their rights and obligations under the Agreement with DeLaurentis to DbD - Wisconsin. (*Id.*) The Duffys claim that they converted DbD - Illinois and incorporated DbD -Wisconsin because they moved to Wisconsin, their principal place of business was Wisconsin, and because they wanted the companies to enjoy the same benefit of diversity jurisdiction as they would receive in a suit against DeLaurentis. (*Id.* at 6; Patrick Duffy Decl. PP 20, 22.)

Meanwhile, on November 26, 2008 -- after DbD - Illinois was dissolved, but before either DbDFI - Illinois was converted to DbDFI - Wisconsin or DbD -Wisconsin was incorporated -- DeLaurentis filed a three-count complaint against the Duffys for fraud, violation of the Illinois Deceptive Business Practices Act ("IDBPA"), and rescission of contract, in the Circuit Court of Lake County, Illinois (the "*DeLaurentis* action"). (DeLaurentis Mem. in Support of Mot. to Dismiss at 2 (hereinafter, "DeLaurentis Mem.").) **[*5]** On January 9, 2009, the Duffys removed that case to the Northern District of Illinois. *See DeLaurentis v. Patrick & Julie Duffy*, No. 09 C 133 (N.D. Ill.). (DeLaurentis Mem. at 3; DbD Mot. for Reassignment P 3 (hereinafter, "DbD Mot.").) The DbD Plaintiffs are not parties to that action, as DeLaurentis sued the Duffys individually. In their Rule 26(f) Report submitted on January 28, 2009, the parties in the *DeLaurentis* action consented to the jurisdiction of a United States magistrate judge and the case was reassigned to Magistrate Judge Mason. (Report of Rule 26(f) Planning Meeting, Dkt. No. 11, No. 09 C 133; 3/6/2009 Order, No. 09 C 133.) The DbD Plaintiffs filed the suit before us on February 2, 2009. In it, they allege that DeLaurentis breached the Agreement. (*Id.* PP 14-21.) On March 19, 2009, the DbD Plaintiffs filed a motion for reassignment as related, asking us to reassign this case to Judge Mason. On March 31, 2009, DeLaurentis moved to dismiss the case for lack of subject matter jurisdiction.

**ANALYSIS**

**I. DeLaurentis's Motion to Dismiss Pursuant to *Rule 12(b)(1)***

**HN1**[⬆] *Rule 12(b)(1)* requires dismissal of claims over which the federal court lacks subject matter jurisdiction. Jurisdiction **[*6]** is the "power to decide," and must be conferred upon the federal courts. *In re Chicago, Rock Island & Pacific R.R. Co., 794 F.2d 1182, 1188 (7th Cir. 1986).* In reviewing a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the court may look beyond the complaint to pertinent evidence submitted by the parties. *See United Transp. Union v. Gateway W. Ry. Co., 78 F.3d 1208, 1210 (7th Cir. 1996).* The plaintiff faced with a properly supported 12(b)(1) motion to dismiss bears the burden of proving that the jurisdictional requirements have been met. *See Kontos v. U.S. Dep't of Labor, 826 F.2d 573, 576 (7th Cir. 1987).*

Plaintiffs have asserted subject matter jurisdiction based on diversity of the parties. (Compl. P 5.) **HN2**[⬆] Pursuant to *28 U.S.C. § 1332*, the district courts have original jurisdiction over civil actions between citizens of different states in which the amount in controversy exceeds $ 75,000. *28 U.S.C. § 1332(a)*. A corporation is deemed to be a citizen of both the state where it is incorporated and the state where it maintains its principal place of business, and citizenship is determined as of the date the lawsuit is filed. [2] *See 28 U.S.C. § 1332(c)(1); Aurora Loan Servs., Inc. v. Craddieth, 442 F.3d 1018, 1025 (7th Cir. 2006);* **[*7]** *Johnson v. Wattenbarger, 361 F.3d 991, 993 (7th Cir. 2004).* Additionally, *28 U.S.C. § 1359* provides that "[a] district court shall not have jurisdiction of a civil

---

[2] Because we determine jurisdiction at the time the suit was filed, the pertinent question is whether the DbD Plaintiffs were properly citizens of Wisconsin on the date the suit was filed, not whether the parties to the underlying transactions were, at the time the transaction was entered into, citizens of Wisconsin. DeLaurentis apparently argues that because DbD - Illinois and DbDFI - Illinois were incorporated in Illinois when they executed the Agreement, they cannot subsequently change their state of corporation in a manner that **[*8]** would permit diversity jurisdiction. (*See* DeLaurentis Mem. at 6 (explaining that because "the Agreement clearly identifies the sellers as Illinois corporations" and that "[n]o Wisconsin corporations was a party to the Agreement . . . [,] [t]he allegations of diversity are a contrivance to invoke jurisdiction in this Court").) This argument is incorrect. As explained herein, we must make a factual determination of whether the change in corporate status was collusive. *See Herzog Contracting Corp. v. McGowen Corp., 976 F.2d 1062, 1066-67 (7th Cir. 1992).*

action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court." *28 U.S.C. § 1359*. In her motion to dismiss, DeLaurentis argues that the Duffys converted DbDFI's state of incorporation to Wisconsin and transferred the dissolved DbD - Illinois' assets from Julie Duffy to the newly incorporated DbD - Wisconsin [3] in an attempt to manufacture diversity in contravention of *§ 1359*. (DeLaurentis Mem. at 9.) We disagree.

In *Kramer v. Caribbean Mills, 394 U.S. 823, 89 S. Ct. 1487, 23 L. Ed. 2d 9 (1969)*, the Supreme Court held that **HN6**[↑] *§ 1359* prohibited diversity jurisdiction when an assignor assigns a legal claim but retains an interest in that claim, the assignee had no previous connection to the assigned claim, and the assignment was made solely to create diversity jurisdiction. *Id. at 827-28, 89 S. Ct. at 1487*. *Kramer* explicitly stated that its holding did not affect "cases in which this Court has held that where **[*11]** the transfer of a claim is absolute, with the transferor retaining no interest in the subject matter, then the transfer is not 'improperly or collusively

_____

[3] The DbD Plaintiffs argue that the assets of DbD - Illinois transferred to its sole shareholder, Julie Duffy, after it was dissolved. (DbD Resp. at 10 (citing *Dubey v. Abam Bldg. Corp., 266 Ill. App. 3d 44, 47, 639 N.E.2d 215, 218, 203 Ill. Dec. 176 (1st Dist. 1994)* (**HN3**[↑]) "Whatever assets a dissolved corporation belong to the former shareholders, subject to the rights of creditors.").) Thus, they argue that because Julie Duffy was a citizen of Wisconsin, even if the transfer of assets to DbD - Wisconsin is considered collusive under *§ 1359*, diversity jurisdiction would still be proper because Julie Duffy would have been the proper plaintiff prior to the asset **[*9]** transfer. (DbD Resp. at 10.) DeLaurentis disagrees, contending that Julie Duffy could not assume ownership of the dissolved corporation's assets until the completion of the winding up process. (DeLaurentis Resp. at 7 (citing *805 ILCS 5/12.30(c)(1)* (**HN4**[↑]) "Dissolution of a corporation does not: [t]ransfer title to the corporation's assets."); *Lasday v. Weiner, 273 Ill. App. 3d 461, 466, 652 N.E.2d 1198, 1201, 210 Ill. Dec. 222 (1st Dist. 1995)* (**HN5**[↑]) "All corporate formalities must be adhered to throughout the winding down process until the ultimate distribution of the proceeds of the sale to the shareholders. . . . To treat corporate funds as personal funds at this stage of the wind down ignores the superior rights of creditors, employees, and others who have claims against the corporation.").

We find this point immaterial. To the extent that Julie Duffy did not assume ownership over DbD - Illinois' assets because corporate formalities were not satisfied, both Julie Duffy and DbD - Illinois were parties to the sale of DbD - Illinois' assets

made,' regardless of the transferor's motive." *Id. at 828 n.9, 89 S. Ct. at 1490*. This statement affirmatively included *Black & White Taxi Cab Co. v. Brown & Yellow Taxi Cab Co., 276 U.S. 518, 48 S. Ct. 404, 72 L. Ed. 681 (1928)*. See *Kramer, 394 U.S. at 828 n.9, 89 S. Ct. at 1490* (citing *Black & White Taxi Cab*). In *Black & White Taxi,* [4] the Supreme Court concluded that **HN7**[↑] ] a corporation's transfer of its assets to a newly created diverse corporation, followed by the dissolution of the former, non-diverse corporation, was not collusive and did not prohibit diversity jurisdiction under *§ 1332*. *276 U.S. at 524, 48 S. Ct. at 405*. It further instructed courts not to inquire into the motives of the parties where "[t]he succession and transfer were actual, not feigned or merely colorable." *Id.*

Since *Kramer,* **HN8**[↑] ] some circuits have adopted a presumption that transfers and assignments between related entities are collusive. *See, e.g., Toste Farm Corp. v. Hadbury, Inc., 70 F.3d 640, 643-44 (1st Cir. 1995)* (applying an "elevated scrutiny to assignments between affiliated parties"); *Nike, Inc. v. Comercial Iberica de Exclusivas Deportivas, S.A., 20 F.3d 987, 991-92 (9th Cir. 1994)* (adopting a presumption of collusion for assignments from a non-diverse subsidiary to a diverse parent corporation); *Prudential Oil Corp. v. Phillips Petroleum Co., 546 F.2d 469, 476 (2d Cir. 1976)* (presuming collusion where non-diverse parent company assigns claims to a diverse subsidiary that

to DbD - Wisconsin. (DbD Resp., Ex. F (listing DbD - Illinois as the "Seller," Julie Duffy as the "Shareholder," and DbD - Wisconsin as the "Buyer").) Therefore, we are concerned **[*10]** with whether this asset sale and the conversion of DbDFI -Wisconsin's state of incorporation are collusive under *§ 1359*. DeLaurentis's conclusory arguments that "money was drained out of" DbD - Illinois prior to the sale of its assets to DbD - Wisconsin in an attempt to create a judgment proof, shell corporation are inappropriate without citing any authority for those statements. (DeLaurentis Reply at 9.) Because the DbD Plaintiffs provided similar reasons for converting DbDFI - Illinois to a Wisconsin corporation as they have for establishing DbD - Wisconsin and transferring DbD - Illinois' assets to it, we consider the two actions jointly in determining whether diversity jurisdiction is prohibited by *§ 1359*.

[4] Although *Black & White Taxi* preceded the enactment of *§ 1359*, it interpreted one of *§ 1359*'s predecessor statutes, *26 U.S.C. § 80 (1940 ed.)*. *Black & White Taxi, 276 U.S. at 524, 48 S. Ct. at 405* (citing 28 U.S.C. § 80; see *Kramer, 394 U.S. at 826-27, 89 S. Ct. at 1489* **[*12]** (explaining that "decisions of [the Supreme Court] under the other predecessor statute, 28 U.S.C. § 80 (1940 ed.), seem squarely in point" in analyzing *§ 1359*).

"engaged in no business other than the prosecution of that claim"). This presumption of collusion can only be rebutted "by offering evidence that the transfer was made for a legitimate business purpose unconnected with the creation of diversity jurisdiction." *Prudential Oil Corp., 546 F.2d at 476*. The Seventh Circuit, however, has explicitly rejected the adoption **[*13]** of such a presumption. [5] *Herzog, 976 F.2d at 1067*; *see also Ambrosia Coal & Constr. Co. v. Pages Morales, 482 F.3d 1309, 1314 (11th Cir. 2007)* (adopting the reasoning of the Seventh Circuit and rejecting a presumption).

**HN9**[↑] In rejecting a presumption of collusion for assignments or transfers between related parties, *Herzog* instructs courts to make a factual determination of whether the assignment was collusive, "in the relevant sense of being motivated by the assignor's desire to obtain access to a federal court under the diversity jurisdiction." *Herzog, 976 F.2d at 1066*. In *Herzog*, the plaintiff's non-diverse subsidiary assigned promissory notes issued by the defendant to the plaintiff. *Id.* The notes could only be collected by filing a lawsuit, and the assignment of the notes created diversity jurisdiction. *Id. at 1066-67*. The Seventh Circuit admitted that "the timing of the assignment in relation to the parties' dispute and to the law suit[] emit[ed] an odor of collusion." *Id. at 1067*. However, it recognized that **[*14]** the district judge "was not required -- perhaps was not permitted -- to disregard the sworn evidence to the contrary submitted by [the plaintiff] and not countered by any evidence submitted by [the defendant]." *Id.* The plaintiff had submitted affidavits stating that the assignment was not made to create diversity, "but to facilitate the provision of additional capital" to its subsidiary. *Id. at 1066*. The court doubted the true value of the assignment, but refused to apply an inference of collusion simply because the parties were under common ownership. *Id. at 1066*. It reasoned that "Congress could if it wanted adopt a rule forbidding the conferral of diversity jurisdiction by assignment to an affiliated corporation but it has not done so and we are given no urgent reason to try to do so in its place even to the extent of creating a soft rule, that is, a presumption." *Id.*

Under *Herzog,* we are convinced that jurisdiction is proper. The DbD Plaintiffs concede that one reason for

the transfer of DbDFI - Illinois' state of incorporation and the creation of DbD - Wisconsin was to ensure diversity jurisdiction in a suit against DeLaurentis. (DbD Resp. at 6.) However, they also claim that there **[*15]** were other reasons for the transfer. For example, Patrick Duffy explains that the DbD Plaintiffs had physically moved to Wisconsin, were not conducting business in Illinois, and had intended to change their corporate status for some time. (DbD Resp., Ex. C, Patrick Duffy Decl. PP 20, 22.) Although we recognize that the Illinois companies had no ongoing business and their only assets were their rights under the Agreement with DeLaurentis, we cannot disregard the sworn statements that caused the incorporation of the companies in Wisconsin for reasons other than just the establishment of diversity jurisdiction. *See Herzog, 976 F.2d at 1067*.

We acknowledge that there are factually similar cases from other circuits that have adopted the opposite conclusion. *See Toste Farm, 70 F.3d at 643-45* (holding that where the main asset transferred to a diverse corporation is the legal claim and the new corporation did not have any ongoing activities after the transfer, other than the pursuit of the legal claim, the transfer was made for collusive purposes and diversity jurisdiction was prohibited by *§ 1359*); *Greater Dev. Co. of Conn., Inc. v. Amelung, 471 F.2d 338, 338 (1973)* (same). *But see Piermont Heights, Inc. v. Dorfman, 820 F. Supp. 99, 100 (S.D.N.Y. 1993)* **[*16]** (holding that the transfer of plaintiff's state of incorporation to a diverse state was not collusive); *Franco, Lewis & Co. v. Callahan, No. 94 C 1027, 1994 WL 744304, at *15 (D.N.J. Aug. 22, 1994)* (reasoning that "a company which abandons its residency and associated privileges in one state for another should not be restrained by a residency status it no longer enjoys"). Those cases applied a presumption of collusion in cases like this one, where transfers were made between related parties. *See, e.g., Toste Farm, 70 F.3d at 643-44*. Because the Seventh Circuit has rejected such a presumption, the reasoning in those cases is not directly applicable here. DeLaurentis has not offered any evidence to indicate that the DbD Plaintiffs' change in corporate status was undertaken solely to fabricate diversity jurisdiction, other than pointing to the suspicious timing and circumstances of the transfers. Under *Herzog,* that is insufficient to overcome the Dbd Plaintiffs' sworn statements. Because diversity jurisdiction is not prohibited by *§ 1359*, we deny DeLaurentis's motion to dismiss.

## II. The DbD Plaintiffs' Motion for Reassignment as Related

---

[5] Accordingly, DeLaurentis's attempted reliance on *Prudential Oil Corp.* and other similar cases applying the presumption of collusion (DeLaurentis Reply at 12-13) is misplaced.

HN10[↑] Local Rule 40.4 provides a mechanism for parties [*17] to request the reassignment of a later-filed case to a judge presiding over an earlier-filed, related case. L.R. 40.4. Typically, such a motion for reassignment is presented to the judge presiding over the lower-numbered case. Id. at 40.4(c). However, where, as here, the lower-numbered case is assigned to a magistrate judge on the consent of the parties and the higher-numbered case is assigned to a district judge, the motion is presented to the district judge. Id. In order for us to grant a motion for reassignment, the movant must first demonstrate that one of the following conditions is satisfied: "(1) the cases involve the same property; (2) the cases involve some of the same issues of fact or law; (3) the cases grow out of the same transaction or occurrence; or (4) in class action suits, one or more of the classes involved in the cases is or are the same." Id. at 40.4(a).

The DbD Plaintiffs move to reassign the case before us to Magistrate Judge Mason as related to the DeLaurentis action. (DbD Mot. at 2.) In DeLaurentis, Sharyn and Salvatore DeLaurentis, Jr. sued the Duffys for fraud, violation of the IDBPA, and rescission of contract. (DbD Mot., Ex. 1, DeLaurentis Compl.) Those claims [*18] arise from DeLaurentis's Agreement to purchase the assets of the Illinois companies. (Id.) In the case before us, the DbD Plaintiffs have sued DeLaurentis for breach of the same Agreement. (Compl. PP 22-27.) Although DeLaurentis attempts to argue that the conditions in L.R. 40.4(a) are not satisfied (DeLaurentis Resp. to DbD Plaintiff's Mot. for Reassignment at 6-7 (hereinafter DeLaurentis Resp.)), she admits that the earlier-filed "action arose from the same transaction" as the action before us (DeLaurentis Mem. at 2). Given that the actions in both cases arose from the same transaction -- the Agreement -- L.R. 40.4(a) has been met.

Before we can grant the motion for reassignment, however, the movant must also demonstrate that each of the criteria in L.R. 40.4(b) is met. HN11[↑] L.R. 40.4(b) requires that:

(1) both cases are pending in this Court; (2) the handling of both cases by the same judge is likely to result in a substantial saving of judicial time and effort; (3) the earlier case has not progressed to the point where designating a later filed case as related would be likely to delay the proceedings in the earlier case substantially; and (4) the cases are susceptible of disposition in [*19] a single proceeding.

L.R. 40.4(b). The first requirement is satisfied -- both cases are pending in the Northern District of Illinois. The second criteria is also met. The disposition of both cases will require a court to consider the meaning of and the facts surrounding the Agreement. If one judge handles both cases, judicial resources will be saved. DeLaurentis's argument that this condition is not satisfied is not persuasive. First, her argument makes no mention of judicial efficiency. Instead, she argues that "[w]hen the Illinois corporation known as Dinner by Design, Inc. is designated as a plaintiff in this action, or a defendant in the action pending before Judge Mason, subject matter will be destroyed." (Id.) However, the DbD Plaintiffs are not attempting to add DbD - Illinois as a party to either action. Instead, they are attempting to reassign this case, which does not include DbD Illinois as a party, to Judge Mason. This reassignment would not consolidate the two cases into one. Compare Fed. R. Civ. P. 42 with L.R. 40.4. Furthermore, we agree with the DbD Plaintiffs that DeLaurentis is merely attempting to present further arguments in support of her motion to dismiss, which [*20] we have denied. Accordingly, the second requirement is satisfied.

The third requirement is also satisfied. Both cases are fairly recent cases, only having been filed in the last six months. Although Judge Mason has issued some rulings in the case pending before him, none of those rulings have been dispositive. Furthermore, neither case has progressed past the motion to dismiss stage, "no discovery has been conducted and little judicial effort has been expended thus far." Global Patent Holdings, LLC v. Green Bay Packers, Inc., No. 00 C 4623, 2008 U.S. Dist. LEXIS 33296, 2008 WL 1848142, at * 4 (N.D. Ill. Apr. 23, 2008). Finally, we are satisfied that the fourth factor has also been met. The fourth factors require that "the cases [be] susceptible of disposition in a single proceeding." L.R. 40.4(b)(4). The DbD Plaintiffs argue that this factor is met and explain that had DeLaurentis sued them instead of the Duffys, the claims would have actually been compulsory counterclaims. (DbD Mot. P 16.) However, the Plaintiffs argue that the case cannot be disposed of in a single proceeding because they will not consent to the jurisdiction of a magistrate judge in this case, which they contend is required. (DeLaurentis Resp. [*21] at 10.) We will address that argument further below. As an initial matter, we think that both cases are susceptible to disposition in a single proceeding. Both cases involve essentially the same parties, similar factual issues, and the same Agreement. Additionally, we think it is highly likely that the same witnesses will be called in both cases. Accordingly, it appears that the cases are

susceptible to disposition in a single proceeding.

The crux of DeLaurentis's opposition to the DbD Plaintiffs' motion is that the earlier-filed case is before a magistrate judge on the consent of the parties and that, although she consented to have that case heard by Judge Mason, she has not and will not give consent for this case to be heard by Judge Mason. (DeLaurentis Resp. at 5-6.) [**HN12**] Magistrate judges are authorized to "conduct any or all proceedings in a jury or nonjury civil matter" with "the consent of the parties" and when they have been "specially designated to exercise such jurisdiction by the district court." *28 U.S.C. § 636(c)(1)*; *see also Fed. R. Civ. P. 73*. Without such consent, a magistrate judge does not have full authority to issue dispositive orders, conduct trial, or enter final judgment. **[*22]** *See Roell v. Withrow, 538 U.S. 580, 582-83, 123 S. Ct. 1696, 1699-1700, 155 L. Ed. 2d 775 (2003)* (holding that such consent can be inferred); *Heft v. Moore, 351 F.3d 278, 281 (7th Cir. 2003)*. Consent can only be vacated "when a party shows extraordinary circumstances." *Fed. R. Civ. P. 73(b)(3)*; *Lorenz v. Valley Forge Ins. Co., 815 F.2d 1095, 1097 (7th Cir. 1987)* (holding that allowing plaintiffs to amend their complaint to request $ 10,000,000 in punitive damages when the original complaint only sought $ 150,000 in punitive damages did not constitute extraordinary circumstances).

DeLaurentis argues that interpreting *L.R . 40.4* to allow the reassignment of a case pending before a district judge to a magistrate judge presiding over a related case without the parties' consent is impermissible because it conflicts with *28 U.S.C. § 636*. (DeLaurentis Resp. at 5 (citing *Fed. R. Civ. P. 83* ("A local rule must be consistent with . . . federal statutes and rules.") and *United States v. Claros, 17 F.3d 1041, 1044-45 (7th Cir. 1994)* (**HN13**) "A local rule may not be inconsistent with the Constitution, a statute of the United States, or with a national rule governing the conduct of litigation in the United States courts.").) **[*23]** She further argues that the drafters of *L.R. 40.4* recognized the limitations that *§ 636* places on magistrate judges, as demonstrated by the exception they created for filing a motion for reassignment before the district judge presiding over the later-filed case when the earlier-filed case is before a magistrate judge on consent. (DeLaurentis Resp. at 5-6.) We disagree with DeLaurentis's argument that this exception demonstrates the drafter's knowledge that reassigning a case as related to a magistrate judge without their consent is prohibited by statute. Instead, the fact that the drafters included such an exception regarding where

to file a motion demonstrates that they considered this situation and decided not to prohibit such a reassignment in its entirety. We have found no case law and the parties have not presented any authority addressing whether reassignment of a related case to a magistrate judge is inappropriate where the parties, although having consented in the earlier case, have not consented to the magistrate judge's jurisdiction for the later case. Because the two cases involve interpretation of the same Agreement and involve similar questions of fact and law, and the **[*24]** DbD Plaintiffs have satisfied L.R. 40.4's requirements for reassignment as related, we are convinced that judicial economy requires that they be decided by the same judge. Accordingly, the case is reassigned to Judge Mason. [6]

## CONCLUSION

For the reasons set forth above, we deny DeLaurentis's motion to dismiss and grant the DbD Plaintiffs' motion to reassign.

/s/ Marvin E. Aspen

Honorable Marvin E. Aspen

United States District Judge

Date: June 23, 2009

**End of Document**

---

[6] We note that Judge Bucklo, the district judge assigned to the first-filed action, may decide, either "[o]n [her] own for good cause" or if DeLaurentis shows "extraordinary circumstances," to vacate the referral to Judge Mason. *See Fed. R. Civ. P. 73(b)(3)*.

# EXHIBIT O

ⓘ Cited
As of: May 4, 2020 2:28 PM Z

# *Williams v. Walsh Constr.*

United States District Court for the Northern District of Illinois, Eastern Division

January 16, 2007, Decided

No. 05 C 6807

**Reporter**
2007 U.S. Dist. LEXIS 3970 *; 2007 WL 178309

ALPHONSO WILLIAMS, Plaintiff, v. WALSH CONSTRUCTION, Defendants.

## Core Terms

cases, reassignment, discovery, allegations, scheduled, savings

**Counsel:** **[*1]** For Alphonso Williams, Plaintiff: Michael Irving Leonard, LEAD ATTORNEY, Meckler, Bulger & Tilson, Chicago, IL.

For Walsh Construction, Defendant: Tom H. Luetkemeyer, LEAD ATTORNEY, Scott M Gilbert, Hinshaw & Culbertson LLP, Chicago, IL; Aimee Elizabeth Delaney, Hinshaw & Culbertson, Chicago, IL.

**Judges:** JOHN W. DARRAH, United States District Court Judge.

**Opinion by:** JOHN W. DARRAH

## Opinion

### MEMORANDUM OPINION AND ORDER

Plaintiff, Alphonso Williams, filed suit against Defendant,

Walsh Construction, alleging race discrimination, harassment, and retaliation in violation of *Title VII of the Civil Rights Act of 1964*. Presently before the Court is Defendant's Motion for Reassignment of an allegedly related case pursuant to *Local Rule 40.4*.

### BACKGROUND

On December 1, 2005, Williams filed suit in this Court against his former employer, Walsh Construction ("the Williams case"). Williams alleged that he was employed by Walsh from September 2000 until his termination on February 10, 2002. At the time of his termination, Williams was a Labor Supervisor. Based on Williams' race, African-American, Walsh: reduced his hours of work; denied him the means to perform his duties, including tools **[*2]** and a truck to carry tools; treated non-African-American employees more favorably; denied Williams' incentive and bonus pay; and forced Williams to single out other African-American employees for termination. Williams' claims are: race discrimination, harassment, and retaliation in Violation of Title VII and *42 U.S.C. § 1981*.

In early 2006, the parties in the Williams case engaged in settlement negotiations, which were unsuccessful. Thereafter, the case was scheduled for a April 30, 2007 jury trial, with discovery closing on December 26, 2006, and a pretrial conference scheduled for April 26, 2007.

On July 28, 2006, Wallace Bolden and eleven other named plaintiffs filed a class-action complaint against Walsh ("the Class Action"). This later suit, 06 C 4104, was assigned to Judge Joan H. Lefkow. The named plaintiffs in the Class Action were laborers, labor supervisors, and labor foremen. The Class Action alleges that Walsh discriminated against African-American employees from January 2001 though the present by laying-off, discharging, constructively discharging, and/or failing to hire African-Americans. The eleven counts of the Class Action are race

2007 U.S. Dist. LEXIS 3970, *2

discrimination, [*3] retaliation, and termination in violation of Title VII and _42 U.S.C. § 1981_. The allegations that form the basis of the claims include: a hostile work environment, disparate impact, denial of overtime, receipt of more dangerous assignments because of race, retaliation for complaining of sexual harassment, and refusal to hire or rehire based on race.

Pursuant to Judge Lefkow's October 31, 2006 Minute Order, non-expert class-certification discovery for the Class Action is to be completed by June 15, 2007; and plaintiffs' motion for class certification is to be briefed as follows: motion to be filed by November 16, 2007, response due by December 14, 2007, and reply brief due by January 28, 2008.

Williams and the Class Action plaintiffs oppose reassignment of the Class Action.

**LEGAL STANDARD**

In reviewing a motion to reassign a case on the basis of relatedness, the moving party must satisfy the requirements of both LR 40.4(a) and 40.4(b). _Hollinger Int'l, Inc. v. Hollinger, Inc., 2004 U.S. Dist. LEXIS 7883, 2004 WL 1102327, at *1 (N.D. Ill. May 5, 2004)_ (_Hollinger_). The court has discretion to reassign the case pursuant to _LR 40.4_. _Clark v. Ins. Car Rentals Inc., 42 F. Supp. 2d 846, 847 (N.D. Ill. 1999)_ [*4] (_Clark_). Under LR 40.4(a), "[t]wo or more civil cases may be related if: "(1) the cases involve the same property; (2) the cases involve some of the same issues of fact or law; (3) the cases grow out of the same transaction or occurrence; or (4) in class-action suits, one or more of the classes involved in the cases is or are of the same." _LR 40.4_. Only one of the above conditions must be met to satisfy LR 40.4(a).

Once the cases are determined to be related under LR 40.4(a), LR 40.4(b) requires more stringent criteria for the case to qualify for reassignment. _See Clark, 42 F. Supp. 2d at 848_. LR 40.4(b) requires that to be reassigned: "(1) both cases are pending in this Court; (2) the handling of both cases by the same judge is likely to result in a substantial saving of judicial time and effort; (3) the earlier case has not progressed to the point where designating a later-filed case as related would be likely to substantially delay the proceedings in the earlier case; and (4) the cases are susceptible of disposition in a single proceeding." Under 40.4(b)(2), the judicial savings alleged by the moving party must be substantial; a mere assertion that some judicial [*5]

time and effort would be saved by reassignment is insufficient. _Hollinger, 2004 U.S. Dist. LEXIS 7883, 2004 WL 1102327 at *2_ (citing _Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc., 2003 U.S. Dist. LEXIS 7466, 2003 WL 21011757 at *2 (N.D. Ill. May 5, 2003)_). Likewise, if the cases will require different discovery, legal findings, defenses or summary judgment motions, it is unlikely that reassignment will result in a substantial judicial savings. _See Hollinger, 2004 U.S. Dist. LEXIS 7883, 2004 WL 1102327 at*2_; _Donahue v. Elgin Riverboat Resort, 2004 U.S. Dist. LEXIS 19362, 2004 WL 2495642 at * 1 (N.D. Ill. Sept. 28, 2004)_ (_Donahue_). Also, cases are rarely susceptible to disposition in one proceeding pursuant to 40.4(b)(4) where the cases involve unique issues of law and fact and those unique characteristics are dominant. _See Mach. Movers, Riggers & Mach. Erectors, Local 136 Defined Contribution Ret. Fund v. Joseph/Anthony, Inc., 2004 U.S. Dist. LEXIS 13631, 2004 WL 1631646 at *4 (N.D. Ill. July 16, 2004)_ (_Machinery Movers_) (citing _Clark, 42 F. Supp. 2d at 849_); _see also Donahue, 2004 U.S. Dist. LEXIS 19362, 2004 WL 2495642 at * 1_ (motion to reassign denied where all cases involved Title VII claims, but each [*6] case was based on a unique set of facts different from every other case involved).

In addition, LR 40.4(c) requires that a motion to reassign: "(1) set forth the points of commonality of the cases in sufficient detail to indicate that the cases are related within the meaning of section (a) and (2) indicate the extent to which the conditions required by section (b) will be met if the cases are found to be related." These provisions "impose an obligation on the moving party to specifically identify why each of the four conditions under LR 40.4(b) is met." _Mach. Movers, 2004 U.S. Dist. LEXIS 13631, 2004 WL 1631646 at *3 (N.D. Ill. July 16, 2004)_; _Lawrence E. Jaffe Pension Plan, 2003 U.S. Dist. LEXIS 7466, 2003 WL 21001757 at *3_. Thus, a motion for reassignment may be denied if a party fails to sufficiently plead each of 40.4(b)'s requirements. _Mach. Movers, 2004 U.S. Dist. LEXIS 13631, 2004 WL 1631646 at *3_.

**ANALYSIS**

Both cases involve _some_ of the same issues of fact or law; accordingly, the cases are related under LR 40.4(a). However, Walsh has failed to demonstrate that the cases satisfy all of the requisite criteria of LR 40.4(b). While the cases are both pending in court in this district, Walsh has [*7] failed to demonstrate that: (1) handling of both cases would likely result in a

2007 U.S. Dist. LEXIS 3970, *7

substantial savings of judicial time and effort; (2) the Williams case has not progressed to a point where reassigning the later-filed case would likely substantially delay the proceedings in the Williams case; and (3) the cases are susceptible of disposition in a single proceeding.

Walsh argues that reassigning the Class Action would likely result in a substantial savings of judicial time and effort because of the similar allegations and claims between the plaintiffs. While some of the claims and allegations are similar in both suits, the Class Action contains allegations and claims that are not present in the Williams suit. The most obvious distinction is the extensive discovery and motion practice involved in the class allegations that are not present in the Williams case. Furthermore, in light of the different claims and specific supporting allegations, a finding in one case would not likely be dispositive of any issues in the other cases. *See Donahue, 2004 U.S. Dist. LEXIS 19362, 2004 WL 2495642 at *3*. Thus, the cases are not likely to reach disposition in a single proceeding.

More significantly, the Williams **[*8]** case has progressed to a point where reassigning the Class Action would substantially delay the proceedings in the Williams case. The parties in the Williams case have unsuccessfully attempted to settle the case. Discovery in the Williams case is scheduled to close December 26, 2006; and trial is scheduled for April 30, 2007. On the other hand, non-expert class discovery for the Class Action is not scheduled to close until June 15, 2007; and the motion for class certification will not be fully briefed until January 28, 2008. Accordingly, without reassignment, the Williams case is scheduled to progress through trial before non-expert class discovery is scheduled to close and more than six months before the motion for class certification will be decided. Clearly, reassignment would result in a *significant* delay in the Williams case if the class-action discovery, briefing and certification schedule were imposed on this case through reassignment of Judge Lefkow's case to this Court.

Based on the above, LR 40.4(b) has not been met. Accordingly, Walsh's Motion for Reassignment is denied.

## CONCLUSION

For the reasons stated above, Walsh's Motion for Reassignment is denied.

Dated: **[*9]** January 16, 2007

JOHN W. DARRAH

United States District Court Judge

**End of Document**

John Bjork

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| FAIR ISAAC CORPORATION, | Case No. 1:17-cv-08318 |
| Plaintiff/Counterclaim Defendant, | |
| v. | Honorable Sharon Johnson Coleman |
| TRANS UNION LLC, | |
| Defendant/Counterclaim Plaintiff. | |

## [PROPOSED] ORDER

Having considered the Movants' Motion to Reassign Cases as Related (the "Motion") and finding that the Class Actions[1] are related to this case within the meaning of Local Rule 40.4, the Court GRANTS the Motion.

IT IS SO ORDERED this _____ day of _____, 2020.

_____
Honorable Sharon Johnson Coleman,
U.S.D.J.

---

[1] The "Class Actions" are *Sky Federal Credit Union v. Fair Isaac Corp.*, No. 20-cv-02114; *First Choice Federal Credit Union v. Fair Isaac Corp.*, No. 20-cv-02516; *Amalgamated Bank v. Fair Isaac Corp.*, No. 20-cv-02533; *Alcoa Community Federal Credit Union v. Fair Isaac Corp.*, No. 20-cv-02559; and *Getten Credit Company v. Fair Isaac Corp.*, No. 20-cv-02651.